IN THE UNITED STATES DISTRICT COURT RECEIVED
FOR THE MIDDLE DISTRICT OF ALABAMA

ALABAMA DISABILITIES ADVOCACY )                    2007 MAY 16  P 3: 34
PROGRAM,                       )
                               )
        Plaintiff,             )          **COMPLAINT**
                               )
    v.                         )          Civil Action No. 2:07-cv-434-MEF
                               )
J. WALTER WOOD, JR. in his official )
Capacity as Executive Director of the )
Alabama Department of Youth Services, )
                               )
        Defendant.             )

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### PRELIMINARY STATEMENT

1. The Alabama Disabilities Advocacy Program ("ADAP") is a nonprofit organization authorized by Congress to protect and advocate for the civil rights of persons with disabilities in Alabama. This complaint is related to a similar complaint filed in this Court less than two years ago (Case 2:05-cv-01030-MHT), in which ADAP sought injunctive and declaratory relief against the Alabama Department of Youth Services ("DYS") for refusing to provide full access to ADAP's client, J.P., her records, DYS staff and other residents for the purposes of investigating allegations that J.P. was physically abused, mechanically restrained, and denied psychiatric medication by DYS staff. Subsequently, the parties were ordered to mediation, ADAP obtained access, and the case was voluntarily dismissed on May 2, 2006. See Exhibits A1-A3.

2. Since the dismissal of the 2005 complaint, DYS has engaged in a pattern and practice of refusing to provide ADAP with access to DYS residents, facilities, facility staff, and records, preventing ADAP from fully exercising the monitoring and investigatory mandates authorized to it under federal law.

1

3. ADAP brings this action against J. Walter Wood, Jr., in his official capacity as Executive Director of DYS, pursuant to the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. §§ 10801 et seq., and its implementing regulations at 42 C.F.R. §§ 51.1 et seq.; the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD Act"), 42 U.S.C. §§ 15001 et seq., and its implementing regulations at 45 C.F.R. §§ 1385 et seq.; the Protection and Advocacy of Individual Rights Program ("PAIR Act"), 29 U.S.C., §§ 794e, et seq., and its implementing regulations at 34 C.F.R. §§ 381.1 et seq.; and 42 U.S.C. § 1983.

4. ADAP seeks a permanent injunction preventing J. Walter Wood, Jr. and all agents of Mr. Wood from denying ADAP, as authorized by its federal enabling statutes and regulations, full, complete, timely access to DYS residents, facilities and facility staff as well as full, complete, timely access to records. In particular, Defendant has denied ADAP its federal statutory right under the PAIMI, PADD and PAIR Acts to:

    a. reasonable unaccompanied access, for monitoring and investigatory purposes, to public and private areas of DYS facilities, in violation of 42 C.F.R. § 51.42(b); 42 C.F.R. § 51.42 (c); 45 C.F.R. § 1386.22(f); and 45 C.F.R. § 1386.22(g);

    b. interview residents, staff and other persons as part of an abuse and neglect investigation when ADAP had probable cause to believe an incident had occurred, in violation of 42 C.F.R. § 51.42(b);

    c. provide information and training on individual rights and services provided by the P&A system, in violation of 42 C.F.R. § 51.42 (c) and 45 C.F.R. § 1386.22(g);

    d. communicate privately with facility residents, in violation of 42 C.F.R. § 51.42 (d) and 45 C.F.R. § 1386.22(h);

2

e.  access to facility incident reports and investigatory findings, in violation of 42 C.F.R. § 51.41(c)(2); and

f.  access to records of facility residents, in violation of 42 C.F.R. § 51.41 and 45 C.F.R. § 1386.22.

## JURISDICTION

5.  Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331.

6.  Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).  Defendant resides in Montgomery County, Alabama.  Ala. Code 1975 § 44-1-20 ("The principal offices of the department [of youth services] shall be located at the state capital.")

## PARTIES

7.  Plaintiff ADAP is a nonprofit organization in the state of Alabama authorized by Congressional mandate to protect and advocate for the civil rights of persons with disabilities in Alabama.  Plaintiff spends significant time and resources conducting federally authorized monitoring activities at DYS facilities like Chalkville, Vacca, and Mt. Meigs, and advocating for the rights of individuals residing in those facilities.  ADAP is charged with the duty of investigating complaints of abuse and neglect of residents of facilities like Chalkville, Vacca, and Mt. Meigs under Congressional mandate pursuant to the PAIMI, PADD and PAIR Acts.  ADAP files this complaint in its own name to redress injuries to itself and on behalf of its clients.

8.  Defendant J. Walter Wood, Jr., is the Executive Director of DYS.  DYS is the agency in the state of Alabama established to "promote and safeguard the social well-being and general welfare of the youth of the state through a comprehensive and coordinated program of public

3

services for the prevention of juvenile delinquency and the rehabilitation of delinquent youth." Ala. Code 1975 § 44-1-1.

## STATEMENT OF FACTS

### ADAP's Access authority

9. In 1975, the PADD Act established the Protections and Advocacy ("P&A") System to investigate incidents of abuse and neglect and to pursue legal, administrative and other appropriate remedies to safeguard the rights of individuals with developmental disabilities. Congress extended the protection and advocacy mandate to cover individuals with mental illness with the enactment of the PAIMI Act in 1986. The scope of the P&A system was further expanded in 1993 when the PAIR Act was enacted.

10. To receive federal funding under the PAIMI, PADD and PAIR Acts, states must have in effect a P&A system. ADAP is designated as Alabama's P&A system. The PADD, PAIMI and PAIR Acts, along with their implementing regulations, authorize ADAP to investigate incidents of abuse and neglect and to pursue legal, administrative, and other appropriate remedies to ensure that the rights of persons with physical, mental and cognitive disabilities are protected – whether those persons live in facilities or in the community. 42 U.S.C. § 15043; 42 U.S.C. § 10805; 29 U.S.C. § 794e (a) and (f). See also, Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr., 97 F.3d 492 (11th Cir. 1996).

11. Under the PAIMI Act, "any public or private residential setting that provides overnight care accompanied by treatment services" is a facility which a P&A is authorized to access and monitor.

> Facilities include, but are not limited to the following: General and psychiatric hospitals, nursing homes, board and care homes, Community housing, juvenile detention facilities, homeless shelters, and jails and

prisons, including all general areas as well as special mental health or forensic units.

42 C.F.R. § 51.2.

12. Under the PADD Act, facilities include "any setting that provides care, treatment, services and habilitation. ... Facilities include, but are not limited to the following: Community living arrangements ..., day programs, juvenile detention centers, hospitals, nursing homes, homeless shelters, jails and prisons."    45 C.F.R. § 1386.19.

13. Under the PAIMI Act, "care" and "treatment" are defined as services:

> provided to prevent, identify, reduce or stabilize mental illness or emotional impairment such as mental health screening, evaluations, counseling, biomedical, behavioral and psychotherapies, supportive or other adjunctive therapies, medication supervision, special education and rehabilitation, even if only, "as needed" or under a contractual arrangement.

42 C.F.R. § 51.2.

14. DYS facilities like Chalkville, Vacca, and Mt. Meigs constitute facilities as described under both the PAIMI and PADD Acts.

15. The PAIMI and PADD Acts empower ADAP to investigate incidents of abuse and neglect of individuals if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred. 42 U.S.C. § 10805; 42 C.F.R. § 51.41; 42 C.F.R. § 51.42; 42 U.S.C. § 15043; 45 C.F.R. § 1386.22(a)(3).

16. To carry out ADAP's investigatory mandates, the PAIMI and PADD Acts authorize ADAP prompt access to all records of any individual who is a client of the system if the individual, or his legal guardian, conservator, or other legal representative, has authorized the system to have such access. 42 U.S.C. § 10805; 45 C.F.R. § 1386.22(a)(1);  42 U.S.C. § 15043; 42 C.F.R. § 51.41(b)(1).

17. The PAIMI and PADD Acts provide ADAP with prompt access to records of individuals who are in the custody of the state and with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe such individual has been subjected to abuse or neglect. 42 U.S.C. § 10805; 42 C.F.R. § 51.41(b)(2)(ii); 42 U.S.C. § 15043; 45 C.F.R. § 1386.22(a)(2)(ii).

18. The PAIMI and PADD Acts provide ADAP with reasonable, unaccompanied access to facilities including all areas which are used by or are accessible to residents, and to programs and their residents at all times, for the purposes of conducting a full investigation of an incident of abuse or neglect. 42 U.S.C. § 10805; 42 C.F.R. § 51.42(b); 42 U.S.C. § 15043; 45 C.F.R. § 1386.22(f).

19. The PAIMI and PADD Acts provide ADAP reasonable unaccompanied access to all residents of a facility at reasonable times to provide P&A service and contact information, rights information, monitor compliance with respect to the rights and safety of service recipients, and to view and photograph all areas of the facility which are used by residents or are accessible to residents. 42 U.S.C. § 10805; 42 C.F.R. § 51.42 (c); 42 U.S.C. § 15043; 45 C.F.R. § 1386.22(g).

20. The PAIMI and PADD Acts provide ADAP unaccompanied access to residents of facilities, including the opportunity to meet and communicate privately with such individuals regularly, both formally and informally, by telephone, mail and in person. 42 C.F.R. § 51.42 (d); 42 C.F.R. § 1386.22(h).

21. The PAIMI regulations require DYS to provide ADAP:

> (2) Reports prepared by an agency charged with investigating abuse, neglect, or injury occurring at facility rendering care or treatment, or, or by or for the facility itself, that describe any or all of the following: (i) Abuse, neglect, or injury occurring at the facility; (ii) The steps taken to investigate the incidents; (iii)

6

Reports and records, including personnel records, prepared or maintained by the facility, in connection with such reports of incidents; or (iv) Supporting information that was relied upon in creating a report, including all information and records used or reviewed in preparing reports of abuse, neglect or injury such as records which describe persons who were interviewed, physical and documentary evidence that was reviewed, and the related investigative findings."

42 C.F.R. § 51.41 (c)(2).

22. The access provisions of the three statutes are interrelated and it is clear that Congress intended that they be applied in a consistent manner. The PAIR Act expressly incorporates by reference (at 42 U.S.C. § 794e (f)) the authority regarding access to facilities and records (as well as the other general authorities granted to P&As) set forth in the PADD Act. Moreover, the preamble to the PAIMI Act regulations states that it is the goal of the Department of Health and Human Services "to ensure that all facets of the P&A system administered by the Department [i.e., the PAIMI and PADD Acts] are subject to the same requirements." 62 Fed. Reg. 53549 (Oct. 15, 1997).

23. The PAIMI Act's implementing regulations states that ADAP has the right to access all residents of a facility where those with mental illness and emotional disorders reside "despite the existence of any State or local laws or regulations which restrict informal access to minors and adults with legal guardians or conservators." 42 C.F.R. § 51.42(e).

24. In addition to lengthy citations of PADD and PAIMI access authority found in ADAP's 2005 complaint and related correspondence, ADAP has provided DYS counsel with numerous pieces of written correspondence explaining ADAP's monitoring and access authority. See Exhibits B1-B6.

**Defendant repeatedly has denied ADAP's lawful access to
DYS residents, facilities, records, and staff.**

*Chalkville*

25. On February 20, 2007, ADAP Staff Attorney Nancy Anderson provided DYS counsel, Dudley Perry, with written notice that ADAP wished to monitor the DYS Chalkville Campus on March 1st.  Anderson reminded DYS Counsel on February 20 and again on February 28th that ADAP possesses federal authority to conduct unaccompanied monitoring activities of DYS facilities "for the purposes of: 1) providing information and training on programs addressing the needs of individuals with mental illness, individual rights, and the protection and advocacy services available from ADAP; 2) monitoring compliance with respect to the rights and safety of residents; and 3) viewing and photographing all areas of the facility which are used by residents or are accessible to residents." 42 U.S.C. § 10805; 42 C.F.R. § 51.42(c).  See Exhibit C.

26. Due to statewide tornado advisories on March 1st, ADAP agreed with DYS to reschedule its Chalkville monitoring visit to March 6, 2007.

27. On March 6, 2007, ADAP Staff Attorney Andrea Mixson and Senior Case Advocate Christy Johnson arrived at the Chalkville campus. As part of ADAP's monitoring activities authorized by the PADD and PAIMI Acts, Mixson and Johnson engaged in private conversations with numerous residents regarding treatment concerns at Chalkville.  Mixson and Johnson also distributed brochures containing ADAP's contact information and a description of ADAP's programs and services. See Exhibits D and E.

28. Among the many residents who communicated privately with Mixson and Johnson on that day, three residents, J.C., B.P. and S.B., stated they desired additional confidential

8

communications with Mixson and Johnson regarding inappropriate treatment at Chalkville. After speaking briefly and confidentially with these three residents, Mixson and Johnson informed the three girls they would return for additional confidential visits as soon as possible. See Exhibits D and E.

29. On March 21, 2007, Mixson provided DYS counsel written notice that ADAP planned a second monitoring visit to Chalkville on March 27th. See Exhibit H. Mixson reminded DYS counsel that ADAP possesses federal access authority to conduct unaccompanied monitoring activities of DYS facilities "for the purposes of: 1) providing information and training on programs addressing the needs of individuals with mental illness, individual rights, and the protection and advocacy services available from ADAP; 2) monitoring compliance with respect to the rights and safety of residents; and 3) viewing and photographing all areas of the facility which are used by residents or are accessible to residents." 42 U.S.C. § 10805; 42 C.F.R. § 51.42(c). In addition, Mixson stated to DYS counsel that she and Johnson requested time to speak confidentially with residents J.C, B.P. and S.B., and requested copies of DYS records for those three residents.

30. DYS counsel responded to Mixson on March 21st, stating: "We will communicate with Chalkville and arrange for your visit next week. I will ask them to coordinate a time for your monitoring visit and visit with the girls you named." See Exhibit F.

31. On March 22, 2007, DYS counsel contacted Mixson and Anderson, requesting that the March 27th monitoring visit be postponed. See Exhibit D. Mixson emailed DYS counsel later that day stating that ADAP would agree to postpone its Chalkville monitoring to March 28th. See Exhibit G. Mixson followed-up in writing with DYS counsel to the same effect on March 22rd and March 26th. See Exhibit H.

32. Mixson and Johnson arrived at Chalkville for their second monitoring visit on March 28, 2007. They met with Ms. Tate, a DYS employee, about the purpose of the monitoring visit. Mixson and Johnson informed Ms. Tate they had arranged with DYS counsel to communicate with residents residing in the Cherokee Unit and to conduct follow-up interviews with J.C., B.P. and S.B. Mixson and Johnson informed Ms. Tate that ADAP intended to provide ADAP contact and service information to residents in the Cherokee unit and to speak privately with Cherokee residents about their treatment at Chalkville. See Exhibits D and E.

33. Ms. Tate informed Mixson and Johnson that Chalkville Director Yolanda Byrdsong had instructed her to deny ADAP access to speak with any Chalkville residents other than J.C., B.P. and S.B., and those other residents who have a disability. See Exhibits D and E.

34. Mixson and Johnson explained to Ms. Tate that ADAP has federal access authority to communicate privately with any resident of Chalkville and that ADAP planned the March 28th monitoring visit to speak with Chalkville residents who did not have an opportunity to meet and speak privately with them during their previous monitoring on March 6th. See Exhibits D and E.

35. Johnson contacted ADAP Attorney Anderson informing her of Ms. Tate's refusal to allow ADAP to speak privately with all residents of Chalkville. See Exhibit E. Anderson immediately faxed DYS counsel and Ms. Tate a letter reminding them of ADAP's access authority and included a copy of pertinent PAIMI regulations relating to P&A access for their review. See Exhibit I.

36. Following Mixson and Johnson's confidential interviews with J.C., B.P. and S.B., Mixson and Johnson restated to Ms. Tate they intended to exercise ADAP's federal access authority

to communicate privately with other Chalkville residents. Ms. Tate informed Mixson and Johnson that DYS counsel instructed her to deny ADAP's access to speak privately with any DYS resident unless that resident had a disability. Ms. Tate informed Mixson and Johnson that they would only be permitted to make a general announcement about ADAP and to distribute brochures to residents on the Cherokee Unit. Mixson and Johnson again explained to Ms. Tate that the PAIMI Act access provisions provide ADAP the authority to communicate privately with any resident of Chalkville regardless of whether they are a current client of ADAP or have a disability. See Exhibits D and E.

37. Mixson and Johnson were accompanied by Ms. Tate to the Cherokee Unit, where Mixson and Johnson distributed brochures and made a general announcement about ADAP's services. During Mixson's announcement, Ms. Tate interrupted and stated to the assembled residents that they must have a disability before they could receive assistance from ADAP. Johnson then clarified that any resident could speak privately with ADAP representatives and that ADAP has the authority to determine whether a resident has a disability. See Exhibits D and E.

### *Vacca*

38. On March 27, 2007, Johnson sent DYS counsel written notice that Mixson and Johnson planned to monitor the Vacca campus on Tuesday, April 10th. See Exhibit J. Johnson reminded DYS counsel that ADAP possesses federal access authority to conduct unaccompanied monitoring activities of DYS facilities "for the purposes of: 1) providing information and training on programs addressing the needs of individuals with mental illness, individual rights, and the protection and advocacy services available from ADAP; 2) monitoring compliance with respect to the rights and safety of residents; and 3) viewing and

11

photographing all areas of the facility which are used by residents or are accessible to residents." 42 U.S.C. §10805; 42 C.F.R. § 51.42(c).

39. DYS counsel did not respond to Johnson's March 27th correspondence or to Attorney Anderson's March 30th correspondence to the same effect. See Exhibit J.

40. Upon arriving at Vacca on April 10th for the scheduled monitoring, Ms. Delbridge informed Johnson and Mixson that DYS counsel had instructed her to prohibit ADAP from communicating with any resident or distributing any ADAP brochures or business cards to any resident unless they were currently ADAP's clients.    Ms. Delbridge also informed Johnson and Mixson that ADAP's facility access was to be limited to an accompanied tour of the Vacca grounds and buildings that was to be conducted by a security guard.   See Exhibits D and E.

*Mt. Meigs*

41. On March 5 and April 6, 2007, Mixson notified DYS counsel in writing that ADAP planned to conduct monitoring activities at the Mt. Meigs facility on April 17, 2007. See Exhibit K1-K2.   Consistent with previous correspondence from ADAP on this matter, Mixson reminded DYS counsel that ADAP possesses federal access authority to conduct unaccompanied monitoring activities of DYS facilities "for the purposes of 1) providing information and training on programs addressing the needs of individuals with mental illness, individual rights, and the protection and advocacy services available from ADAP; 2) monitoring compliance with respect to the rights and safety of residents; and 3) viewing and photographing all areas of the facility which are used by residents or are accessible to residents." 42 U.S.C. § 10805; 42 C.F.R. § 51.42(c).

42. Mixson and Johnson arrived at the Mt. Meigs facility on April 17th. Mixson and Johnson
informed the security guard that they were ADAP employees and had arranged a monitoring
with DYS counsel. The guard stated that DYS counsel had not notified him of ADAP's
monitoring and that he could not permit them to conduct monitoring activities at Mt. Meigs.
See Exhibits D and E.

43. Mixson and Johnson then spoke with Ms. Phyllis Carney, administrative assistant to DYS
counsel, who stated that ADAP was only permitted an accompanied tour of the facility and
could not speak with residents or distribute information about ADAP. Mixson explained that
ADAP's federal access authority authorized Mixson and Johnson to communicate privately
with residents, distribute ADAP information, and have unaccompanied access to the facility,
and provided the assistant with a copy of Anderson's March 28th letter to DYS counsel,
describing ADAP's federal access authority. See Exhibits D and E.

44. After she contacted DYS counsel, Ms. Carney informed Mixson that counsel denied ADAP
access to speak with residents other than current ADAP clients and denied ADAP access to
distribute ADAP information to any resident. The assistant also declared that Mixson and
Johnson would be required to be accompanied at all times on Mt. Meigs grounds by a DYS
employee. See Exhibits D and E.

*Request for D.R.'s Record*

45. On March 5, 2007, Johnson provided DYS Counsel with notice that Vacca resident, D.R.
was suffering mistreatment and verbal abuse by Vacca staff. See Exhibit L. ADAP had
received a letter from D.R. reporting abuse by staff. See Exhibit M.

46. On April 4, 2007, Johnson learned from D.R.'s case manager, Patricia Henderson, that D.R.
had been hospitalized at Children's Hospital in Birmingham for elevated blood levels and a

possible self-administered medication overdose. Later on April 4th, Johnson reviewed D.R.'s

DYS case file at the Vacca campus and requested a copy of it from Vacca Administrator

Delbridge. Ms. Delbridge informed Johnson that a copy of D.R.'s record would be available

for Johnson on ADAP's April 10 2007 monitoring visit to Vacca. See Exhibit E.

47. On April 10, 2007, Johnson met with Ms. Delbridge and reminded her that ADAP requested

copies of D.R.'s records on April 4, 2007 and that she had stated she would provide copies of

those records to Johnson during the scheduled April 10th Vacca monitoring. Ms. Delbridge

replied that she would not provide ADAP with copies of D.R.'s record until D.R. was

released from the hospital and had signed an authorization for release of records. See

Exhibits D and E. As of the date of this filing, DYS has neither provided ADAP copies of

the child's records, as required under 42 C.F.R. § 51.41, nor provided ADAP with a written

explanation as to why it has refused to provide them, as required under 42 C.F.R. § 51.43 --

six weeks after ADAP first requested them.

*Requests for Incident Reports and Investigative Findings*

48. On November 29, 2006, ADAP sent a written request for the DYS incident reports and

investigative findings regarding three clients, W.B., H.M. and K.W, male residents of Vacca

and Mt. Meigs whom ADAP had probable cause to believe suffered abuse or neglect while in

DYS custody. See Exhibit N. On April 20, 2007, ADAP again made a written request that

these reports be forwarded to ADAP. See Exhibit O. As of the date of this filing, DYS has

neither provided ADAP copies of the incident reports and investigatory findings regarding

these three clients, as required under 42 C.F.R. § 51.42, nor provided ADAP with a written

explanation as to why it has refused to provide them, as required under 42 C.F.R. § 51.43.

14

49. On April 20, 2007, ADAP sent a written request for copies of incident reports and investigative findings prepared by DYS regarding J.C., B.P. and S.B., residents at Chalkville whom ADAP had probable cause to believe suffered abuse or neglect while in DYS custody. See Exhibit O. As of the date of this filing, DYS has neither provided ADAP copies of the incident reports and investigatory findings regarding these three clients, as required under 42 C.F.R. § 51.42, nor provided ADAP with a written explanation as to why it has refused to provide them, as required under 42 C.F.R. § 51.43.

50. On April 20, 2007, ADAP sent a written request for copies of all investigative reports prepared by any agency charged with investigating abuse or neglect, or injury occurring at Vacca, Chalkville and Mt. Meigs within the last 6 months. ADAP requested that these reports be forwarded to ADAP by May 4, 2007. See Exhibit O. As of the date of this filing, DYS has neither provided ADAP copies of the requested incident reports and investigatory findings, as required under, 42 C.F.R. § 51.42, nor provided ADAP an explanation as to why it has refused to provide them, as required under 42 C.F.R. § 51.43.

51. Plaintiff does not have an adequate remedy at law and will be irreparably harmed if the Defendant is permitted to continue prohibiting ADAP from:

   a) having reasonable unaccompanied access, for monitoring and investigatory purposes, to public and private areas of DYS facilities;

   b) interviewing facility service recipients, staff and other persons as part of abuse and neglect investigations when ADAP has probable cause to believe an incident has occurred;

   c) providing information and training about individual rights and services provided by the P&A system;

    d)  communicating privately with facility residents;

    e)  accessing facility incident reports, investigatory findings; and records; and

    f)  accessing residents' records.

## CAUSE OF ACTION

52. The policies, procedures, regulations, practices and customs of the Defendant, acting under color of law, violate and continue to violate the rights of the Plaintiff to full, complete, prompt access to DYS facilities, staff, residents and records, in violation of the Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. §§ 10801 et seq., and its implementing regulations at 42 C.F.R. §§ 51.1 et seq.; the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. §§ 15001 et seq., and its implementing regulations at 45 C.F.R. §§ 1385 et seq.; the Protection and Advocacy of Individual Rights Program, 29 U.S.C., §§ 794e, et seq. and its implementing regulations at 34 C.F.R. §§ 381.1 et seq.; and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

53. Wherefore, Plaintiff respectfully requests that this Court:

    a)  Grant injunctive relief enjoining the Defendant and his agents and employees from denying ADAP full, complete, timely access to DYS residents, facilities and facility staff to conduct monitoring activities and abuse and neglect investigations as well as full, complete, timely access to records, including those of ADAP client D.R.;

    b)  Issue a declaratory judgment that the Defendant's polices, regulations, and practices of denying ADAP full, complete and timely access to DYS residents, facilities, facility staff and records to monitor and to conduct abuse and neglect investigations violate the PAIMI, PADD and PAIR Acts;

c) Award Plaintiff reasonably necessary attorneys' fees and costs pursuant to 28 U.S.C. §

2202 and 42 U.S.C. § 1988; and

d) Award such other and further relief to which Plaintiff is justly entitled, at law or equity.


Respectfully Submitted,


James A. Tucker

AL Bar No: ASB-6986-T39J                                          MAY 16, 2007

E-mail: jtucker@adap.ua.edu

Nancy Anderson

AL Bar No.: ASB-3738-R67N

Email: nanderso@adap.ua.edu

Alabama Disabilities Advocacy Program

University of Alabama

Box 870395

Tuscaloosa, Alabama 35487-0395

Telephone: (205) 348-4928

Facsimile: (205) 348-3909

**ATTORNEYS FOR PLAINTIFF**


17

### Index to Plaintiff's Exhibits

**Exhibit A** (2:05-CV-1030-MHT)
    A-1 Complaint for Injunctive Relief
    A-2 Mediation Order
    A-3 Telephone Status Conference noting voluntary dismissal without prejudice

**Exhibit B**
    B-1 -4/24/06 correspondence from Nancy Anderson to Dudley Perry
    B-2 - 6/12/06 correspondence from Christy Johnson to Dudley Perry
    B-3 - 6/13/06 correspondence from Christy Johnson to Dudley Perry
    B-4 - 6/22/06 correspondence from Nancy Anderson to Dudley Perry
    B-5 - 9/12/06 correspondence from Nancy Anderson to Dudley Perry
    B-6 - 1/16/07 correspondence from Nancy Anderson to Dudley Perry

**Exhibit C** - 2/20/07 & 2/28/07 emails from Nancy Anderson to Dudley Perry

**Exhibit D** - Affidavit of Andrea Mixson

**Exhibit E** - Affidavit of Christy Johnson

**Exhibit F** - 3/21/07 emails to/from Andrea Mixson and Dudley Perry

**Exhibit G** - 3/22/07 emails to/from Andrea Mixson and Dudley Perry

**Exhibit H** - 3/22/07 & 3/26/07 emails to/from Andrea Mixson and Dudley Perry

**Exhibit I** - 3/28/07 faxed correspondence from Nancy Anderson to Ms. Tate and Dudley Perry

**Exhibit J** - 3/27/07 & 3/30/07 – email from Christy Johnson to Dudley Perry & email from Nancy Anderson to Dudley Perry

**Exhibit K**
    K-1 - 3/5/07 email from Andrea Mixson to Dudley Perry
    K-2 - 4/6/07 email from Andrea Mixson to Dudley Perry

**Exhibit L** - 3/5/07 email from Christy Johnson to Dudley Perry

**Exhibit M** - undated correspondence from D.R. to Christy Johnson

**Exhibit N** - 11/29/06 correspondence from Christy Johnson to Dudley Perry

**Exhibit O** - 4/20/07 correspondence from Christy Johnson to Dudley Perry



EXHIBIT
A1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| ALABAMA DISABILITIES ADVOCACY PROGRAM, | ) ) ) | |
| Plaintiff, | ) ) | **COMPLAINT** |
| v. | ) ) | Civil Action No. _____ |
| J. WALTER WOOD, JR. in his official capacity as Executive Director of the Alabama Department of Youth Services, | ) ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### PRELIMINARY STATEMENT

1.     Plaintiff Alabama Disabilities Advocacy Program ("ADAP") is a nonprofit organization in the state of Alabama authorized by congressional mandate to protect and advocate for the civil rights of persons with disabilities in Alabama.

2.     On October 18, 2005 and October 19, 2005, ADAP received several complaints alleging that a guard at the Chalkville facility of the Alabama Department of Youth Services ("DYS") assaulted a minor female with a mental illness, J.P., who was remanded to their care, and mechanically restrained her, in a "hog-tied" position, for an entire night.   On October 19, 2005, ADAP staff met with J.P. and obtained consent from both J.P. and her mother to access J.P.'s records and open a full investigation of the incident.

3.     ADAP has requested full access to J.P.'s records, access to J.P., access to the Chalkville facility, and access to staff and other residents of Chalkville for the purposes of investigating the alleged abuse and neglect of J.P.  DYS refused ADAP's request.

4.     ADAP brings this action against J. Walter Wood, Jr., in his official capacity as Executive Director of Alabama Department of Youth Services ("DYS"), pursuant to the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. §§ 10801 et seq. and 42 U.S.C. § 1983.  ADAP seeks a preliminary and permanent injunction preventing J. Walter Wood Jr. from denying ADAP full, complete, and timely access to the records of J.P., a minor with a mental illness confined at DYS's Chalkville facility, and full, complete, and timely access to the Chalkville facility, to J.P., and to other staff and residents of Chalkville for the purposes of conducting a full investigation of alleged abuse and neglect.

## JURSIDICTION

5.     Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331 (federal question).

6.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).  Defendant resides in Montgomery County, Alabama.  Ala. Code 1975 § 44-1-20 ("The principal offices of the department [of youth services] shall be located at the state capital.").

## PARTIES

7.     Plaintiff Alabama Disabilities Advocacy Program ("ADAP") is a nonprofit organization in the state of Alabama authorized by congressional mandate to protect and advocate for the civil rights of persons with disabilities in Alabama.  Plaintiff spends significant time and resources monitoring conditions at detention facilities, including facilities like those at Chalkville, and in advocating for the rights of individuals residing in those facilities.  ADAP also is charged with the duty of investigating complaints of abuse and neglect of residents of facilities like Chalkville.  ADAP is

authorized to perform its Congressional mandate pursuant to the PAIMI Act, 42 U.S.C. § 10801 et seq., and other federal laws.

8.    J.P. is a client of ADAP.

9.    ADAP files this complaint in its own name, to redress injuries to itself, and on behalf of its clients, to redress injuries to ADAP clients.

10.    Defendant J. Walter Woods Jr. is the Executive Director of the Alabama Department of Youth Services. DYS is the agency in the state of Alabama established to "promote and safeguard the social well-being and general welfare of the youth of the state through a comprehensive and coordinated program of public services for the prevention of juvenile delinquency and the rehabilitation of delinquent youth." Ala. Code 1975 § 44-1-1.

## STATEMENT OF FACTS

11.    The Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 6041 et seq., initially established the Protection and Advocacy ("P&A") system to investigate incidents of abuse and neglect and to pursue legal, administrative and other appropriate remedies to safeguard the rights of individuals with developmental disabilities. Congress extended the protection and advocacy mandate to cover individuals with mental illness with the Protection and Advocacy for Individuals with Mental Illness Act of 1986, as amended, 42 U.S.C. § 10801 et seq. ("PAIMI Act").

12.    In order to receive federal funding under the Acts, states must have in effect a protection and advocacy system. ADAP is designated as Alabama's protection and advocacy system. The PADD and PAIMI Acts, along with the Protection and Advocacy for Individual Rights ("PAIR") Program of the Rehabilitation Act of 1973, as

3

amended, 29 U.S.C. § 794e, and the corresponding implementing regulations, grant the designated protection and advocacy system authority to investigate incidents of abuse and neglect and the authority to pursue legal, administrative, and other appropriate remedies to ensure that the rights of these vulnerable populations are not violated. 42 U.S.C. § 6042(a), 42 U.S.C. § 10805(a), and 29 U.S.C. § 794e(a) and (f).

13.    The PAIMI statute provides that P&A systems have the authority to investigate incidents of abuse and neglect of individuals "if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 10805.

14.    In order to carry out P&A systems' investigatory mandates, the PAIMI Act authorizes P&A systems broad access to all records of any individual who is a client of the system "if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access." 42 U.S.C. § 10805(a)(4).    The PAIMI Act also allows P&A systems to access records of individuals who cannot consent because the state is their guardian, and with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe such individual has been subjected to abuse or neglect. Id.

15.    The PAIMI Act also grants P&A systems unaccompanied access to all areas of the facility used by or accessible to residents, and directly to residents and staff of facilities, to monitor such facilities and when this access is necessary to conduct a full investigation of abuse and neglect. 42 U.S.C. § 10805(a)(3); 42 C.F.R. § 51.42.

14.    The Chalkville facility of DYS is a facility that provides care and treatment services to individuals with mental illness. The PAIMI regulations specifically

4

include "juvenile detention facilities" in the list of facilities covered by the PAIMI Act. 42 C.F.R. § 51.2.

16.    On October 18, 2005, ADAP received two separate complaints regarding the alleged beating of J.P. by a guard at Chalkville. Upon information and belief, J.P. is a minor confined at DYS's Chalkville facility, who has been diagnosed with a mental illness, namely bipolar disorder.

17.    Temporary legal custody of J.P. resides with the Department of Youth Services. Permanent legal custody remains with A.W., J.P.'s mother, as A.W.'s parental rights have not been terminated.

18.    On October 19, 2005, ADAP made a formal request through DYS's legal office to speak with J.P.. Permission was granted via telephone, and ADAP staff met with J.P. that afternoon.

19.    J.P. reported to ADAP that the following took place:

a.    A Chalkville guard, Mr. R. (first name unknown), beat her for kicking the door of a seclusion room, and for refusing to be restrained; Mr. R. and two other Chalkville staff, Ms. H. and Ms. H. (first names unknown) sat on her and restrained her by forcibly placing her hands in handcuffs in front of her body, placing her feet in shackles, and tightly binding her handcuffs to her leg shackles. This position, commonly referred to as "hog-tying," caused her body to be positioned in a small ball, with her head in between her feet on the floor, and this caused her chest pain and made it difficult to breathe. After J.P. was restrained, Mr. R. picked her up by her shackles and threw her against the wall. Mr. R. also forcibly slammed her head against the floor, causing injuries to her head.

5

b.    J.P. was denied her prescribed psychiatric medication, Depakote, for some time before and during the alleged incident. At some point after she was restrained, she took the string that was holding up her pants, removed it, and tied it around her neck in an attempt to commit suicide. While J.P. could tie the string around her neck, J.P. could not remove the string; J.P. was unable to undo the knot in the string holding the string around her neck, due to the restraints on her hands. J.P. felt like she could not breathe, and requested assistance from a staff member. This assistance was denied.

c.    Chalkville staff told J.P. that she was not allowed to speak with ADAP staff, and that she was told she was not allowed to write to ADAP to complain about her treatment.

20.    ADAP obtained J.P.'s consent to conduct a full investigation, including J.P.'s consent to access J.P.'s records, and to interview residents and staff of Chalkville believed to have information about the incident.

21.    Later that evening, on October 19, 2005, ADAP contacted J.P.'s mother and obtained her consent to access J.P.'s records and open a full investigation into the complaints received regarding the abuse and neglect of J.P..

22.    On October 20, 2005, ADAP informed DYS legal counsel of the fact that it had received complaints regarding the abuse and neglect of J.P., that ADAP had conducted a preliminary investigation and had probable cause to believe J.P. was in imminent danger of serious harm, and that ADAP had received consent from both J.P.

6

and her mother to access J.P.'s records. ADAP then requested access to J.P.'s records, and access to a specific list of residents and staff of Chalkville that ADAP believed may have information about the alleged abuse and neglect.

23.    On October 21, 2005, DYS General Counsel William Samford II, sent a letter to ADAP requesting that ADAP forward to him any complaints received, and stating that "the department is subject to certain statutory responsibilities with reference to child committed to ... [their] custody."

24.    On October 21, 2005, ADAP replied to Mr. Samford's letter, explaining that ADAP is statutorily obligated to undertake an independent investigation of the matter, and therefore could not simply forward complaints to DYS. ADAP once again reiterated its request to access J.P.'s records and to speak with staff and residents of Chalkville. See Exhibit 3.

25.    On October 24, 2005, ADAP requested permission to meet with its client, J.P., on October 26, 2005.

26.    DYS has not responded to this request.

27.    DYS is mandated to provide ADAP, as Alabama's Protection and Advocacy agency, access to records of individuals eligible for Protection and Advocacy services, if such individuals reside in their facilities and consent to the release of their records. 42 U.S.C. § 10805(a)(4). DYS is also mandated to provide ADAP access to records of individuals eligible for Protection and Advocacy services, if such individuals reside in their facilities, are unable to consent because they are in the state's legal custody, and "with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a

complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect." 42 U.S.C.A. § 10805.

28.    DYS is also mandated to provide ADAP with access to its Chalkville facility and Chalkville staff and residents, because Chalkville is a facility providing care and treatment to individuals with mental illness.  42 U.S.C. § 10805(a)(3), 42 C.F.R. 51.42.  Juvenile detention facilities are specifically included in the list of covered facilities contained in the PAIMI Act implementing regulations.  42 C.F.R. § 51.2.

29.    Under the above-described circumstances, Defendant has acted in his official capacity to deny ADAP congressionally mandated complete and timely access to an eligible client's records.

30.    Defendant has also acted in his official capacity to deny ADAP congressionally mandated complete and timely access to staff and residents of Chalkville, including J.P., a client of ADAP.

31.    Defendant's conduct has prohibited ADAP from conducting an independent, timely and effective investigation in the case of allegations of abuse and neglect on the part of Defendant, his agents and employees, or those acting in active concert, or under contract, or other arrangement with him.  This has prevented ADAP from fulfilling its congressionally mandated function of conducting independent investigations.

32.    ADAP has made numerous attempts to resolve this matter with DYS, while being respectful and mindful of the urgent nature of the issue, namely the issue of allegations from several sources that a child with a mental illness, in the care and custody

8

of the state, was denied appropriate treatment, severely beaten, and mechanically restrained (via "hog-tying") for an entire night.

33.    Plaintiff does not have an adequate remedy at law and will be irreparably harmed if Defendant is permitted to continue to deny it access to the Chalkville facility and staff, to J.P.'s records, to J.P., and to other juveniles who are incarcerated at the Chalkville facility.

34.    Plaintiff has reason to believe that J.P. is in imminent danger of further harm, as evidenced by the injuries J.P. sustained, the fact that there is no evidence that Defendant has placed the individuals suspected of abusing J.P. on administrative leave, and the fact that Defendant has attempted to prevent ADAP from having access to J.P., her records, or other residents and staff for the purposes of conducting a full investigation of the alleged abuse.

## CAUSE OF ACTION

35.    The policies, procedures, regulations, practices and customs of Defendant, acting under the color of law, violate and continue to violate the rights of Plaintiff to full, complete, timely and meaningful access to the Chalkville facility, its staff, and its detainees, in violation of the P&A Acts. Specifically, Defendant has violated the right of Plaintiff, granted to Plaintiff under the PAIMI Act, to J.P.'s records, to J.P., and to Chalkville staff and other residents. Defendant is preventing Plaintiff from conducting a full investigation of a serious complaint of abuse and neglect, in violation of the PAIMI Act.

## PRAYER FOR RELIEF

36.    Wherefore, Plaintiff respectfully requests that this Court:

a.    Grant preliminary and injunctive relief enjoining Defendant and his agents and employees from denying ADAP immediate, full, complete, meaningful and unaccompanied access to its Chalkville facility, the staff of Chalkville, the residents of Chalkville, including J.P., and J.P.'s records or the records of any other youth for which ADAP has received a complaint, in order to monitor Chalkville and to conduct abuse and neglect investigations regarding residents of Chalkville, without advance notice and at any reasonable time, including business and visiting hours;

b.    Grant preliminary and permanent injunctive relief enjoining Defendant and his agents and employees from denying ADAP immediate, full, and complete access to the records of J.P. and any other youth for which ADAP has received consent or for which ADAP has received a complaint or has probable cause to believe has been the subject of abuse and/or neglect;

c.    Issue a declaratory judgment that Defendant's policies, regulations, and practices of denying ADAP immediate, full, complete, meaningful, and unaccompanied access to Chalkville, its residents, and its staff, in order to monitor Chalkville and to conduct abuse and neglect investigations, without advance notice and at any reasonable time, including during business and visiting hours, violates the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, et seq.;

10

d.     Issue a declaratory judgment that Defendant's policies, regulations, and practices of denying ADAP immediate, full, and complete access to the records of J.P. or any other youth from which consent has been received or for which ADAP has received a complaint or for which ADAP has probable cause to believe has been subjected to abuse or neglect, violates the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, et seq.;

e.     Issue a protective order, preliminarily and permanently enjoining Defendant from retaliating against J.P. or any other resident or staff who may have informed ADAP of the alleged abuse of a resident of Chalkville. Plaintiff requests that Defendant and anyone acting as his agent, employee, or in contract or concert with Defendant be enjoined from physically harming J.P., or any other resident of Chalkville that may have reported suspected abuse and neglect to ADAP, in any manner, including assaulting, striking, kicking, throwing, pushing, "hog-tying," or mechanically restraining such residents, or denying such residents medical treatment lawfully prescribed by a medical professional, or from denying such residents reasonable access to the telephone and the U.S. mail for the purposes of communicating with ADAP staff and attorneys;

f.     Award Plaintiff reasonably necessary attorneys' fees and costs pursuant to 28 U.S.C. § 2202 and 42 U.S.C. § 1988; and

11

g.    Award such other and further relief to which Plaintiff is justly entitled, at law or equity.

Respectfully Submitted,

_____
LAUREN CARR
State Bar no. _____

JENNIFER LAV
State Bar no. ASB-2817-E26L

ALABAMA DISABILITIES
ADVOCACY PROGRAM
University of Alabama
Box 870395
Tuscaloosa, Alabama 35487
(205) 348-4928 (Phone)
(205) 349-3909 (Facsimile)

ATTORNEYS FOR PLAINTIFF

12

CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2005, I served a copy of the foregoing on J. Walter Wood Jr., Executive Director of the Alabama Department of Youth Services, via Certified U.S. Mail, Return Receipt Requested.

Respectfully Submitted,


_____
Lauren Carr
ASB # _____
ALABAMA DISABILITIES
ADVOCACY PROGRAM
University of Alabama
Box 870395
Tuscaloosa, Alabama 35487
(205) 348-4928 (Phone)
(205) 349-3909 (Facsimile)
lcarr@adap.ua.edu

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

EXHIBIT
A 2

| | |
|---|---|
| ALABAMA DISABILITIES ADVOCACY PROGRAM, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CIVIL ACTION NO. 2:05CV1030-T ) |
| J. WALTER WOOD, JR., | ) ) |
| Defendant. | ) |

## ORDER

The parties have indicated their interest in engaging in nonbinding mediation. This case has been referred to the undersigned Magistrate Judge for mediation. Accordingly, it is

ORDERED that the parties and their counsel shall appear before the Magistrate Judge for mediation on *6 December 2005 at 1:30 p.m.*, Courtroom 5-A, Frank M. Johnson, Jr. United States Courthouse Complex, One Church Street, Montgomery, Alabama. It is further ORDERED as follows:

1.    **REQUIRED ATTENDANCE.** *The attorneys who will try the case* shall appear at the Settlement Mediation with (a) the parties[1], (b) the person or persons having full authority to negotiate and to settle the case *on any terms,* and (c) in an employment discrimination case, any person under the parties' control who is charged in the complaint

---

[1]Counsel are directed to provide in their Confidential Settlement Conference Statements the exact name of their client(s) who will be attending the mediation, and to include the names of any client representatives. Counsel are reminded that no persons not a party to this matter will be allowed to attend the mediation.

with a direct violation of the plaintiff's rights.[2]

    2.    *CONFERENCE CALL*: Counsel for the parties shall appear for a *pre-mediation conference call* on **30 November 2005** at **10:00 a.m.** to be arranged by the counsel for the defendants.

    3.    **CONFIDENTIAL SETTLEMENT CONFERENCE STATEMENT.** On or before *28 November 2005*, the parties shall deliver directly to the undersigned Judge Confidential Settlement Conference Statements of no more than 10 pages in length, which should *not* be filed with the Clerk of the Court, *nor filed* via facsimile, *nor served* upon the other parties.[3] *The parties are reminded that failure to file the Confidential Settlement Statements on the date set out in this order could lead to an order from this court vacating the mediation.* The Confidential Settlement Conference Statement shall include the following: (a) an estimate of the cost and time to be expended for further discovery, pretrial and trial; (b) the relief sought; (c) the party's affirmative or defensive contentions; (d) a history of past settlement discussions, offers and demands. If no discussions have taken place, the Court requires the attorneys to discuss settlement and exchange demands and offers prior to the settlement conference; and (e) the perceived strengths and weaknesses of the party's positions, factually and legally.

    4.    **PRIOR SETTLEMENT CONFERENCE.** Mediation conferences are often

---

    [2]This category includes the person named as a harasser or the supervisor or other person who actually initiated or recommended the adverse action.

    [3]Each party shall file his or her individual settlement statement.

2

unproductive unless the parties have already exchanged demands and offers in a serious effort to settle the case on their own.  If counsel have not held a good-faith, face-to-face settlement conference, as required in the Court's scheduling order, counsel shall confer with each other **BEFORE THE DATE** of the mediation conference and make a good-faith effort to settle this case by exchanging offers.

Additionally,  prior to the mediation conference, counsel shall confer and attempt to agree upon (a) the form and contents of mutual releases for execution if this case is settled, (b) the form and contents of a confidential settlement, if the parties desire a confidential settlement; and (c) whether it is necessary for the parties to reduce their agreement to writing or file it with the Clerk of the court.

5.    **PREPARATION FOR MEDIATION CONFERENCE.**  Counsel for the parties are DIRECTED to confer with their clients **BEFORE THE DATE** of the mediation conference and formulate a *realistic* assessment of the value of this case, which (in addition to considerations of time and expense) shall include consideration of the following:

a.    the extent to which the parties' allegations are in dispute;

b.    the consistency of the factual allegations during pretrial (administrative)

proceedings, complaint/answer, and discovery;

c.    the availability and the quality of evidence corroborating the allegations;

d.    the ability of the witnesses (or the capacity of the documentary evidence) to articulate and justify the parties' positions;

3

e.      the extent to which the parties intend to continue their [business, professional, employment, personal] relationships;

f.      the actual dollar value of the objectively determinable loss (e.g., medical bills, backpay, property damage);

g.      the implications of a non-jury trial vs. a jury trial, including the history of judicial outcomes in this district in similar cases; and

h.      the parties' needs and desires for finality in this litigation.

The court advises that Counsel are further DIRECTED to bring with them to the conference evidentiary materials in support of their monetary demands or offers.[4]  These documents *should not be filed* with the Clerk of the Court, *nor served* upon the other parties.

DONE this 22nd of November, 2005.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED  STATES  MAGISTRATE  JUDGE

---

[4]If the parties' claims or defenses are based upon sums of money which are susceptible of objective computation   - including backpay, frontpay, premiums, interest payments, pension payments, etc. -  the party who asserts the claim or defense shall provide the court with a written, updated computation at the mediation conference.

4

# MEMORANDUM
## *United States District Court* ■ *Middle District of Alabama*

TO:        Counsel in Cases Set for Mediation

FROM:    Judge McPherson

RE:        *Preparation for Mediation*

DATE:    22 November 2005

The attached order establishes the schedule for mediation.  During the past year, it has become apparent that the parties   - plaintiffs and defendants -   in mediation conferences are not adequately prepared for the proceeding and that they may have unrealistic expectations about the outcome.  To facilitate the parties' understanding of their positions and the mediation proceeding, it is imperative that counsel consult with them extensively before the conference, consistent with the specific directives in the order, to prepare them for mediation.

The parties are also advised to consider alternative remedies.  Even if the sole intent of the complaint is the recovery of monetary damages, some combination equitable relief and monetary damages might resolve the dispute.

It is also imperative that counsel for all parties meet before the date of mediation to discuss settlement generally and to exchange initial offers. The attached order directs the production at the mediation conference of "evidentiary materials in support of their monetary demands or offers". These may include, inter alia, documents which directly support a contention, photographs, personnel records, cancelled checks, or deposition excerpts.

Counsel's special attention is directed to the directive regarding "claims or defenses . . . based upon sums of money which are susceptible of objective computation   - including backpay, frontpay, premiums, interest payments, pension payments".  Henceforth, if counsel (whether plaintiffs' or defendants') for parties who assert such claims or defenses fail to provide the court with a written, updated computation at the mediation conference, the court will seriously consider cancelling the mediation until the record is prepared.

## MINUTES



EXHIBIT
A3

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

HON. ___MYRON H. THOMPSON,___ JUDGE            AT MONTGOMERY  ALABAMA

DATE COMMENCED  May 1, 2006                    AT  8:30   A.M./P.M.

DATE COMPLETED  May 1, 2006                    AT  8:33   A.M./P.M.

ALABAMA DISABILITIES ADVOCACY PROGRAM          Civil Action
                                               2:05-CV-1030-MHT
         VS.

J. WALTER WOOD, JR.

| PLAINTIFF(S) | APPEARANCES | DEFENDANT(S) |
|---|---|---|
| Atty James A. Tucker | X | Atty Thornton Dudley Perry |
| | X | |
| | X | |
| | X | |
| | X | |

COURT OFFICIALS PRESENT:

Anthony Green,            Kevin Kish,             Risa Entrekin,
Courtroom Clerk           Law Clerk               Court Reporter

PROCEEDINGS:

( )  NONJURY TRIAL
(x)  OTHER PROCEEDING:      TELEPHONE STATUS CONFERENCE
                           RE: JOINT ORAL MOTION TO CONTINUE

8:30 a.m.                  Plaintiff advises that all issues have been
                           resolved and that a voluntary dismissal
                           without prejudice will be filed by the end
                           of the week.  Defendant concurs with the
                           exception of to dismiss with or without
                           prejudice.
8:33 a.m.                  Hearing concluded.

Alabama Disabilities
Advocacy Program



EXHIBIT
B1

April 24, 2006

Mr. Dudley Perry
Deputy Attorney General
Alabama Department of Youth Services
PO Box 66
Mt. Meigs, AL 36057

## THE UNIVERSITY OF
## ALABAMA
### FOUNDED 1831

Re: Alabama Disabilities Advocacy Program (ADAP) v. Wood
Case Number 2:05-cv-1030

Protection & Advocacy for
Persons with Developmental
Disabilities

Dear Mr. Perry,

Protection & Advocacy for
Individuals with Mental Illness

In our last meeting we focused our discussion on three main points as
found in paragraphs 3-5 of your 9 December 2005 letter:

Protection & Advocacy of
Individual Rights

1. The notice that DYS would receive of ADAP's intent to enter a
facility for monitoring and investigatory purposes.

Protection & Advocacy for
Assistive Technology

2. ADAP's determination of probable cause for investigations.

Protection & Advocacy for
Individuals with
Traumatic Brain Injury

3. The process by which a student would be deemed an ADAP client,
including who has the authority to make that determination.

Protection & Advocacy for
Beneficiaries of Social Security

Protection & Advocacy for
Voting Accessibility

Finally, we also discussed ADAP's right to conduct monitoring of DYS
facilities when such monitoring may put us in contact with students
who would not be considered ADAP clients. You had requested some
clarification from us regarding this last point, given your concern about
how such contact would affect the confidentiality rights of non-client
students.

To lay the groundwork for this discussion, it is worth reviewing the
general nature of ADAP's role and, in particular, its access authority.

*The Role of the P&A*



500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
(205)348-4928
(800)826-1675
FAX (205)348-3909
www.ADAP.net

A P&A's authority and functions go well beyond those of a traditional
law firm retained to represent a client in a particular case. The P&A
access provisions must be applied in this context. The populations
served by these statutes, especially those who are institutionalized, have
their own special needs and, often severe, physical and mental
limitations. Moreover, some facilities caring for these individuals may
deny outsiders access to them when they seek to bring these individuals
information about their rights, and may resist the exercise of those
rights. Even where the information is available, an individual's

Designated by the Governor to
The University of Alabama in accordance
with Public Laws 100 - 146 and 99 - 319.
ADAP is The Protection and Advocacy
System for Alabama on behalf of persons
with disabilities.

2

disability may hamper his or her understanding and options in exercising legal rights.

For instance, the court in *Robbins v. Budke*, 739 F. Supp. 1439 (D.N.M. 1990), found that restrictions imposed by a psychiatric facility on the right of the New Mexico P&A to gain access to facility residents and records clearly violated the P&A's rights, under the PAIMI Act, in light of the residents' special needs for outreach and coordinated advocacy services. The court found:

> The mentally ill are vulnerable to abuse and neglect because many mentally ill individuals have difficulty recognizing the concept that they have rights and will not necessarily identify even the most egregious abuse as a violation of their rights. Even if cognizant of their rights, many of these individuals have difficulty assessing whether their rights have been violated and may have difficulty identifying P&A as a resource to remedy rights violations.

*Id.* at 1486.

The same concerns are equally applicable with respect to a P&A's advocacy efforts under the DD Act, because persons with development disabilities have the same special needs, vulnerabilities and limitations as persons with mental illness.

In view of these factors, the P&A statutes contemplate that P&As must have broad discretion to respond to these needs and limitations in order to provide effective advocacy. *Mississippi Protection and Advocacy System, Inc. v. Cotten*, 1989 WL 224953 (S.D. Miss. Aug. 7 1989), Final Order issued September 29, 1989 (unpublished), aff'd, 929 F.2d 1054 (5th Cir. 1991); *Robbins v. Budke, supra.*

*P&A Monitoring Authority*

The DD Act provides, at section 15043(a)(2)(H), that a P&A shall "have access at reasonable times to any individual with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual."

In turn, the DD Act regulations at 1386.22(g) clarify that this mandate includes the authority to conduct monitoring activities. The regulation states that "the system and all of its authorized agents shall have unaccompanied access to all residents of a facility at reasonable times, which at a minimum shall include normal working hours and visiting hours," for purposes of providing information, training and referrals; and "monitoring compliance with respect to the rights and safety of service recipients."

The legislative history of the analogous provision contained in the 1994 version of the DD Act states that this requirement is intended to "assure that the most vulnerable individuals [facility residents] who may not be able to contact the P&A system will have access to protection and advocacy services." S. Rep. 120, 103rd Cong.1st Sess. 36 (1993).

The PAIMI Act, at 10805(a)(3), gives P&As "access to facilities in the State providing care and treatment." The Act's legislative history states Congress' expectation:

> that facilities will provide the [PAIMI] system with reasonable access to all inpatients and residents in [facilities that provide care and treatment] to enable the systems to inform all such individuals of their rights under Federal and State law and the U.S. Constitution and to explain the nature and scope of the system's authority under the Act. Informing a mentally ill individual of his or her rights is a critical function of a protection and advocacy system.

S. Rep. 454, 100th Cong., 2d Sess. 11 (1988).

Like the corresponding DD Act regulation, the PAIMI Act regulation at 51.42(c) clarifies that it provides P&As with the authority to conduct monitoring of conditions. The regulation is generally consistent with the DD Act regulation, but elaborates on the logistics of P&A monitoring:

> (c) ... a P&A system shall have reasonable unaccompanied access to facilities including all area which are used by residents, are accessible to residents, and to programs and their residents at reasonable times, which at a minimum shall include normal working hours and visiting hours. Residents include adults or minors who have legal guardians or conservators. P&A activities shall be conducted so as to minimize interference with facility programs, respect residents' privacy interests, and honor a resident's request to terminate an interview. This access is for the purpose of:
>
> > 1. Providing information and training on, and referral to program addressing the needs of individuals with mental illness, and information and training about individual rights and the protection and advocacy services available from the P&A system, including the name, address, and telephone number of the P&A system.
> >
> > 2. Monitoring compliance with respect to the rights and safety of residents; and
> >
> > 3. Inspecting, viewing and photographing all areas of the facility which are used by residents or are accessible to residents.

A number of cases affirm a P&A's authority to conduct monitoring: *Mississippi Protection and Advocacy System, Inc. v. Cotten*, 1989 WL 224953 (S.D. Miss.); *Pennsylvania Protection and Advocacy, Inc. v. Royer-Greaves School for the Blind*, 1999 WL 179797 (E.D. Pa.); *Robbins v. Budke*, 739 F.Supp. 1479 (D.N.M. 1990); *Kentucky Protection and Advocacy Division v. Hall*, No. 3:01cv-538-H (W.D. Ky., 2001) (unpublished); *Michigan Protection and Advocacy Service, Inc. v. Miller*, 849 F. Supp. 1202 (W.D. Mi.1994).

*Confidentiality and Client Status*

*Miller* and *Hall* are of particular interest because both involved a P&A's access authority to state juvenile detention facilities and raised the issues of student confidentiality and client status.

In *Miller*, the Michigan Department of Social Services ("DSS") asserted inter alia that restrictions on the Michigan P&A's access to its juvenile detention facilities was proper in order to limit interference with DSS's educational and rehabilitation programs, protect the privacy of DSS residents, and protect the safety of all involved. *Id.* at 1208.

Responding to these assertions, the court recognized that the DD and PAIMI Acts "clearly mandate that organizations like [the Michigan P&A] have the authority to access DSS facilities and records." *Id.* The court addressed the safety issues, suggesting that while some restrictions are warranted to ensure the safety of all involved, "surely . . . [safety] options are available which will allow MPAS to fulfill its statutory duty under the DD and PAMII (sic) Acts while ensuring the protection of visitors." *Id.*

Finally, regarding confidentiality concerns, the court noted the P&A's statutory duty to maintain the confidentiality of any records to the same extent as the DSS, referencing the PAIMI Act at 10806(a), and concluding that "[i]n light of this obligation, DSS concerns about resident privacy are misplaced." *Id.*

The purpose of the provision at 10806(a) is to ensure that P&As maintain the confidentiality of such records "in compliance with applicable State, Federal, and local laws and the rules of any involved organization or institution which has legal responsibility for the records." S. Rep. No. 109, 99th Cong, 1st Sess. 10 (1985). A parallel provision is not contained in either the DD Act or its implementing regulations. However, given Congress' intent that the laws be construed in a uniform manner, it should be concluded that the courts may apply the same restrictions under the DD Act.

*Miller* also addressed the fact that not all residents of DSS facilities have been determined to be "mentally ill or emotionally impaired." *Id.* at 1207. Contrary to DSS's evidence, the Michigan P&A presented substantial evidence that many DSS facilities housed minors who had mental illness in the past and that they continue to house such minors. The Court reasoned that "DSS's present policy of denying [the Michigan P&A] full access prevents the advocacy organization from bringing in their own mental health professionals to ascertain whether any DSS residents do, in fact suffer from mental illness. Such conduct by DSS defeats the very purpose of PAMII (sic) and the DD Act to provide effective protection and advocacy services to mentally ill and developmentally disabled individuals." *Id.*

The Kentucky Protection and Advocacy agency in *Hall* faced similar resistance to its access rights from the operator of private, nonprofit child care facilities that treated boys between the ages of fourteen and eighteen upon referral and placement by the Kentucky Department of Juvenile Justice.

In *Hall* the court concluded that the defendant's facilities fall within the scope of both the PAIMI and DD Acts. Noting the services provided by the defendant to the youth entrusted to its care, it was enough for the court, citing to *Miller*, that the defendant had "treated in the past or may be [treating] ... [in] the present individuals with significant mental illness or emotional impairment."

In both instances these courts had to address the issue that some facility students do – and, by extension, do not – have disabilities that would qualify them for P&A services under the PAIMI and DD Acts. Indeed, as conceptualized under PAIMI, facilities necessarily would include places where both disabled and non-disabled persons are treated. Under the PAIMI Act at 10802(3) facilities are "hospitals, nursing homes, community facilities for individuals with mental illness, board and care homes, homeless shelters, and jails and prisons." The implementing regulation at 51.2 further defines a facility as:

> any public or private residential setting that provides overnight care
> accompanied by treatment services. Facilities include, but are not limited to
> the following:  general and psychiatric hospitals, nursing homes, board and
> care homes, community housing, juvenile detention facilities, homeless
> shelters, and jails and prisons, including all general areas as well as special
> mental health or forensic units.

Given these definitions, it would be expected that many facilities to which the P&A has access will have both persons with and without disabilities residing there. Limiting access to places which solely treated persons with disabilities would be at odds with the definition of the word "facility" and would thwart the statutory authority given P&As to "protect and advocate the rights of all individuals in state facilities who suffer developmental disabilities or mental illness." *Miller* at 1206.

I hope this information helps to clarify some of the monitoring issues, including confidentiality concerns, raised in our last conversation. Please feel free to contact me if you have any questions about these matters.


With Best Regards,


Nancy Anderson
Senior Staff Attorney



Alabama Disabilities
Advocacy Program (ADAP)

June 13, 2006



EXHIBIT
B3

Dudley Perry, Deputy Attorney General
Alabama Department of Youth Services
Post Office Box 66
Mt. Meigs, Alabama 36057



THE UNIVERSITY OF
ALABAMA
FOUNDED 1831

RE: S███ W███

Dear Dudley:

Please allow this letter to serve as a formal request to access records for S███ W███, a resident at Mt. Meigs, contained by the Department of Youth Services. S███ is a client of ADAP and qualifies for our services under the Protection and Advocacy for Individuals with Mental Illness Act of 1986 (the PAIMI Act or Program), 42 U.S.C. 10801 et seq. S███ historically received treatment for a mental illness and is currently under the care of a DYS psychiatrist who prescribed medication for the treatment of depression, a mood disorder, seizures and restless leg syndrome.

Protection and Advocacy for
Persons with Developmental
Disabilities

Protection and Advocacy for
Individuals with Mental Illness

Protection and Advocacy of
Individual Rights

Protection and Advocacy for
Assistive Technology

Protection and Advocacy for
Individuals with
Traumatic Brain Injury

Protection and Advocacy for
Beneficiaries of Social Security

Protection and Advocacy for
Voting Accessibility

The PAIMI Act, § 105 (a)(1)(A), sets forth authority of the Protection and Advocacy agency to gain access to the records of persons with disabilities and access to facilities that provide services and treatment to persons with disabilities. P&As are authorized to have access to all records of any person with a disability who is a client of the system, if such person, or his or her legal guardian, conservator, or other legal representative has authorized such access. Moreover, the P&A statutes authorize the P&A to obtain access to records, in the absence of authorization, where a complaint has been received; when abuse and neglect is suspected; or in certain instances, when the health or safety of the individual is in serious and immediate jeopardy, DD Act § 142(a)(2)(I); PAIMI Act § 105(a)(4). The PAIMI Act § 51.41(b) also grants the P&A access to records based on the P&As finding of probable cause – either a finding relating to abuse or neglect (paragraph (ii)) or that the health and safety of the individual is in jeopardy (paragraph (iii)).

Designated by the Governor
to The University of Alabama
in accordance with Public Laws
100-146 and 99-319. ADAP is
the protection and advocacy
system for Alabama on behalf
of persons with disabilities

As we discussed, ADAP was contacted by the parent and legal guardian of S███ W███ requesting our assistance. A letter requesting access to records and a copy of the signed "Authorization to Obtain and Release Information" form was faxed, emailed and mailed to you on June 12, 2006. Allegations reported to ADAP include but are not limited to 1) inadequate access to a psychiatrist regarding mental health treatment, 2) failure by staff to appropriately address a number of incidents in which S███ was involved with other residents, 3) failure to provide medical



500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
(205) 348-4928
(800) 826-1675
fax (205) 348-3909
www.ADAP.net

care following injuries sustained during altercations with other residents, 4) timely access to appropriate medical treatment for his back, 5) denied access to treatment for restless leg syndrome, 6) denied access to family contact, including written correspondence.

ADAP is requesting that the following documentation be made available for our review and copies provided of the entire record held by Mt. Meigs including but not limited to, medical treatment, mental health treatment, service plans, any and all incident reports, investigations reports, court documents, disciplinary records, progress notes and other related documentation while S█████has been in the care of Mt. Meigs. It is my understanding that documentation will be made available for ADAP's review Wednesday, June 14, 2006.

Sincerely,

Christy Johnson
Senior Case Advocate

cc: James Tucker
    Nancy Anderson



Alabama Disabilities
Advocacy Program

Protection & Advocacy for
Persons with Developmental
Disabilities

Protection & Advocacy for
Individuals with Mental Illness

Protection & Advocacy of
Individual Rights

Protection & Advocacy for
Assistive Technology

Protection & Advocacy for
Individuals with
Traumatic Brain Injury

Protection & Advocacy for
Beneficiaries of Social Security

Protection & Advocacy for
Voting Accessibility



500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
(205) 348-4928
(800) 826-1675
FAX, (205) 348-3909
www.ADAP.net

Designated by the Governor to
The University of Alabama in accordance
with Public Laws 100 - 146 and 99 - 319.
ADAP is The Protection and Advocacy
System for Alabama on behalf of persons
with disabilities.

**By Facsimile and U.S. Post**

June 22, 2006

Mr. Dudley Perry
Deputy Attorney General
Department of Youth Services
P.O. Box 66
Mt. Meigs, AL 36057

RE: ADAP access

Dear Dudley,

I am writing to express concern about ADAP's ability to fully exercise its access authority in light of our recent experiences regarding our clients SW and KW.

ADAP Senior Case Advocate Christy Johnson wrote and faxed you letters on June 13, 2006 about accessing records for these two young men during an on-site visit she planned on making on June 14th. It was her understanding from the telephone conversation you and she had shared on June 12th that such written requests were the only thing that stood in the way of her obtaining these records and that you understood what her intentions were regarding visiting Mt. Meigs on the 14th. You and James Tucker had a similar discussion.

Upon her arrival at Mt. Meigs on June 14th, the records were not available. They were subsequently mailed to Ms. Johnson by your office.

It should be noted that these written requests came after many previous discussions and correspondence between her and you or DYS treatment coordinator Alesia Allen about these boys and ADAP's desire to visit and review their records. For example, our records indicate that on at least five different occasions starting on May 5, 2006, Ms. Johnson spoke or corresponded with you or Ms. Allen about visiting KW and reviewing his records.

The statutory and regulatory authority by which we sought to gain access to these boys and their records is clear. If this rather straightforward invocation of our access rights was problematic, it seems quite likely that other difficulties will occur as we seek to more broadly invoke our access rights.

EXHIBIT
B4

for K W file

Given that, we would like to meet with both you and Commissioner Wood to fully review and explain our access rights and the day-to-day logistics of how we plan on asserting those rights, including what you and your employees at the various DYS facilities across the state might see us do during a record review, investigation and monitoring.

I will contact you early next week to schedule such a meeting.

In the meantime, if you have any questions, please feel free to call me at 205.348.6803.

With Best Regards,

Nancy Anderson
Attorney

EXHIBIT

B5

Alabama Disabilities
Advocacy Program

**BY EMAIL AND U.S. POST**

September 12, 2006

THE UNIVERSITY OF
# ALABAMA
FOUNDED 1831

Protection & Advocacy for
Persons with Developmental
Disabilities

Protection & Advocacy for
Individuals with Mental Illness

Protection & Advocacy of
Individual Rights

Protection & Advocacy for
Assistive Technology

Protection & Advocacy for
Individuals with
Traumatic Brain Injury

Protection & Advocacy for
Beneficiaries of Social Security

Protection & Advocacy for
Voting Accessibility



500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
(205) 348-4928
(800) 826-1675
FAX (205) 348-3909
www.ADAP.net

Designated by the Governor to
The University of Alabama in accordance
with Public Laws 100 - 146 and 99 - 319;
ADAP is The Protection and Advocacy
System for Alabama on behalf of persons
with disabilities.

Mr. Dudley Perry
Deputy Attorney General
Alabama Department of Youth Services
PO Box 66
Mt. Meigs, AL 36057

Re:  ADAP Monitoring Visit, Mt. Meigs

Dear Dudley,

To date, I haven't heard back from you regarding your request that we contact you about the plans ADAP was developing to come to Mt. Meigs for a monitoring visit and the tentative dates we had pinpointed (see attached email). So that there are no further delays, Christy and I have set Wednesday, September 27th as the day that we will come to facility to monitor it.

Given that it will be our first monitoring visit, it would make sense for someone to give us a tour of the facility — much like what was done for us at Chalkville last winter.

As we have discussed previously, ADAP's monitoring authority allows us:

"unaccompanied access to facilities including all area which are used by residents, are accessible to residents, and to programs and their residents at reasonable times, which at a minimum shall include normal working hours and visiting hours. ... This access is for the purpose of:

1.  Providing information and training on, and referral to programs addressing the needs of individuals with mental illness, and information and training about individual rights and the protection and advocacy services available from the P&A system, including the name, address, and telephone number of the P&A system.

2.  Monitoring compliance with respect to the rights and safety of residents; and

3.  Viewing and photographing all areas of the facility which are used by residents or are accessible to residents.

42 CFR 51.42.  *See also* 45 CFR 1386.22 (f – i).

2

Please contact me when you receive this letter so we can confirm the date and discuss the logistics of our visit. At that time, I also would like to discuss some issues that have come to our attention regarding treatment services provided to four of our clients at Mt. Meigs: H█████ M█████, D█████ M█████, K█████ W█████, and S█████ W█████.

With Best Regards,

Nancy Anderson
Senior Staff Attorney

Alabama Disabilities
Advocacy Program

January 16, 2007

EXHIBIT
B6

THE UNIVERSITY OF
**ALABAMA**
FOUNDED 1831

Protection & Advocacy for
Persons with Developmental
Disabilities

Protection & Advocacy for
Individuals with Mental
Illness

Protection & Advocacy of
Individual Rights

Protection & Advocacy for
Assistive Technology

Protection & Advocacy for
Individuals with
Traumatic Brain Injury

Protection & Advocacy for
Beneficiaries of Social Security

Protection & Advocacy for
Voting Accessibility

500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-
0395
(205)348-4928
(800)826-1675
FAX (205)348-3909
www.ADAP.net

Designated by the Governor to
The University of Alabama in
accordance with Public Laws 100 -
146 and 99 - 319.
ADAP is The Protection and Advocacy
System for Alabama on behalf of
persons with disabilities.

Mr. Dudley Perry
Deputy Attorney General
Alabama Department of Youth Services
PO Box 66
Mt. Meigs, AL 36057

Re: W█████ B██████ & L█████ P█████

Dear Dudley,

I am writing to clarify ADAP's access authority to DYS records and to
facility staff.

ADAP staff members have made repeated inquiries of DYS staff for
verbal information and written records for ADAP clients W██████
B█████ and L█████ P█████.

In W█████'s case, Senior Case Advocate Christy Johnson has been
requesting information from his DYS records since October 17, 2006.
(See attached letter.) She has received no response from either Ms.
McClure, W█████'s case manager, or your office.

Please note that ADAP's access authority provides that the agency shall
be provided records related to its investigations "not later than 3
business days after the system makes a written request for the records
involved." 42 U.S.C. 15043 Sec.143(a)(2)(J)(i).

In L█████'s case, Senior Case Advocate Christa Hackney has been
attempting to speak with DYS case manager Marguerite Crane since
mid-December regarding the girl's transfer back to Alabama from
Youth Villages on December 7, 2006. Ms. Hackney is also seeking
discharge and updated treatment records for L█████.

Multiple voice messages were left for Ms. Crane during the latter part
of December. None were returned. It wasn't until January 4, 2007 that
Ms. Hackney was able to get a hold of Ms. Crane. At that point Ms.
Crane told Ms Hackney that any information she sought would have to
come from the DYS legal department.

Ms. Alesia Allen confirmed this statement in an email to Ms. Hackney
in which she stated that Ms. Crane would not be her "point of contact."
Ms. Alesia Allen recently has been corresponding with Ms. Hackney

regarding dates for a meeting for you, she and Ms. Hackney to discuss L____'s case.

ADAP's access authority provides us the ability "to interview any ... [facility] employee, or other person...who might be reasonably believed ... to have knowledge of the incident [of abuse or neglect] under investigation[.]" 45 C.F.R. Sec. 1386.22(f) and 42 C.F.R. Sec. 51.42(b) (emphasis added). So, while we welcome the opportunity to discuss L____'s case with you and Ms. Allen now, we had the authority to speak with Ms. Crain under this access provision at the time we contacted her.

Furthermore, at this point, whether we speak with Ms. Crain or you and Ms. Allen, these discussions are going to happen almost a month after we (again) voiced our concerns about the sufficiency of L____'s treatment.

The delays we've experienced in these cases are not unusual. Such delays frustrate our ability to act upon our statutory mandate to protect the rights of persons with disabilities. As noted by the court in Robbins v. Budke, such delays prevent us from "evaluating and acting on possible incidents of abuse and neglect in a timely manner" and "may prevent the P&A from acting within prescribed deadlines or may cause a violation of rights to go unaddressed until it is too late to remedy." 739 F. Supp. at 1488 (1990).

If you do not envision providing our office with the requested records and employee contact by the close of this week, please promptly provide a written statement of the reasons why our access to records and staff on behalf of both youth has been denied. See 45 C.F.R. Sec. 1386.22 (i) and 42 C.F.R. Sec. 51.43.


With Best Regards,


Nancy Anderson
Attorney


cc:  James Tucker, Director of Litigation

**Mixson, Andrea**

| | |
|---|---|
| **From:** | Anderson, Nancy |
| **Sent:** | Wednesday, February 28, 2007 11:57 AM |
| **To:** | Dudley Perry |
| **Cc:** | Phyllis.carney@dys.alabama.gov |
| **Subject:** | RE: monitoring visit |

> **EXHIBIT**
> **C**

Dudley,

I'm just confirming our visit tomorrow.

Nancy

**From:** Anderson, Nancy
**Sent:** Tue 2/20/2007 4:34 PM
**To:** Dudley Perry
**Subject:** monitoring visit

Dear Dudley,

ADAP plans to do a monitoring of Chalkville next Thursday, March 1, 2007.

As we have discussed in the past, our enabling statutes provide for reasonable unaccompanied access to facilities including all areas which are used by residents, are accessible to residents, and to programs and their residents at reasonable times, which at a minimum shall include normal working hours and visiting hours.

This access is for the purposes of 1) providing information and training on programs addressing the needs of individuals with mental illness, individual rights, and the protection and advocacy services available from ADAP; 2) monitoring compliance with respect to the rights and safety of residents; and 3) viewing and photographing all areas of the facility which are used by residents or are accessible to residents.

ADAP staff members Christie Johnson and Andrea Mixson will plan on arriving at 2 PM.

Please contact me with any questions or concerns.

Thanks.

Nancy

Nancy Anderson
Attorney
Alabama Disabilities Advocacy Program
University of Alabama
526 Martha Parham West
Box 870395

4/6/2007

Tuscaloosa, AL  35487-0395
205-348-4928
205-348-3909 (fax)
1-800-826-1675 (toll-free)
*********************

This email is intended only for the person to whom
it is addressed.  Any review or other use of this
information by persons or entities other than
the intended recipient or any retransmission
without the consent of the sender is prohibited.
The views or opinions expressed by the sender
of this email are not necessarily those of the
institution.



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

ALABAMA DISABILITIES ADVOCACY )
PROGRAM                          )
                                 )
          Plaintiff,             )
                                 )
     v.                          )     Civil Action No.
                                 )
J. WALTER WOOD, JR. in his official )
Capacity as Executive Director of the )
Alabama Department of Youth Services, )
                                 )
          Defendant.             )

## AFFIDAVIT OF ANDREA MIXSON

State of Alabama       ]
County of Tuscaloosa ]

Andrea Mixson, being duly sworn, deposes and states as follows:

1.     My name is Andrea Mixson. I am over the age of nineteen.  This
       Affidavit is given on the basis of my personal knowledge.

2.     I am employed as a staff attorney with the Alabama Disabilities
       Advocacy Program ("ADAP").

3.     On March 28, 2007, I, along with ADAP senior case advocate, Christy
       Johnson, arrived at the Alabama Department of Youth Services
       ("DYS") Chalkville facility around 1:00 p.m. for a monitoring visit
       arranged through DYS Deputy Attorney General Mr. Dudley Perry's
       office.  In a March 21, 2007 email and in a telephone call on March 22,
       2007, I explained to Mr. Perry that ADAP planned to communicate
       privately with residents in the Cherokee unit about their treatment and

explain and distribute information about ADAP. I also explained to Mr. Perry that ADAP planned to speak privately with, and obtain the records of, Chalkville residents, J.C. B.P. and S.B., whom ADAP met on its March 6, 2007 visit and who wished to discuss further with ADAP concerns they had about inappropriate treatment.

4.      On March 22, 2007, Mr. Perry stated to ADAP Staff Attorney Nancy Anderson and me that he wanted a DYS internal investigator to look into the concerns of J.C., B.P. and S.B. prior to ADAP's second visit. Mr. Perry asked that I postpone ADAP's March 27, 2007 monitoring visit to Chalkville till later that week to give his investigator time to look into J.C., B.P. and S.B.'s concerns.

5.      On March 22, 2007, I emailed Mr. Perry stating that Ms. Johnson and I would arrive for our monitoring visit on March 28, 2007 at 1:00 p.m.

6.      When Ms. Johnson and I arrived at Chalkville on March 28, 2007 around 1:00 p.m., the security guard at the entrance told us that Ms. Yolanda Byrdsong, the director of Chalkville, was not at Chalkville that day. The security guard directed Ms. Johnson and me to the administration office and stated that I would need to speak with Ms. Tate instead regarding our monitoring visit.

7.      Upon meeting Ms. Tate, I explained to Ms. Tate that Ms. Johnson and I were planning to speak with residents whom we did not have an opportunity to meet during our previous monitoring visit to Chalkville on March 6, 2007. These residents live in the Cherokee Unit at

Chalkville. Ms. Tate stated that Ms. Byrdsong instructed her to tell us that we were not permitted to speak with any residents other than J.C., B.P. and S.B. Ms. Tate stated that ADAP only had authority to speak with staff and to tour the Cherokee Unit.

8.    Ms. Johnson and I explained to Ms. Tate that ADAP has federal access authority to speak with any and all residents at Chalkville and that ADAP's access, included communicating with those residents who we did not have chance to speak with during our last visit. I stated to Ms. Tate that, in fact, the complaints made to ADAP by J.C., B.P. and S.B. came as a result of conversations Ms. Johnson and I had with these residents as part of our March 6, 2007 monitoring visit.

9.    Following our interview with J.C., B.P. and S.B., Ms. Johnson and I again stated to Ms. Tate that ADAP has federal access authority to speak to any resident on the Chalkville campus. I stated that ADAP planned to exercise its federal access authority to speak with any resident of Chalkville and to distribute information about ADAP's services. Ms. Tate stated she received instruction from Mr. Perry to deny ADAP the opportunity to speak to any resident, except those who have a disability or who are already ADAP's clients. Ms. Tate stated that not all residents have a disability and allowing ADAP to speak with residents who did not have a disability would be a breach of those residents' confidentiality. Ms. Tate stated that ADAP was only allowed to speak with staff, make a general announcement about ADAP services

to residents at the Cherokee Unit, and to distribute brochures to those residents.

10.     Ms. Johnson and I, accompanied by Ms. Tate, gave Cherokee Unit residents a copy of our brochure and made a general announcement to the residents about the purpose of ADAP, stating that we were interested in speaking with any resident who had concerns about inappropriate treatment while at Chalkville. While I was making the announcement to the Cherokee Unit residents, Ms. Tate interjected and stated that only residents with disabilities would be able to receive assistance from ADAP. Ms. Johnson explained that any resident may contact ADAP if they have concerns about inappropriate treatment at Chalkville. After my announcement, Ms. Tate stated that she did not understand why ADAP was not permitted to speak to all residents at the facility. I stated to Ms. Tate that DYS officials allowed ADAP to speak privately with all Chalkville residents on March 6, 2007.

11.     On April 10, 2007, Ms. Johnson and I arrived on the Vacca Campus for a monitoring visit. We met the Vacca Director, Ms. Joyce Delbridge, who stated that Mr. Perry prohibited us from communicating privately with any resident unless they were currently considered our clients. Ms. Delbridge also stated to us that Mr. Perry prohibited us from distributing any ADAP brochures to any resident of Vacca.

12.     Ms. Delbridge then stated that a Vacca guard, Mr. O'Connor, would be accompanying us on "a tour" of the Vacca campus and facilities.

Another individual, who was there at Vacca as part of a job application

process, was present as Ms. Johnson and I walked around the campus

accompanied by Mr. O'Connor.

13.    When our tour of the facilities was completed, Ms. Delbridge, Ms.

Johnson and I met for a discussion. Mr. O'Connor, the security guard,

sat at the table with Ms. Johnson, Ms. Delbridge and me.

14.    During the conference with Ms. Delbridge, Ms. Johnson asked Ms.

Delbridge for a copy of ADAP client D.R.'s record which Ms. Johnson

stated she had requested prior to this visit. Ms. Delbridge stated that she

could not provide a copy of D.R.'s DYS record until D.R. was able to

sign an authorization for release of information and was released from

the hospital.

15.    On April 17, 2007, Ms. Johnson and I arrived on the DYS Mount Meigs

campus around 9:00 a.m.

16.    We walked to the gated entrance of Mt. Meigs and stated to the guard

on duty, Mr. Hanna, that we had a prearranged monitoring visit

scheduled through Mr. Perry's office. Mr. Hanna stated that he did not

have any notification from Mr. Perry that ADAP had planned a

monitoring visit to Mt. Meigs and could not allow us to enter the Mt.

Meigs campus. Mr. Hanna called Mr. Booker, Administrator of

Institutional Services, to find out if ADAP had been granted access for a

monitoring visit. Upon finishing the phone call with Mr. Booker, Mr.

Hanna directed Ms. Johnson and me to the Mt. Meigs administrative

building for further clarification on our permission to conduct
monitoring activities.

17.    Ms. Johnson and I walked to the office of Mr. Dudley Perry. Ms.
Phyllis Carney, Mr. Perry's assistant, stated that Mr. Perry was not in
the office today. I explained to Ms. Carney that I had sent Mr. Perry
emails informing him of our visit. Ms. Carney stated that ADAP should
have emailed her a copy of the emails sent to Mr. Perry. Ms. Carney
stated that she had received instructions from Mr. Perry that ADAP has
the "access you have always have." When I asked Ms. Carney to
describe that access, Ms. Carney stated that ADAP was only permitted a
tour of the facility and could not speak with any residents, unless they
were current ADAP clients, and we could not distribute ADAP contact
information. I stated to Ms. Carney that ADAP had federal authority to
communicate privately with any Mt. Meigs resident and to distribute
ADAP contact and service information to any resident at the facility. I
provided Ms. Carney a letter from Nancy Anderson sent to Mr. Perry on
March 28, 2007 reminding Mr. Perry of ADAP's access authority. Ms.
Carney made a copy of this letter.

18.    After Ms. Carney spoke with Mr. Perry on the phone, Ms. Carney stated
that Mr. Perry instructed her that Ms. Johnson and I were only permitted
to walk around the campus and into the buildings and could not speak
with any Mt. Meigs resident unless they were currently ADAP's clients.

Ms. Carney also stated that Mr. Perry instructed her that a Mt. Meigs employee must accompany Ms. Johnson and me throughout our visit.

19.     Ms. Johnson and I myself walked back to the security gate, where a Mt. Meigs staff member, Ms. Katherine Spillers, accompanied us through a tour of the Mt. Meigs buildings.

20.     **FURTHER** AFFIANT SAYETH NOT.


_Andrea Mixson_
Andrea Mixson

Sworn to and subscribed before me on this the 16th day of May, 2007.


_Janet K. Owens_
Notary Public

                                    2/27/2010

My Commission expires:



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

ALABAMA DISABILITIES ADVOCACY )
PROGRAM )
)
        Plaintiff, )
)
    v. )    Civil Action No.
)
J. WALTER WOOD, JR. in his official )
Capacity as Executive Director of the )
Alabama Department of Youth Services, )
)
        Defendant. )

## AFFIDAVIT OF CHRISTY JOHNSON

State of Alabama    ]
County of Tuscaloosa ]

1. My name is Christy Johnson. I am over the age of nineteen. This Affidavit is given on the basis of my personal knowledge.

2. I am employed as a senior case advocate with the Alabama Disabilities Advocacy Program, ("ADAP").

3. On March 28, 2007, I, along with ADAP attorney, Andrea Mixson, arrived at the Alabama Department of Youth Services ("DYS") Chalkville facility at approximately 1:00 p.m. to meet with residents on the Cherokee unit to explain ADAP's services and provide contact information. In addition, ADAP scheduled with Dudley Perry, Deputy Attorney General for DYS, to review the records and interview three residents whom ADAP had probable cause to believe received improper medical treatment at Chalkville.

4.  When Ms. Mixson and I arrived at Chalkville, the security guard at the entrance
    told us that Ms. Yolanda Byrdsong, the Campus Administrator of Chalkville, was
    attending a training off campus and not available. We were directed to the
    administration office and told to speak with Ms. Tate.

5.  Upon meeting Ms. Tate, Andrea and I explained the purpose of the monitoring
    visit. Andrea told Ms. Tate that we planned to meet with residents on the
    Cherokee unit, a unit we did not have the chance to monitor on March 6, 2007.
    Ms. Tate told us that Ms. Byrdsong instructed her to tell us not to speak with any
    resident at Chalkville unless they have a disability or unless the individual is one
    of the three girls for which arrangements were made to visit through Mr. Perry.
    Ms. Tate told us that we would only be allowed to talk with staff on the unit, pass
    out ADAP brochures and make a general announcement to residents as a group.

6.  Ms. Mixson and I explained to Ms. Tate that ADAP's federal access authority
    allows us to speak with any resident at Chalkville, including the three residents
    for which arrangements were made to visit through Mr. Perry.

7.  I contacted Nancy Anderson, ADAP senior staff attorney to notify her that our
    access to residents was denied, and to request her assistance with resolving this
    issue with Mr. Perry. In response, Mrs. Anderson faxed a letter to Ms. Tate and
    to Mr. Perry which outlines ADAP's access authority and monitoring intent. Mrs.
    Anderson also contacted Mr. Perry by phone, but was unable to reach him.

8.  Upon completion of our interviews with J.C., B.P. and S.B., Ms. Mixson and I
    met with Ms. Tate again and asked if she received the faxed letter from Mrs.
    Anderson. Ms. Mixson again explained our access authority which allows ADAP

to talk with any resident at the Chalkville campus. Ms. Mixson notified Ms. Tate of our intent to exercise this authority to speak with residents on the Cherokee unit and to pass out information about our program. Ms. Tate said that she spoke with Mr. Perry on the phone and he told her not to allow us to talk with residents unless they have a disability. Ms. Tate said that Mr. Perry told her that allowing ADAP to talk with other residents would be a breach of a resident's confidentiality. Ms. Tate stated that ADAP was only allowed to speak with staff, make a general announcement about ADAP services to a group of residents, and to distribute brochures to residents.

9. ADAP distributed brochures and made a general announcement about ADAP's services and contact information to the residents living on the Cherokee unit. During the announcement, Ms. Tate interrupted Ms. Mixson and told residents that they must be disabled for ADAP to help them. I provided clarification to residents and informed them that anyone may contact us if they feel they have been abused or neglected and that we would schedule a time to meet with them in private to determine if they qualify for our services.

10. While exiting the Cherokee unit, a resident walked toward me and started to ask how she could contact ADAP. Ms. Tate stepped in between me and the resident and told the resident that she was not allowed to talk with me. After Ms. Tate walked away, I provided the resident a brochure and showed her the contact phone number and address.

11. While walking towards the front gate, Ms. Tate stated that she did not understand why ADAP was not allowed to speak with all residents, as we have been to the

Chalkville campus in the past. Ms. Mixson and I told Ms. Tate that we made a recent visit on March 6, 2007 and were allowed to visit with residents.

12. On March 5, 2007, I contacted Vacca staff, Patricia Henderson, case manager, Joyce Delbridge, Campus Administrator, and sent an email to Dudley Perry to request a visit with D.R. Dudley Perry was issued a statement of probable cause based on a letter ADAP received from D.R. in which he reported an allegation of verbal abuse and mistreatment by staff. After repeated attempts to arrange a visit, I conducted an interview with D.R. at Vacca on March 19. I subsequently contacted the case manager and scheduled a follow up visit to take place April 4. On the morning of April 4, I received a phone call from Ms. Henderson reporting that D.R. had been hospitalized for elevated blood levels and a suspected self-administered medication overdose. I conducted a review of D.R.'s record at Vacca on the afternoon of April 4, and discussed obtaining a copy of D.R.'s record with Joyce Delbridge. Ms. Delbridge agreed to provide ADAP a copy of the DYS record on April 10, when ADAP returned to conduct a monitoring visit. On April 10, Ms. Delbridge denied ADAP a copy of D.R.'s record and indicated that DYS must first obtain written authorization from D.R.

13. On April 10, 2007, I, along with ADAP attorney, Andrea Mixson, arrived at the Vacca facility around 8:30 a.m., to complete a walk-through of all buildings, talk with residents and provide them with information about ADAP and our services. ADAP scheduled this monitoring visit with Mr. Perry on March 30, 2007.

14. When Ms. Mixson and I arrived at the Vacca facility, the security guard at the entrance told us to go to the administration building to meet with Joyce Delbridge,

Campus Administrator. Before we reached the administration building, Ms.
Delbridge met us outside and introduced us to a security guard, Mr. O'Connor.
Ms. Delbridge said that Mr. O'Connor would be giving us a tour of campus. I
asked Ms. Delbridge if we could meet with her first, and she said that she could
not meet with us because she had to attend a staff meeting. I told Ms. Delbridge
that we would like to meet with her when we completed our monitoring.

15. Ms. Delbridge told us that Dudley Perry instructed her to tell us not to talk with
any residents except our existing clients, and not to pass out any business cards or
ADAP brochures. Ms. Delbridge also told us not to disrupt classes or
programming, but that we could observe.

16. I explained ADAP's federal access authority to Ms. Delbridge, and told her that it
allows us to talk with all residents and distribute information about ADAP's
program. Ms. Delbridge told us that Dudley Perry instructed her to tell us that we
could not talk with residents or pass out any information, denying our access
authority. A female, Kiyoshi Torrence, accompanied Ms. Mixson and me on the
tour. Ms. Torrence indicated that she was not a DYS employee, but was in the
job application process.

17. I explained to the security guard, Mr. O'Connor that this was not a tour, but that
ADAP was conducting a monitoring visit. Mr. O'Connor said that he would
show us some residential units and the school, and would try to answer any
questions that we had.

18. Mr. O'Connor escorted me, Ms. Mixson and Ms. Torrence to three residential
units, Bailey Hall, Smith Hall, and Hill Hall, the medical building, the school and

the dining hall. We were not allowed to talk with residents, distribute business cards or ADAP brochures.

19. Upon completion of the tour, Ms. Mixson and I met with Joyce Delbridge, accompanied by Mr. O'Connor, in the Administration Building. During this interview, I requested a copy of D.R.'s record as previously agreed upon. Ms. Delbridge informed me that D.R. was still at Children's Hospital and that DYS would not release a copy of his record to ADAP without his written consent.

20. Following the April 10, 2007 monitoring visit, I made a number of attempts to contact Vacca staff regarding D.R.'s placement and to obtain a copy of his DYS record. On May 15, 2007, I contacted Ms. Henderson, case manager, and was told that D.R. was discharged from the hospital and placed at Mt. Meigs, Intensive Treatment Unit on Tuesday, May 8. ADAP has not been provided a copy of D.R.'s record as requested six weeks ago.

21. On April 17, 2007, I, along with ADAP attorney, Andrea Mixson arrived at the Mt. Meigs facility for a prearranged monitoring visit of the facility.

22. When Ms. Mixson and I arrived at Mt. Meigs, the security guard at the entrance told us that he had not received a memorandum from Dudley Perry about our visit and he was unaware that we were coming. The security guard informed us that Mr. Perry was not on campus that day and that he would have to contact Mr. Booker, Administrator of Institutional Services, to determine if ADAP was allowed access into the facility.

23. After the security guard contacted Mr. Booker, we were instructed to go to the campus administration building located outside of the secured campus to discuss our access to the facility.

24. Ms. Mixson and I went to the administration building and spoke with Phyllis Carney, Mr. Perry's legal assistant. Ms. Carney contacted Mr. Perry and instructed us to meet Katherine Spillers at the front gate to take a tour of the campus. Ms. Carney said that Mr. Perry instructed her to tell us that we were not allowed to pass out brochures or business cards and that we were not allowed to talk with any residents other than existing clients.

25. Ms. Mixson explained to Ms. Carney that ADAP has federal access authority to speak with any resident at the facility and to distribute information. Ms. Mixson provided Ms. Carney with a copy of Nancy Anderson's letter from March 28, 2007 to Mr. Perry, which explains ADAP's federal access authority. Ms. Carney made a copy of the letter for her file.

26. Ms. Mixson went on to explain that ADAP arranged this visit with Mr. Perry a month ago. Ms. Carney asked if ADAP sent her a copy of the email and indicated that Mr. Perry does not always check his emails and suggested that he may not be aware of the visit. Ms. Mixson informed Ms. Carney that a second notice was sent to Mr. Perry and went on to explain that notifying Mr. Perry of the visit was sufficient.

27. Ms. Mixson and I met Ms. Spiller at the front gate and were provided a monitoring tour of campus. We were not allowed to speak with any resident or distribute information.

28. **FURTHER** AFFIANT SAYETH NOT.

_Christy Johnson_
Christy Johnson

Sworn to and subscribed before me on this the 16th day of May, 2007.

_Janet K. Owens_
Notary Public

My Commission expires:     2/27/2010

EXHIBIT
F
tabbies

-----Original Message-----
From: Perry, Dudley [mailto:Dudley.Perry@dys.alabama.gov]
Sent: Wednesday, March 21, 2007 3:35 PM
To: Mixson, Andrea
Cc: Anderson, Nancy; Carney, Phyllis; Baldwin, Sandra; Allen, Alesia
Subject: RE: Monitoring @Chalkville 3/27/07

Dear Andrea,

We will communicate with Chalkville and arrange for your visit next
week.  I will ask them to coordinate a time for your monitoring visit
and visit with the girls you named.

If you are conducting an investigation, please let me know the grounds
on which ADAP believes the students are within ADAP's potential
clientele, and the facts on which probable cause for an investigation
is based.

Thank you,
Dudley

-----Original Message-----
From: Mixson, Andrea [mailto:amixson@adap.ua.edu]
Sent: Wednesday, March 21, 2007 1:01 PM
To: Perry, Dudley
Cc: Anderson, Nancy; Johnson, Christy; Tucker, James
Subject: Monitoring @Chalkville 3/27/07

Dear Dudley:

ADAP is planning another monitoring visit of Chalkville. ADAP staff
members, Christy Johnson and myself, plan to arrive at Chalkville next
Tuesday, March 27, 2007 at 1:00 p.m. In addition to monitoring
activities, Christy Johnson and I are requesting a confidential visit
with residents J█████ C█████t, S█████h B█████s, and B█████y F█████t.
Please provide ADAP with copies of any and all documents relating to
these residents kept by DYS prior to our visit.

As we have discussed in the past, our enabling statutes provide for
reasonable unaccompanied access to facilities including all areas which
are used by residents, are accessible to residents, and to programs and
their residents at reasonable times, which at a minimum shall include
normal working hours and visiting hours.

This access is for the purposes of 1) providing information and
training on programs addressing the needs of individuals with mental
illness, individual rights, and the protection and advocacy services
available from ADAP; 2) monitoring compliance with respect to the
rights and safety of residents; and 3) viewing and photographing all
areas of the facility which are used by residents or are accessible to
residents.

Please contact me with any questions or concerns.

Thank you,

Andrea Mixson


Andrea J. Mixson, Staff Attorney
Alabama Disabilities Advocacy Program (ADAP) University of Alabama
526 Martha Parham West
Box 870395
Tuscaloosa, AL  35487-0395
205-348-4928
205-348-3909 (fax)
1-800-826-1675 (toll-free)
This email is intended only for the person to whom it is addressed.
Any review or other use of this information by persons or entities
other than the intended recipient or any retransmission without the
consent of the sender is prohibited.  The views or opinions expressed
by the sender of this email are not necessarily those of the
institution.

## Mixson, Andrea

| | |
|---|---|
| **From:** | Mixson, Andrea |
| **Sent:** | Thursday, March 22, 2007 11:53 AM |
| **To:** | Anderson, Nancy |
| **Cc:** | Johnson, Christy; Mixson, Andrea |
| **Subject:** | Chalkville Visit |

**EXHIBIT G** 

Dudley:

As you requested in our phone conversation today with Nancy Anderson, ADAP will accommodate your request to reschedule our March 27, 2007 visit to Chalkville. As such, ADAP plans to visit Chalkville on Wednesday, March 28, 2007 at 1:00 p.m. I hope this time is agreeable and I would appreciate your confirmation.

Sincerely,

Andrea Mixson


-----Original Message-----
From: Mixson, Andrea
Sent: Thursday, March 22, 2007 10:03 AM
To: dudley.perry@dys.alabama.gov
Cc: Anderson, Nancy; Mixson, Andrea; Johnson, Christy
Subject: Chalkville

Dudley:

As you requested, please see below information establishing these Chalkville residents as ADAP clients and the basis for probable cause for an ADAP investigation.

S██████ B██████:
ADAP has cause to believe Chalkville psychiatrist prescribed S██████ with psychotropic medication while at Chalkville. ADAP has probable cause to believe S██████ has been improperly restrained and searched at Chalkville.

B██████ P██████:
ADAP has cause to believe that B██████ has bi-polar disorder.
ADAP has probable cause to believe that B██████ received improper mental health treatment while at Chalkville.

J██ C██████:
ADAP has cause to believe that J██ C██████ has a physical disability.
ADAP has probable cause to believe that J██ received improper medical treatment.

As always, please let me know if you have any further questions or concerns.

Sincerely,

Andrea

Andrea J. Mixson, Staff Attorney
Alabama Disabilities Advocacy Program (ADAP) University of Alabama
526 Martha Parham West
Box 870395
Tuscaloosa, AL 35487-0395
205-348-4928
205-348-3909 (fax)
1-800-826-1675 (toll-free)
This email is intended only for the person to whom it is addressed. Any review or other use of this information by persons or entities other than the intended recipient or any retransmission without the consent of the sender is prohibited. The views or opinions

**Mixson, Andrea**

| | |
|---|---|
| **From:** | Mixson, Andrea |
| **Sent:** | Monday, March 26, 2007 12:09 PM |
| **To:** | dudley.perry@dys.alabama.gov |
| **Subject:** | Confirmation Chalkville |



Dudley:

Per our telephone discussion today, ADAP will visiting Chalkville on Wednesday, March 28, 2007 at 1:00 p.m.

Thank you,

Andrea

-----Original Message-----
From: Mixson, Andrea
Sent: Friday, March 23, 2007 11:31 AM
To: dudley.perry@dys.alabama.gov
Subject: FW: Chalkville Visit

Dudley:

Just wanted to confirm that ADAP will be visiting Chalkville on Wednesday, March 28, 2007 at 1:00 p.m. Please see email below.

Thank you,

Andrea

-----Original Message-----
From: Mixson, Andrea
Sent: Thursday, March 22, 2007 11:53 AM
To: Anderson, Nancy
Cc: Johnson, Christy; Mixson, Andrea
Subject: Chalkville Visit

Dudley:

As you requested in our phone conversation today with Nancy Anderson, ADAP will accommodate your request to reschedule our March 27, 2007 visit to Chalkville. As such, ADAP plans to visit Chalkville on Wednesday, March 28, 2007 at 1:00 p.m. I hope this time is agreeable and I would appreciate your confirmation.

Sincerely,

Andrea Mixson

-----Original Message-----
From: Mixson, Andrea
Sent: Thursday, March 22, 2007 10:03 AM
To: dudley.perry@dys.alabama.gov
Cc: Anderson, Nancy; Mixson, Andrea; Johnson, Christy
Subject: Chalkville

Dudley:

As you requested, please see below information establishing these Chalkville residents as ADAP clients and the basis for probable cause for an ADAP investigation.

S B :

1

ADAP has cause to believe Chalkville psychiatrist prescribed S██████ with psychotropic medication while at Chalkville. ADAP has probable cause to believe S██████ has been improperly restrained and searched at Chalkville.

B██████ P██████:
ADAP has cause to believe that B██████ has bi-polar disorder.
ADAP has probable cause to believe that B██████ received improper mental health treatment while at Chalkville.

J████ C████:
ADAP has cause to believe that J████ C████ has a physical disability.
ADAP has probable cause to believe that J████ received improper medical treatment.

As always, please let me know if you have any further questions or concerns.

Sincerely,

Andrea

Andrea J. Mixson, Staff Attorney
Alabama Disabilities Advocacy Program (ADAP) University of Alabama
526 Martha Parham West
Box 870395
Tuscaloosa, AL  35487-0395
205-348-4928
205-348-3909 (fax)
1-800-826-1675 (toll-free)

This email is intended only for the person to whom it is addressed.  Any review or other use of this information by persons or entities other than the intended recipient or any retransmission without the consent of the sender is prohibited.  The views or opinions expressed by the sender of this email are not necessarily those of the institution.

MAR-28-2007 14:27 FROM:ADAP                2053483909            TO:3342643214          P.001/004

**Alabama
Disabilities
Advocacy
Program**



500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
(205)348-4928
(800)826-1675
FAX (205)348-3909
www.ADAP.net

If you do not receive legible
copies of all pages,
please call 205/348-4928.
Manual answer 8:00 a.m. to 4:45
p.m.;
voice mail other times.

NOTE: Unless otherwise
indicated or obvious from the
nature of the transmittal, the
information contained in this
facsimile message is confidential
information intended only for use
of the individual or entity named
above. If the reader of this
message is not the intended
recipient, or the employee or
agent responsible to deliver it to
the intended recipient, you are
hereby notified that any
dissemination, distribution or
copying of this communication is
strictly prohibited.
If you have received this
communication in error or are not
sure whether it is privileged,
please immediately notify us by
telephone, and return the original
message to us at the above
address via the U.S. Postal
Service at our expense.

Thank You



# Fax Cover Letter

**EXHIBIT
I**

Date:  March 28, 2007

Sent by:  Nancy Anderson

Total pages including cover page:  4

Fax to:

Dudley Perry, Deputy Attorney General, DYS  (334) 215-3872

Mrs. Tate, Chalkville, 205.680.8543

Comments:

PLEASE DELIVER IMMEDIATELY.

TIME SENSITIVE.

DATE OF LETTER IS CORRECTED.

MAR-28-2007 14:28 FROM:ADAP    2053483909    TO:3342643214    P.002/004



ALABAMA DISABILITIES

ADVOCACY PROGRAM

March 28, 2007

Mrs. Tate
Chalkville Campus
5849 Old Springville Road
Pinson, AL 35126

RE: The Alabama Disabilities Advocacy Program (ADAP) monitoring
authority

Dear Mrs. Tate:

Protection & Advocacy for
Persons with Developmental
Disabilities

Protection & Advocacy for
Individuals with Mental Illness

Protection & Advocacy of
Individual Rights

Protection & Advocacy for
Assistive Technology

Protection & Advocacy for
Individuals with
Traumatic Brain Injury

Protection & Advocacy for
Beneficiaries of Social Security

Protection & Advocacy for
Voting Accessibility



THE UNIVERSITY OF

ALABAMA

FOUNDED 1831

500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
(205)348-4928
(800)826-1675
FAX (205)348-3909
adap@adap.ua.edu
www.ADAP.net

It is my understanding that you have a question regarding the scope of
ADAP's monitoring authority in relation to the visit that is being made
today by ADAP representatives Christy Johnson and Andrea Mixson.

ADAP arranged for today's monitoring visit to Chalkville with DYS
Deputy General Counsel Dudley Perry over a week ago. We even
agreed to delay our visit by a couple of days in order to accommodate
Mr. Perry. Mr. Perry is very aware of the scope of our access authority
and understands what it is Ms. Johnson and Ms. Mixson seek to
accomplish today.

For your benefit, I am providing a summary of ADAP's access
authority under federal law (as found in 42 CFR 51.42):

- Persons with disabilities may not be aware of their state's P&A
  or be able to contact the P&A on their own. To ensure that
  persons with disabilities have access to the agency's protection
  and advocacy services, federal law provides P&As with the
  right to unaccompanied access to all residents of a facility at
  reasonable times (including, at a minimum, normal working
  hours and visiting hours) to provide information, training and
  referrals to facility residents.

- P&As have broad authority to conduct on-site monitoring of
  health and safety conditions in both institutional and community
  settings.

- Access to facility residents and staff to discuss issues relating to
  rights protections and treatment may not be restricted except in
  the most limited circumstances and notice to a facility is
  generally not required prior to meeting with residents or staff.

MHR-28-2007 14:28 FROM:HDHP          2053483909          TO:3342643214          P.0003/0004

- P&A staff have a right to have unaccompanied access to residents, which includes the opportunity to meet and communicate privately with them, both formally and informally, by telephone, mail and in person. The right of informal access applies to all residents of a facility, including those who may eventually be found not to meet the P&A eligibility criteria. The P&A is the final arbiter of what individuals served by a facility are, or are not, P&A clients and a facility may not require, as a condition of granting access to records or facilities, that the P&A make a definitive showing that particular individuals have a disability.

- Permission of a parent or guardian of a resident is not necessary for P&A staff to meet informally with any resident. However, the P&A staff must honor a resident's request to terminate an interview. A request to terminate an interview should not mean, however, that the P&A never again approaches the individual. Most advocates have worked with clients who will not talk with them one day, but welcome a respectful approach on the next.

I trust that with this information you will allow Ms. Johnson and Ms. Mixson to continue with their monitoring visit. If you have any further questions, I invite you to direct them to me or to Mr. Perry.

With very best regards,

Nancy Anderson
Attorney

cc: Dudley Perry

MAR-28-2007  14:29  FROM:HUHP                    2053483909              TO:3342643214              P.004/004

**Sec. 51.42 Access to facilities and residents.**

(a) Access to facilities and residents shall be extended to all authorized agents of a P&A system.

(b) A P&A system shall have reasonable unaccompanied access to public and private facilities and programs in the State which render care or treatment for individuals with mental illness, and to all areas of the facility which are used by residents or are accessible to residents. The P&A system shall have reasonable unaccompanied access to residents at all times necessary to conduct a full investigation of an incident of abuse or neglect. This authority shall include the opportunity to interview any facility service recipient, employee, or other persons, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation. Such access shall be afforded, upon request, by the P&A system when:

1. An incident is reported or a complaint is made to the P&A system;
2. The P&A system determines there is probable cause to believe that an incident has or may have occurred; or
3. The P&A system determines that there is or may be imminent danger of serious abuse or neglect of an individual with mental illness.

(c) In addition to access as prescribed in paragraph (b) of this section, a P&A system shall have reasonable unaccompanied access to facilities including all area which are used by residents, are accessible to residents, and to programs and their residents at reasonable times, which at a minimum shall include normal working hours and visiting hours. Residents include adults or minors who have legal guardians or conservators. P&A activities shall be conducted so as to minimize interference with facility programs, respect residents' privacy interests, and honor a resident's request to terminate an interview.
This access is for the purpose of:

1. Providing information and training on, and referral to programs addressing the needs of individuals with mental illness, and information and training about individual rights and the protection and advocacy services available from the P&A system, including the name, address, and telephone number of the P&A system.
2. Monitoring compliance with respect to the rights and safety of residents; and
3. , viewing and photographing all areas of the facility which are used by residents or are accessible to residents.

(d) Unaccompanied access to residents shall include the opportunity to meet and communicate privately with individuals regularly, both formally and informally, by telephone, mail and in person. Residents include minors or adults who have legal guardians or conservators.

**Mixson, Andrea**

| | |
|---|---|
| **From:** | Anderson, Nancy |
| **Sent:** | Friday, March 30, 2007 6:54 PM |
| **To:** | Dudley Perry |
| **Subject:** | FW: Vacca Monitoring |

```
EXHIBIT

J
```

Dudley,

I am confirming our monitoring at Vacca on Tuesday, 4/10 at 8 AM, as outlined by Christy
Johnson in her original email to you (dated 3/27).

Nancy


-----Original Message-----
From: Johnson, Christy
Sent: Tuesday, March 27, 2007 9:02 AM
To: 'dudley.perry@dys.alabama.gov'
Cc: Mixson, Andrea; Anderson, Nancy
Subject: Vacca Monitoring

Dear Dudley:

ADAP is planning a monitoring visit of Vacca.  ADAP staff members, Andrea Mixson and
myself, plan to arrive at Vacca Tuesday, April 10, 2007 at 8:00 a.m.

As we have discussed in the past, our enabling statutes provide for reasonable
unaccompanied access to facilities including all areas which are used by residents, are
accessible to residents, and to programs and their residents at reasonable times, which at
a minimum shall include normal working hours and visiting hours.

This access is for the purposes of 1) providing information and training on programs
addressing the needs of individuals with mental illness, individual rights, and the
protection and advocacy services available from ADAP; 2) monitoring compliance with
respect to the rights and safety of residents; and 3) viewing and photographing all areas
of the facility which are used by residents or are accessible to residents.


Please contact me with any questions or concerns.

Christy Johnson
Senior Case Advocate
Alabama Disabilities Advocacy Program
Box 870395
Tuscaloosa, Alabama 35487-0395
(205)348-4928
(205)348-3909 fax

*********************************************************

This email is intended only for the person to whom it is addressed.  Any review or other
use of this information by persons or entities other than the intended recipient or any
retransmission without the consent of the sender is prohibited.  The views or opinions
expressed by the sender of this email are not necessarily those of the institution.

EXHIBIT
K 1

**Johnson, Christy**

| | |
|---|---|
| **From:** | Mixson, Andrea |
| **Sent:** | Monday, March 05, 2007 5:16 PM |
| | dudley.perry@dys.alabama.gov |
| **To:** | Anderson, Nancy; Tucker, James; Johnson, Christy; Mixson, Andrea |
| **Cc:** | |
| **Subject:** | Monitoring Visit Mt. Meigs |

Dear Dudley:

ADAP plans to do a monitoring of Mt. Meigs on Tuesday April 17, 2007.

As we have discussed in the past, our enabling statutes provide for reasonable unaccompanied access to facilities including all areas which are used by residents, are accessible to residents, and to programs and their residents at reasonable times, which at a minimum shall include normal working hours and visiting hours.

This access is for the purposes of 1) providing information and training on programs addressing the needs of individuals with mental illness, individual rights, and the protection and advocacy services available from ADAP; 2) monitoring compliance with respect to the rights and safety of residents; and 3) viewing and photographing all areas of the facility which are used by residents or are accessible to residents.

Christy Johnson, ADAP staff member, and myself will plan on arriving at 2 PM. at Mt. Meigs.

Please contact me with any questions or concerns.

Sincerely,

Andrea Mixson

1

**Johnson, Christy**

| | |
|---|---|
| **From:** | Mixson, Andrea |
| **Sent:** | Friday, April 06, 2007 2:43 PM |
| **To:** | dudley.perry@dys.alabama.gov |
| **Cc:** | Johnson, Christy; Anderson, Nancy |
| **Subject:** | ADAP Monitoring Visit to Mt. Meigs |



Dudley:

ADAP will be conducting a monitoring visit at Mount Meigs on Tuesday, April 17, 2007 starting at 9:00 a.m. Three people from ADAP will be participating in this site visit.

As we have discussed in the past, our enabling statutes provide for reasonable unaccompanied access to facilities including all areas which are used by residents, are accessible to residents, and to programs and their residents at reasonable times, which at a minimum shall include normal working hours and visiting hours.

This access is for the purposes of 1) providing information and training on programs addressing the needs of individuals with mental illness, individual rights, and the protection and advocacy services available from ADAP; 2) monitoring compliance with respect to the rights and safety of residents; and 3) viewing and photographing all areas of the facility which are used by residents or are accessible to residents.

Please contact me with any questions or concerns.

Sincerely,

Andrea Mixson

Alabama Disabilities Advocacy Program (ADAP) University of Alabama
526 Martha Parham West
Box 870395
Tuscaloosa, AL 35487-0395
205-348-4928
205-348-3909 (fax)
1-800-826-1675 (toll-free)
This email is intended only for the person to whom it is addressed. Any review or other use of this information by persons or entities other than the intended recipient or any retransmission without the consent of the sender is prohibited. The views or opinions expressed by the sender of this email are not necessarily those of the institution.

1

EXHIBIT

L

-----Original Message-----
From: Johnson, Christy
Sent: Monday, March 05, 2007 2:59 PM
To: 'dudley.perry@dys.alabama.gov'
Cc: 'joyce.delbridge@dys.alabama.gov'; 'phyllis.carney@dys.alabama.gov'
Subject: Vacca Interview

Dudley, I contacted Joyce Delbridge, Campus Administrator at Vacca, to
request her assistance with scheduling a potential client visit.  Mrs.
Delbridge referred me to Patricia Henderson, case manager, to make
these arrangements.

D▪▪▪▪▪ recently sent ADAP a letter requesting a visit.  He reported
allegations of verbal abuse and mistreatment by staff.  He reports
exhibiting previous suicidal ideations and attempts.  The purpose of
the visit is to determine if D▪▪▪▪▪ qualifies for our services and to
determine if we can provide him with individual case assistance.
Please contact me if you have any questions or concerns.  Thank you!

Christy

Christy Johnson
Senior Case Advocate
Alabama Disabilities Advocacy Program
Box 870395
Tuscaloosa, Alabama 35487-0395
(205)348-4928
(205)348-3909 fax

*********************************************************

This email is intended only for the person to whom it is addressed.
Any review or other use of this information by persons or entities
other than the intended recipient or any retransmission without the
consent of the sender is prohibited.  The views or opinions expressed
by the sender of this email are not necessarily those of the
institution.



Hi,
   Mrs. Johnson. This is D████
████. There are many things I
would like to tell you, but the letter
might not get sent. So I will
tell you some now and some later
if you come to see me. I have
tried to kill myself 9 times.
2 times since Ive been locked u.
I have been to 4 different, Hospitals,
and out of those 4 I have been to 2
more than once. I have been moved
around from place to place and out of
all of them this is worse.
Here there are people who treat me
bad, for instance, Some staff and peers
call me names because I'm white, and
because I hang out with a choice
few people who happen to not be
white. I hang out with these
people because they stay out of trouble.
Not because I'm prejudice.

other People say degrading things
about me because of my religion.
I am wiccan, and just because Im
pagan means Im a satanist freak, who
does witch craft, and does human sacrifice
to some unnamed god. Sorry if I
seem cruel, harsh, but it makes
me angry. There is more I
want to say to you, but it will
have to wait until you can talk
to me. Bye.



Alabama Disabilities
Advocacy Program

FILED



November 29, 2006

THE UNIVERSITY OF
**ALABAMA**
F O U N D E D  1 8 3 1

Protection & Advocacy for
Persons with Developmental
Disabilities

Protection & Advocacy for
Individuals with Mental Illness

Protection & Advocacy of
Individual Rights

Protection & Advocacy for
Assistive Technology

Protection & Advocacy for
Individuals with
Traumatic Brain Injury

Protection & Advocacy for
Beneficiaries of Social Security

Protection & Advocacy for
Voting Accessibility

500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
(205)348-4928
(800)826-1675
FAX (205)348-3909
www.ADAP.net

Designated by the Governor to
The University of Alabama in accordance
with Public Laws 100 - 146 and 99 - 319.
ADAP is The Protection and Advocacy
System for Alabama on behalf of persons
with disabilities.

Department of Youth Services
Dudley Perry, Deputy Attorney General
Post Office Box 66
Mt. Meigs, Alabama 36057

Dear Mr. Perry:

I am requesting information on behalf of three ADAP clients, W████
D████ B████, H████ M████ and K████ W████.

W████ B████ – ADAP conducted an initial interview with W████
B████ and his case manager, Pearline McClure, at the Vacca facility.
ADAP subsequently sent Ms. McClure a letter of request for
information, (see attached), and a follow up letter to you when we did
not receive a response (see attached). It is my understanding that Ms.
McClure turned over this request for information to the DYS legal
division. ADAP originally requested specific documentation related to
W████s mental health treatment. However, since our initial
interview, W████ reported to ADAP an allegation of abuse by a staff
member named Mr. Farley. W████ reported that Mr. Farley punched
him in the chest, knocking him back into his room one evening during
the week of November 6. W████ did not report this incident to staff
because he was afraid of retaliation and indicated that this staff member
has physically abused other residents, but DYS refuses to address his
behavior. ADAP is requesting copies of W████s DYS record,
including copies of any incident reports and investigative findings that
involve W████.

H████ M████ – ADAP sent you a letter dated November 7, 2006,
requesting that DYS conduct an internal investigation regarding an
allegation of medical neglect involving H████ M████ on November 5,
2006. If you would please advise ADAP of the status of this
investigation in writing.

K████ W████ - In a letter dated June 13, 2006, (see attached), ADAP
requested copies of investigative findings related to an allegation of
medical neglect involving K████ W████. It was reported to ADAP
that K████ was denied access to appropriate medical care following
an ACL surgery in September of 2005. A second ACL surgery was
subsequently required. As part of ADAP's preliminary investigation,
we requested copies of any investigative findings related to this
allegation of neglect. To date, we have not received these reports.

As you are aware, the PAIMI Act § 51.41 grants the P&A access to records. Access to records shall be extended promptly to all authorized agents of the P&A system. Information and individual records, whether written or in another medium, draft or final, including handwritten notes, electronic files, photographs or video or audio tape records, which shall be available to the P&A system under the Act shall include, but not be limited to:

1. Information and individual records, obtained in the course of providing intake, assessment, evaluation, supportive and other services, including medical records, financial records, and reports prepared or received by a member of the staff of a facility or program rendering care or treatment. This includes records stored or maintained in locations other than the facility or program as long as the system has obtained appropriate consent consistent with section 105(a)(4) of the Act. The system shall request of facilities that in requesting records from service providers or other facilities on residents that they indicate in the release form the records may be subject to review by a system.

2. Reports prepared by an agency charged with investigating abuse, neglect, or injury occurring at a facility rendering care or treatment, or by or for the facility itself, that describe any or all of the following:

(i) Abuse, neglect, or injury occurring at the facility;
(ii) The steps taken to investigate the incidents;
(iii) Reports and records, including personnel records, prepared or maintained by the facility, in connection with such reports of incidents; or
(iv) Supporting information that was relied upon in creating a report, including all information and records used or reviewed in preparing reports of abuse, neglect or injury such as records which describe persons who were interviewed, physical and documentary evidence that was reviewed, and the related investigative findings.

3. Discharge planning records.

4. Reports prepared by individuals and entities performing certification or licensure reviews, or by professional accreditation organizations, as well as related assessments prepared for the facility by its staff, contractors or related entities, except that nothing in this section is intended to preempt State law protecting records produced by medical care evaluation or peer review committees.

If you will please promptly respond in writing to this request for information and provide requested documentation. If you have any questions, please contact me at (205) 348-4928.

Sincerely Yours,

Christy Johnson
Senior Case Advocate



**ALABAMA DISABILITIES**

# ADAP

**ADVOCACY PROGRAM**

Protection & Advocacy for
Persons with Developmental
Disabilities

Protection & Advocacy for
Individuals with Mental Illness

Protection & Advocacy of
Individual Rights

Protection & Advocacy for
Assistive Technology

Protection & Advocacy for
Individuals with
Traumatic Brain Injury

Protection & Advocacy for
Beneficiaries of Social Security

Protection & Advocacy for
Voting Accessibility

## THE UNIVERSITY OF
# ALABAMA
**FOUNDED 1831**

500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
(205)348-4928
(800)826-1675
FAX (205)348-3909
adap@adap.ua.edu
www.ADAP.net

April 20, 2007

Alabama Department of Youth Services
Mr. Dudley Perry, Deputy Attorney General
Post Office Box 66
Mt. Meigs, Alabama 36057

Dear Mr. Perry:

ADAP sent you a letter on November 29, 2006 on behalf of three clients, W██ D██ B█████, H██ M███, and K█████ W███. Please find a copy of this letter enclosed for your review. To date, ADAP has not received copies of incident reports and investigative findings as requested. Please forward those reports to us by May 4, 2007.

We are also requesting copies of incident reports and investigative findings prepared by DYS regarding concerns we raised on behalf of J███ C███, B█████ P█████, and S█████ B█████, residents at Chalkville. Again, please forward these reports to us by May 4, 2007.

In addition, ADAP is requesting copies of all investigative reports prepared by any agency charged with investigating abuse or neglect, or injury occurring at Vacca, Chalkville and Mt. Meigs within the last 6 months. Please forward these reports to us by May 4, 2007.

We are requesting these reports under our access authority as described at 42 C.F.R. § 51.41 (c), granting ADAP access to:

(2) Reports prepared by an agency charged with investigating abuse, neglect, or injury occurring at a facility rendering care or treatment, or by or for the facility itself, that describe any or all of the following:
(i) Abuse, neglect, or injury occurring at the facility;
(ii) The steps taken to investigate the incidents;
(iii) Reports and records, including personnel records, prepared or maintained by the facility, in connection with such reports of incidents; or
(iv) Supporting information that was relied upon in creating a report, including all information and records used or reviewed in preparing reports of abuse, neglect or injury such as records which describe persons who were interviewed, physical and documentary evidence that was reviewed, and the related investigative findings.

If you intend to delay or deny ADAP's access to these records, please note that 42 C.F.R. § 51.43 requires you to provide ADAP with a prompt written statement of the reasons for the delay or denial. Please provide us this statement by April 26, 2007.

As we have discussed with you in the past, ADAP is responsible for maintaining the confidentiality of any records received by our office to the same extent as required of you under Federal or State laws. 42 C.F.R. § 51.45.

Sincerely Yours,

Christy Johnson
Senior Case Advocate

Enclosure

Alabama Disabilities
Advocacy Program (ADAP)

June 12, 2006



EXHIBIT
B2

Dudley Perry, Deputy Attorney General
Alabama Department of Youth Services
Post Office Box 66
Mt. Meigs, Alabama 36057

THE UNIVERSITY OF
**ALABAMA**
F O U N D E D  1 8 3 1

RE: S▓▓ W▓▓

Dear Dudley:

Protection and Advocacy for
Persons with Developmental
Disabilities

Protection and Advocacy for
Individuals with Mental Illness

Protection and Advocacy of
Individual Rights

Protection and Advocacy of
Assistive Technology

Protection and Advocacy for
Individuals with
Traumatic Brain Injury

Protection and Advocacy for
Beneficiaries of Social Security

Protection and Advocacy for
Voting Accessibility

As you are aware, I recently attempted to access records contained by the Department of Youth Services, Mt. Meigs on behalf of S▓▓ W▓▓, an ADAP client.

According to the PAIMI Act, § 51.41 (b) (1), the P&A shall be granted access to records on behalf of a client if authorized by that individual or the legal guardian, conservator or other legal representative.

Please find enclosed a release provided by S▓▓'s mother, Mrs. K▓▓ W▓▓. If you will please provide me a copy of S▓▓'s records, I will be in Montgomery attending a conference on Wednesday, June 14 and can pick them up at that time.

Thank you for your prompt attention regarding this matter. If you have any questions or concerns, please contact me at (205) 348-4928.

Sincerely Yours,



Christy Johnson
Senior Case Advocate

cc: James Tucker, esq.
    K▓▓ W▓▓
    S▓▓ W▓▓

Designated by the Governor
to The University of Alabama
in accordance with Public Laws
100-146 and 99-319. ADAP is
the protection and advocacy
system for Alabama on behalf
of persons with disabilities.

500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
(205) 348-4928
(800) 826-1675
FAX (205) 348-3909
www.ADAP.net