IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

ALABAMA DISABILITIES ADVOCACY )
PROGRAM, )
                     )
         Plaintiff, )
    v. )      CIVIL ACTION NO.
                     )      2:07-CV-434-MHT
                     )
J. WALTER WOOD, JR. in his official )
Capacity as Executive Director of the )
Alabama Department of Youth Services, )
                     )
         Defendant. )

## AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### PRELIMINARY STATEMENT

1. The Alabama Disabilities Advocacy Program ("ADAP") is a nonprofit organization authorized by Congress to protect and advocate for the civil rights of persons with disabilities in Alabama. This complaint is related to a similar complaint filed in this Court less than two years ago (Case 2:05-cv-01030-MHT), in which ADAP sought injunctive and declaratory relief against the Alabama Department of Youth Services ("DYS") for refusing to provide full access to ADAP's client, J.P., her records, DYS staff and other residents for the purposes of investigating allegations that J.P. was physically abused, mechanically restrained, and denied psychiatric medication by DYS staff. Subsequently, the parties were ordered to mediation, ADAP obtained access, and the case was voluntarily dismissed on May 2, 2006. See Doc. No. 000077-000095.

2. Since the dismissal of the 2005 complaint, DYS has engaged in a pattern and practice of refusing to provide ADAP with access to DYS residents, facilities, facility staff, and records, preventing ADAP from fully exercising the monitoring and investigatory mandates authorized to it under federal law.

3. ADAP brings this action against J. Walter Wood, Jr., in his official capacity as Executive Director of DYS, pursuant to the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. §§ 10801 et seq., and its implementing regulations at 42 C.F.R. §§ 51.1 et seq.; the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD Act"), 42 U.S.C. §§ 15001 et seq., and its implementing regulations at 45 C.F.R. §§ 1385 et seq.; the Protection and Advocacy of Individual Rights Program ("PAIR Act"), 29 U.S.C., §§ 794e, et seq., and its implementing regulations at 34 C.F.R. §§ 381.1 et seq.; and 42 U.S.C. § 1983.

4. ADAP seeks a permanent injunction preventing J. Walter Wood, Jr. and all agents of Mr. Wood from denying ADAP, as authorized by its federal enabling statutes and regulations, full, complete, timely access to DYS residents, facilities and facility staff as well as full, complete, timely access to records. In particular, Defendant has denied ADAP its federal statutory right under the PAIMI, PADD and PAIR Acts to:

a) reasonable unaccompanied access, for monitoring and investigatory purposes, to public and private areas of DYS facilities, in violation of 42 C.F.R. § 51.42(b); 42 C.F.R. § 51.42 (c); 45 C.F.R. § 1386.22(f); and 45 C.F.R. § 1386.22(g);

b) interview residents, staff and other persons as part of an abuse and neglect investigation when ADAP had probable cause to believe an incident had occurred, in violation of 42 C.F.R. § 51.42(b);

c) provide information and training on individual rights and services provided by the P&A system, in violation of 42 C.F.R. § 51.42 (c) and 45 C.F.R. § 1386.22(g);

d) communicate privately with facility residents, in violation of 42 C.F.R. § 51.42 (d) and 45 C.F.R. § 1386.22(h);

e)  access to facility incident reports and investigatory findings, in violation of 42 C.F.R. §
   51.41(c)(2); and

f)  access to records of facility residents, in violation of 42 C.F.R. § 51.41 and 45 C.F.R. §
   1386.22.

## JURISDICTION

5.  Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331.

6.  Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).  Defendant resides in
   Montgomery County, Alabama.  Ala. Code 1975 § 44-1-20 ("The principal offices of the
   department [of youth services] shall be located at the state capital.")

## PARTIES

7.  Plaintiff ADAP is a nonprofit organization in the state of Alabama authorized by
   Congressional mandate to protect and advocate for the civil rights of persons with disabilities
   in Alabama.  Plaintiff spends significant time and resources conducting federally authorized
   monitoring activities at DYS facilities like Chalkville, Vacca, and Mt. Meigs, and advocating
   for the rights of individuals residing in those facilities.  ADAP is charged with the duty of
   investigating complaints of abuse and neglect of residents of facilities like Chalkville, Vacca,
   and Mt. Meigs under Congressional mandate pursuant to the PAIMI, PADD and PAIR Acts.
   ADAP files this complaint in its own name to redress injuries to itself and on behalf of its
   clients.

8.  Defendant J. Walter Wood, Jr., is the Executive Director of DYS.  DYS is the agency in the
   state of Alabama established to "promote and safeguard the social well-being and general
   welfare of the youth of the state through a comprehensive and coordinated program of public

services for the prevention of juvenile delinquency and the rehabilitation of delinquent youth." Ala. Code 1975 § 44-1-1.

## STATEMENT OF FACTS

### ADAP's Access authority

9. In 1975, the PADD Act established the Protections and Advocacy ("P&A") System to investigate incidents of abuse and neglect and to pursue legal, administrative and other appropriate remedies to safeguard the rights of individuals with developmental disabilities. Congress extended the protection and advocacy mandate to cover individuals with mental illness with the enactment of the PAIMI Act in 1986. The scope of the P&A system was further expanded in 1993 when the PAIR Act was enacted.

10. To receive federal funding under the PAIMI, PADD and PAIR Acts, states must have in effect a P&A system. ADAP is designated as Alabama's P&A system. The PADD, PAIMI and PAIR Acts, along with their implementing regulations, authorize ADAP to investigate incidents of abuse and neglect and to pursue legal, administrative, and other appropriate remedies to ensure that the rights of persons with physical, mental and cognitive disabilities are protected – whether those persons live in facilities or in the community. 42 U.S.C. § 15043; 42 U.S.C. § 10805; 29 U.S.C. § 794e (a) and (f). See also, Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr., 97 F.3d 492 (11th Cir. 1996).

11. Under the PAIMI Act, "any public or private residential setting that provides overnight care accompanied by treatment services" is a facility which a P&A is authorized to access and monitor.

> Facilities include, but are not limited to the following: General and psychiatric hospitals, nursing homes, board and care homes, Community housing, juvenile detention facilities, homeless shelters, and jails and

4

prisons, including all general areas as well as special mental health or forensic units.

42 C.F.R. § 51.2.

12.  Under the PADD Act, facilities include "any setting that provides care, treatment, services and habilitation. ... Facilities include, but are not limited to the following:  Community living arrangements ..., day programs, juvenile detention centers, hospitals, nursing homes, homeless shelters, jails and prisons."   45 C.F.R. § 1386.19.

13. Under the PAIMI Act,  "care" and "treatment" are defined as services:

> provided to prevent, identify, reduce or stabilize mental illness or emotional impairment such as mental health screening, evaluations, counseling, biomedical, behavioral and psychotherapies, supportive or other adjunctive therapies, medication supervision, special education and rehabilitation, even if only, "as needed" or under a contractual arrangement.

42 C.F.R. § 51.2.

14. DYS facilities like Chalkville, Vacca, and Mt. Meigs constitute facilities as described under both the PAIMI and PADD Acts.

15. The PAIMI and PADD Acts empower ADAP to investigate incidents of abuse and neglect of individuals if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred. 42 U.S.C. § 10805; 42 C.F.R. § 51.41; 42 C.F.R. § 51.42; 42 U.S.C. § 15043; 45 C.F.R. § 1386.22(a)(3).

16. To carry out ADAP's investigatory mandates, the PAIMI and PADD Acts authorize ADAP prompt access to all records of any individual who is a client of the system if the individual, or his legal guardian, conservator, or other legal representative, has authorized the system to have such access. 42 U.S.C. § 10805; 45 C.F.R. § 1386.22(a)(1);  42 U.S.C. § 15043; 42 C.F.R. § 51.41(b)(1).

17. The PAIMI and PADD Acts provide ADAP with prompt access to records of individuals who are in the custody of the state and with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe such individual has been subjected to abuse or neglect. 42 U.S.C. § 10805; 42 C.F.R. § 51.41(b)(2)(ii); 42 U.S.C. § 15043; 45 C.F.R. § 1386.22(a)(2)(ii).

18. The PAIMI and PADD Acts provide ADAP with reasonable, unaccompanied access to facilities including all areas which are used by or are accessible to residents, and to programs and their residents at all times, for the purposes of conducting a full investigation of an incident of abuse or neglect.  42 U.S.C. § 10805; 42 C.F.R. § 51.42(b); 42 U.S.C. § 15043; 45 C.F.R. § 1386.22(f).

19. The PAIMI and PADD Acts provide ADAP reasonable unaccompanied access to all residents of a facility at reasonable times to provide P&A service and contact information, rights information, monitor compliance with respect to the rights and safety of service recipients, and to view and photograph all areas of the facility which are used by residents or are accessible to residents. 42 U.S.C. § 10805; 42 C.F.R. § 51.42 (c); 42 U.S.C. § 15043; 45 C.F.R. § 1386.22(g).

20. The PAIMI and PADD Acts provide ADAP unaccompanied access to residents of facilities, including the opportunity to meet and communicate privately with such individuals regularly, both formally and informally, by telephone, mail and in person. 42 C.F.R. § 51.42 (d); 42 C.F.R. § 1386.22(h).

21.  The PAIMI regulations require DYS to provide ADAP:

> (2) Reports prepared by an agency charged with investigating abuse, neglect, or injury occurring at facility rendering care or treatment, or, or by or for the facility itself, that describe any or all of the following: (i) Abuse, neglect, or injury occurring at the facility; (ii) The steps taken to investigate the incidents; (iii)

Reports and records, including personnel records, prepared or maintained by the facility, in connection with such reports of incidents; or (iv) Supporting information that was relied upon in creating a report, including all information and records used or reviewed in preparing reports of abuse, neglect or injury such as records which describe persons who were interviewed, physical and documentary evidence that was reviewed, and the related investigative findings."

42 C.F.R. § 51.41 (c)(2).

22. The access provisions of the three statutes are interrelated and it is clear that Congress intended that they be applied in a consistent manner. The PAIR Act expressly incorporates by reference (at 42 U.S.C. § 794e (f)) the authority regarding access to facilities and records (as well as the other general authorities granted to P&As) set forth in the PADD Act. Moreover, the preamble to the PAIMI Act regulations states that it is the goal of the Department of Health and Human Services "to ensure that all facets of the P&A system administered by the Department [i.e., the PAIMI and PADD Acts] are subject to the same requirements." 62 Fed. Reg. 53549 (Oct. 15, 1997).

23. The PAIMI Act's implementing regulations states that ADAP has the right to access all residents of a facility where those with mental illness and emotional disorders reside "despite the existence of any State or local laws or regulations which restrict informal access to minors and adults with legal guardians or conservators." 42 C.F.R. § 51.42(e).

24. In addition to lengthy citations of PADD and PAIMI access authority found in ADAP's 2005 complaint and related correspondence, ADAP has provided DYS counsel with numerous pieces of written correspondence explaining ADAP's monitoring and access authority. See Doc. No. 000096-000109.

**Defendant repeatedly has denied ADAP's lawful access to
DYS residents, facilities, records, and staff.**

*Chalkville*

25. On February 20, 2007, ADAP Staff Attorney Nancy Anderson provided DYS counsel,
Dudley Perry, with written notice that ADAP wished to monitor the DYS Chalkville Campus
on March 1st.   Anderson reminded DYS Counsel  on February 20 and again on February
28th  that ADAP possesses federal authority to conduct unaccompanied monitoring activities
of DYS facilities "for the purposes of:  1) providing information and training on programs
addressing the needs of individuals with mental illness, individual rights, and the protection
and advocacy services available from ADAP; 2) monitoring compliance with respect to the
rights and safety of residents; and 3) viewing and photographing all areas of the facility
which are used by residents or are accessible to residents." 42 U.S.C. § 10805; 42 C.F.R. §
51.42(c).  See Doc. No. 000110-000111.

26. Due to statewide tornado advisories on March 1st, ADAP agreed with DYS to reschedule its
Chalkville monitoring visit to March 6, 2007.

27. On March 6, 2007, ADAP Staff Attorney Andrea Mixson and Senior Case Advocate Christy
Johnson arrived at the Chalkville campus. As part of ADAP's monitoring activities
authorized by the PADD and PAIMI Acts, Mixson and Johnson engaged in private
conversations with numerous residents regarding treatment concerns at Chalkville.  Mixson
and Johnson also distributed brochures containing ADAP's contact information and a
description of ADAP's programs and services. See Doc. No. 000112-000126.

28. Among the many residents who communicated privately with Mixson and Johnson on that
day, three residents, J.C., B.P. and S.B., stated they desired additional confidential

communications with Mixson and Johnson regarding inappropriate treatment at Chalkville. After speaking briefly and confidentially with these three residents, Mixson and Johnson informed the three girls they would return for additional confidential visits as soon as possible. See Doc. No. 000112-000126.

29. On March 21, 2007, Mixson provided DYS counsel written notice that ADAP planned a second monitoring visit to Chalkville on March 27th. See Doc. No. 000130-000131. Mixson reminded DYS counsel that ADAP possesses federal access authority to conduct unaccompanied monitoring activities of DYS facilities "for the purposes of: 1) providing information and training on programs addressing the needs of individuals with mental illness, individual rights, and the protection and advocacy services available from ADAP; 2) monitoring compliance with respect to the rights and safety of residents; and 3) viewing and photographing all areas of the facility which are used by residents or are accessible to residents." 42 U.S.C. § 10805; 42 C.F.R. § 51.42(c). In addition, Mixson stated to DYS counsel that she and Johnson requested time to speak confidentially with residents J.C. B.P. and S.B., and requested copies of DYS records for those three residents.

30. DYS counsel responded to Mixson on March 21st, stating: "We will communicate with Chalkville and arrange for your visit next week. I will ask them to coordinate a time for your monitoring visit and visit with the girls you named." See Doc. No. 000127-000128.

31. On March 22, 2007, DYS counsel contacted Mixson and Anderson, requesting that the March 27th monitoring visit be postponed. See Doc. No. 000112-000118. Mixson emailed DYS counsel later that day stating that ADAP would agree to postpone its Chalkville monitoring to March 28th. See Doc. No. 000129. Mixson followed-up in writing with DYS counsel to the same effect on March 22rd and March 26th. See Doc. No. 000130-000131.

32. Mixson and Johnson arrived at Chalkville for their second monitoring visit on March 28, 2007. They met with Ms. Tate, a DYS employee, about the purpose of the monitoring visit. Mixson and Johnson informed Ms. Tate they had arranged with DYS counsel to communicate with residents residing in the Cherokee Unit and to conduct follow-up interviews with J.C., B.P. and S.B. Mixson and Johnson informed Ms. Tate that ADAP intended to provide ADAP contact and service information to residents in the Cherokee unit and to speak privately with Cherokee residents about their treatment at Chalkville. See Doc. No. 000112-000126.

33. Ms. Tate informed Mixson and Johnson that Chalkville Director Yolanda Byrdsong had instructed her to deny ADAP access to speak with any Chalkville residents other than J.C., B.P. and S.B., and those other residents who have a disability. See Doc. No. 000112-000126.

34. Mixson and Johnson explained to Ms. Tate that ADAP has federal access authority to communicate privately with <u>any</u> resident of Chalkville and that ADAP planned the March 28th monitoring visit to speak with Chalkville residents who did not have an opportunity to meet and speak privately with them during their previous monitoring on March 6th. See Doc. No. 000112-000126.

35. Johnson contacted ADAP Attorney Anderson informing her of Ms. Tate's refusal to allow ADAP to speak privately with all residents of Chalkville. See Doc. No. 000119-000126. Anderson immediately faxed DYS counsel and Ms. Tate a letter reminding them of ADAP's access authority and included a copy of pertinent PAIMI regulations relating to P&A access for their review. See Doc. No. 000132-000135.

36. Following Mixson and Johnson's confidential interviews with J.C., B.P. and S.B., Mixson and Johnson restated to Ms. Tate they intended to exercise ADAP's federal access authority

to communicate privately with other Chalkville residents. Ms. Tate informed Mixson and Johnson that DYS counsel instructed her to deny ADAP's access to speak privately with any DYS resident unless that resident had a disability. Ms. Tate informed Mixson and Johnson that they would only be permitted to make a general announcement about ADAP and to distribute brochures to residents on the Cherokee Unit. Mixson and Johnson again explained to Ms. Tate that the PAIMI Act access provisions provide ADAP the authority to communicate privately with any resident of Chalkville regardless of whether they are a current client of ADAP or have a disability. See Doc. No. 000112-000126.

37. Mixson and Johnson were accompanied by Ms. Tate to the Cherokee Unit, where Mixson and Johnson distributed brochures and made a general announcement about ADAP's services. During Mixson's announcement, Ms. Tate interrupted and stated to the assembled residents that they must have a disability before they could receive assistance from ADAP. Johnson then clarified that any resident could speak privately with ADAP representatives and that ADAP has the authority to determine whether a resident has a disability. See Doc. No. 000112-000126.

38. After the Joint Report of the Parties (Doc. No. 17) was filed on October 19, 2007, the Defendant communicated to Plaintiff that it would no longer allow Plaintiff's staff members to communicate privately with DYS residents during Plaintiff's monitoring activities. Defendant's change in policy was communicated upon the arrival of ADAP employees at the Defendant's Chalkville facility on October 23, 2007, for a monitoring visit that had been scheduled in advance. See Doc. No. 000016-000018. Upon arriving at Chalkville on October 23, 2007, ADAP attorney, Andrea Mixson, was instructed by Chalkville case manager Naren Phillips that ADAP staff members would not be allowed to communicate privately with any

Chalkville resident during the ADAP monitoring visit scheduled for that day. When Ms. Mixson asked Ms. Phillips why ADAP would not be allowed to speak privately with individual residents who might request such an opportunity, Ms. Phillips stated that Chalkville staff received instructions from DYS counsel, Mr. Perry that private discussions between ADAP staff and DYS residents were not allowed during ADAP monitoring activities. Ms. Phillips stated DYS staff did not know which DYS residents qualify for ADAP's services and that DYS residents would be allowed to write ADAP to express their concerns. See Doc. No. 000016-000018. Defendant has not has not provided, as required under 42 C.F.R. 51.43, a written statement as to why it has refused to provide ADAP with the opportunity to speak privately with Chalkville residents on October 23, 2007.

39. Defendant has utilized its Special Investigator to question ADAP clients before and debrief ADAP clients after confidential discussions between ADAP and its clients, S.L., C.L. and B.Y.. Defendant's practice of questioning and electronically recording the statements of ADAP's clients before and after confidential conversations between ADAP and its clients may have a chilling effect on current and future DYS residents who wish to communicate confidentially their concerns regarding abuse and neglect at DYS facilities to ADAP staff. On November 16, 2007, Plaintiff received a handwritten statement from S.L. stating that a man came out to Chalkville and asked her questions about her reports of abuse while at Chalkville. S.L. states in her note that the man "was asking me very strange questions like if I were being sexually abused or physically abused in any way. S.L. states that "I felt like I was being forced to tell him what was going on." See Exhibit A. On November 16, 2007, Plaintiff received a handwritten statement from C.L. stating that a man came out to Chalkville and asked her questions about her reports of abuse while at Chalkville. C.L. writes

that "As he question [sic] me he put it on videotape [sic]. I didn't know it was something he suppose to do so that why I'm contacting you." See Exhibit B. On November 16, 2007, Plaintiff received a handwritten statement from B.Y. stating that a man came out to Chalkville and asked her questions about her reports of abuse while at Chalkville. B.Y. states that the man intended to videotape her answers to his questions, but she told him that she "did not want to answer any of his questions." See Exhibit C.

*Vacca*

40. On March 27, 2007, Johnson sent DYS counsel written notice that Mixson and Johnson planned to monitor the Vacca campus on Tuesday, April 10th. See Doc. No. 000136. Johnson reminded DYS counsel that ADAP possesses federal access authority to conduct unaccompanied monitoring activities of DYS facilities "for the purposes of: 1) providing information and training on programs addressing the needs of individuals with mental illness, individual rights, and the protection and advocacy services available from ADAP; 2) monitoring compliance with respect to the rights and safety of residents; and 3) viewing and photographing all areas of the facility which are used by residents or are accessible to residents." 42 U.S.C. §10805; 42 C.F.R. § 51.42(c).

41. DYS counsel did not respond to Johnson's March 27th correspondence or to Attorney Anderson's March 30th correspondence to the same effect. See Doc. No. 000136.

42. Upon arriving at Vacca on April 10th for the scheduled monitoring, Ms. Delbridge informed Johnson and Mixson that DYS counsel had instructed her to prohibit ADAP from communicating with any resident or distributing any ADAP brochures or business cards to any resident unless they were currently ADAP's clients. Ms. Delbridge also informed Johnson and Mixson that ADAP's facility access was to be limited to an accompanied tour of

13

the Vacca grounds and buildings that was to be conducted by a security guard.    See Doc. No. 000112-000126.

43. After the Joint Report of the Parties (Doc. No. 17) was filed on October 19, 2007, the Defendant communicated to Plaintiff that it would no longer allow Plaintiff's staff members to communicate privately with DYS residents during Plaintiff's monitoring activities. Defendant's change in policy was communicated upon the arrival of ADAP at the Defendant's Vacca facility on October 23, 2007, for a monitoring visit that had been scheduled in advance.   On October 23, 2007, ADAP staff member, Christy Johnson, arrived at Vacca for a monitoring visit arranged through Mr. Perry's office on October 14, 2007. Vacca employee, Linda Norwood, informed Ms. Johnson that DYS staff had met recently with Mr. Perry in Montgomery. Mr. Perry instructed DYS staff at the Montgomery meeting to prohibit ADAP staff from communicating privately with any DYS residents during ADAP's monitoring visits. Ms. Norwood stated that, upon Mr. Perry's instruction, ADAP staff members were allowed only to make a presentation to residents, pass out information and collect the names of residents with whom they wished to meet at a later date. See Doc. No. 000019-000020.

### Mt. Meigs

44. On March 5 and April 6, 2007, Mixson notified DYS counsel in writing that ADAP planned to conduct monitoring activities at the Mt. Meigs facility on April 17, 2007.   See Doc. No. 000137-000138.    Consistent with previous correspondence from ADAP on this matter, Mixson reminded DYS counsel that ADAP possesses federal access authority to conduct unaccompanied monitoring activities of DYS facilities "for the purposes of 1) providing information and training on programs addressing the needs of individuals with mental illness,

14

individual rights, and the protection and advocacy services available from ADAP; 2) monitoring compliance with respect to the rights and safety of residents; and 3) viewing and photographing all areas of the facility which are used by residents or are accessible to residents." 42 U.S.C. § 10805; 42 C.F.R. § 51.42(c).

45. Mixson and Johnson arrived at the Mt. Meigs facility on April 17th. Mixson and Johnson informed the security guard that they were ADAP employees and had arranged a monitoring with DYS counsel. The guard stated that DYS counsel had not notified him of ADAP's monitoring and that he could not permit them to conduct monitoring activities at Mt. Meigs. See Doc. No. 000112-000126.

46. Mixson and Johnson then spoke with Ms. Phyllis Carney, administrative assistant to DYS counsel, who stated that ADAP was only permitted an accompanied tour of the facility and could not speak with residents or distribute information about ADAP. Mixson explained that ADAP's federal access authority authorized Mixson and Johnson to communicate privately with residents, distribute ADAP information, and have unaccompanied access to the facility, and provided the assistant with a copy of Anderson's March 28th letter to DYS counsel, describing ADAP's federal access authority. See Doc. No. 000112-000126.

47. After she contacted DYS counsel, Ms. Carney informed Mixson that counsel denied ADAP access to speak with residents other than current ADAP clients and denied ADAP access to distribute ADAP information to any resident. The assistant also declared that Mixson and Johnson would be required to be accompanied at all times on Mt. Meigs grounds by a DYS employee. See Doc. No. 000112-000126.

*Request for D.R.'s Record*

48. On March 5, 2007, Johnson provided DYS Counsel with notice that Vacca resident, D.R. was suffering mistreatment and verbal abuse by Vacca staff. See Doc. No. 000139. ADAP had received a letter from D.R. reporting abuse by staff. See Doc. No. 000140-000141.

49. On April 4, 2007, Johnson learned from D.R.'s case manager, Patricia Henderson, that D.R. had been hospitalized at Children's Hospital in Birmingham for elevated blood levels and a possible self-administered medication overdose. Later on April 4th, Johnson reviewed D.R.'s DYS case file at the Vacca campus and requested a copy of it from Vacca Administrator Delbridge. Ms. Delbridge informed Johnson that a copy of D.R.'s record would be available for Johnson on ADAP's April 10 2007 monitoring visit to Vacca. See Doc. No. 000119-000126.

50. On April 10, 2007, Johnson met with Ms. Delbridge and reminded her that ADAP requested copies of D.R.'s records on April 4, 2007 and that she had stated she would provide copies of those records to Johnson during the scheduled April 10th Vacca monitoring. Ms. Delbridge replied that she would not provide ADAP with copies of D.R.'s record until D.R. was released from the hospital and had signed an authorization for release of records. See Doc. No. 000112-000126. As of the date of this filing, DYS has neither provided ADAP copies of the child's records, as required under 42 C.F.R. § 51.41, nor provided ADAP with a written explanation as to why it has refused to provide them, as required under 42 C.F.R. § 51.43 -- six weeks after ADAP first requested them.

*Request for C.L.'s Record*

51. Defendant has refused to provide Plaintiff with the entire record of ADAP client, C.L.. Defendant has not provided ADAP with the electronically recorded statement of C.L.

16

created by DYS Special Investigator or any other DYS employee, nor any documentation
regarding an interview of C.L. by DYS Special Investigator or any other DYS employee.  In
a September 4, 2007 email to DYS, ADAP asserted probable cause to believe that Chalkville
resident C.L., suffered abuse and neglect at Chalkville.  See Exhibit D.  In the same email,
ADAP requested the complete DYS file of C.L. including incident reports and investigative
findings.  On September 24, 2007, ADAP emailed Defendant again requesting the complete
record of C.L..  See Exhibit D.  As of the date of this filing, Defendant has not produced the
complete record of C.L. including all incident reports, investigative findings, and electronic
recordings of C.L.'s statements to DYS  employees, investigators, or any outside agency
charged with investigating abuse and neglect in DYS facilities, nor provided ADAP with a
written explanation as to why it has refused to provide them, as required under 42 C.F.R. §
51.43 -- five months after ADAP first requested them.

### *Requests for Incident Reports and Investigative Findings*

52. On November 29, 2006, ADAP sent a written request for the DYS incident reports and
investigative findings regarding three clients, W.B., H.M. and K.W, male residents of Vacca
and Mt. Meigs whom ADAP had probable cause to believe suffered abuse or neglect while in
DYS custody.  See Doc. No. 000142-000143.   On April 20, 2007, ADAP again made a
written request that these reports be forwarded to ADAP. See Doc. No. 000144-000145.   As
of the date of this filing, DYS has neither provided ADAP copies of the incident reports and
investigatory findings regarding these three clients, as required under 42 C.F.R. § 51.42, nor
provided ADAP with a written explanation as to why it has refused to provide them, as
required under 42 C.F.R. § 51.43.

53. On April 20, 2007, ADAP sent a written request for copies of incident reports and investigative findings prepared by DYS regarding J.C., B.P. and S.B., residents at Chalkville whom ADAP had probable cause to believe suffered abuse or neglect while in DYS custody. See Doc. No. 000144-000145. As of the date of this filing, DYS has neither provided ADAP copies of the incident reports and investigatory findings regarding these three clients, as required under 42 C.F.R. § 51.42, nor provided ADAP with a written explanation as to why it has refused to provide them, as required under 42 C.F.R. § 51.43.

54. On April 20, 2007, ADAP sent a written request for copies of all investigative reports prepared by any agency charged with investigating abuse or neglect, or injury occurring at Vacca, Chalkville and Mt. Meigs within the last 6 months. ADAP requested that these reports be forwarded to ADAP by May 4, 2007. See Doc. No. 000144-000145. As of the date of this filing, DYS has neither provided ADAP copies of the requested incident reports and investigatory findings, as required under, 42 C.F.R. § 51.42, nor provided ADAP an explanation as to why it has refused to provide them, as required under 42 C.F.R. § 51.43.

55. Defendant has engaged in extreme delay in providing the complete record of S.L.. Defendant has not provided ADAP with the electronically recorded statement of S.L. created by DYS Special Investigator or any other DYS employee, nor any documentation regarding an interview of S.L. by DYS Special Investigator or any other DYS employee. In a September 4, 2007 email to DYS, ADAP asserted probable cause to believe that Chalkville resident, S.L., suffered abuse and neglect at Chalkville. See Exhibit D. Within this same email, ADAP requested the complete DYS file of S.L., including incident reports and investigative findings.   On September 24, 2007, Plaintiff's counsel sent a letter to Defendant's counsel requesting written investigative findings after S.L. reported another

incident of abuse while at Chalkville. See Exhibit E.  On September 24, 2007, ADAP emailed Defendant again requesting the complete record of S.L.  See Exhibit D.  On December 11, 2007, ADAP wrote Defendant notifying him of another incident of abuse S.L. reported at Chalkville. See Exhibit F.  As of December 11, 2007, Defendant had failed to provide Plaintiff with any of S.L. Chalkville records which ADAP had requested on September 4, 2007 and September 24, 2007.  Defendant hand delivered to ADAP S.L.'s records in December, 2008, three months after ADAP first made its written request. However, Defendant has not provided a written statement as required under 42. C.F.R. 51.43, as to why it has not produced all requested investigative findings regarding S.L..

56. Defendant has engaged in extreme delay in providing the complete record of B.Y.  Defendant has not provided ADAP with the electronically recorded statement of B.Y. created by DYS Special Investigator or any other DYS employee, nor any documentation regarding an interview of B.Y. by DYS Special Investigator or any other DYS employee. In a September 4, 2007, email to DYS, ADAP asserted probable cause to believe that Chalkville resident, B.Y., suffered abuse and neglect at Chalkville.  See Exhibit D.  In this same email, ADAP requested the complete DYS file of B.Y. including all incident reports and investigative findings.  As of this writing, ADAP has not received all requested incident reports and investigative findings regarding B.Y.. Defendant has not provided, as required under 42 C.F.R. 51.43, a written statement as to why it has refused to provide ADAP with all requested investigative findings regarding B.Y.

57. Plaintiff does not have an adequate remedy at law and will be irreparably harmed if the Defendant is permitted to continue prohibiting ADAP from:

a) having reasonable unaccompanied access, for monitoring and investigatory purposes, to public and private areas of DYS facilities;

b) interviewing facility service recipients, staff and other persons as part of abuse and neglect investigations when ADAP has probable cause to believe an incident has occurred;

c) providing information and training about individual rights and services provided by the P&A system;

d) communicating privately with facility residents;

e) accessing facility incident reports, investigatory findings; and records; and

f) accessing residents' records.

## CAUSE OF ACTION

58. The policies, procedures, regulations, practices and customs of the Defendant, acting under color of law, violate and continue to violate the rights of the Plaintiff to full, complete, prompt access to DYS facilities, staff, residents and records, in violation of the Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. §§ 10801 et seq., and its implementing regulations at 42 C.F.R. §§ 51.1 et seq.; the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. §§ 15001 et seq., and its implementing regulations at 45 C.F.R. §§ 1385 et seq.; the Protection and Advocacy of Individual Rights Program, 29 U.S.C., §§ 794e, et seq. and its implementing regulations at 34 C.F.R. §§ 381.1 et seq.; and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

59. Wherefore, Plaintiff respectfully requests that this Court:

a)   Grant injunctive relief enjoining the Defendant and his agents and employees from denying ADAP full, complete, timely access to DYS residents, facilities and facility staff to conduct monitoring activities and abuse and neglect investigations as well as full, complete, timely access to records, including those of ADAP client D.R.;

b)   Issue a declaratory judgment that the Defendant's polices, regulations, and practices of denying ADAP full, complete and timely access to DYS residents, facilities, facility staff and records to monitor and to conduct abuse and neglect investigations violate the PAIMI, PADD and PAIR Acts;

c)   Award Plaintiff reasonably necessary attorneys' fees and costs pursuant to 28 U.S.C. § 2202 and 42 U.S.C. § 1988; and

d)   Award such other and further relief to which Plaintiff is justly entitled, at law or equity.

Respectfully Submitted this 14th day of January, 2008

/s/ James Tucker

James Tucker
AL Bar No. ASB 6986 – T39J
E-Mail:  jtucker@adap.ua.edu

Nancy Anderson
AL Bar No: ASB-3738-R67N
E-mail:  nanderso@adap.ua.edu

Alabama Disabilities Advocacy Program
Box 870395
Tuscaloosa, Alabama  35487-0395
Telephone: (205) 348-4928
Facsimile: (205) 348-3909

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of January, 2008, a copy of the foregoing

pleading was served on the following by placing a copy of the same in the U.S. Mail, postage

prepaid and properly addressed or by hand delivery to each:

Mr. Dudley Perry
Deputy Attorney General
Alabama Department of Youth Services
PO Box 66
Mount Meigs, AL 36057-0066

Mr. Walter Wood
Director, Alabama Department of Youth Services
PO Box 66
Mount Meigs, AL 36057-0066

/s/ James Tucker

James Tucker
AL Bar No. ASB 6986 – T39J
E-Mail: jtucker@adap.ua.edu

Nancy Anderson
AL Bar No: ASB-3738-R67N
E-mail: nanderso@adap.ua.edu

Alabama Disabilities Advocacy Program
Box 870395
Tuscaloosa, Alabama  35487-0395
Telephone: (205) 348-4928
Facsimile: (205) 348-3909

EXHIBIT

A

Dear ADAP

To whom this may concern, There was a man who came out here to chalkville to talk to me. He was asking me very strange questions like if I were being sexually abused or physically abused in any way. He was also audio taping what I was saying. I felt like I was being forced to tell him what was going on.

████ ██    11-16-07

EXHIBIT
B

Dear ADAP,

I was just writing you to let you know that not to long ago some man came out here + he was questioning me. As he question me he put it on vidiotape. I didn't know if it was something he suppose to do so that was why I'm contacting you.

~~~~~~~~~ K [ ~~~~~~~~~ ]
11-16-07

P.S.-He was ask me about the Ms. Burrell situation.

There was a man who out here (to Chalkville campus) who was tring to interview me. While he started asking me questions I told him I did not want to answer any of his questions. Then he turned of the camra and recorder.

B███████ Y██████
11-18-07

EXHIBIT
C

## Mixson, Andrea

| | |
|---|---|
| **From:** | Tucker, James |
| **Sent:** | Monday, September 24, 2007 4:32 PM |
| **To:** | Mixson, Andrea; 'Perry, Dudley' |
| **Cc:** | Tucker, James |
| **Subject:** | RE: Client Meetings |



Dudley,

See also, my letters faxed to you today.
These appear to be the 3 cases I mentioned last Fri. where there were improprieties re- mail privileges.
We appreciate your attention to our concerns & look forward to hearing from you.
James

---

**From:** Mixson, Andrea
**Sent:** Monday, September 24, 2007 2:55 PM
**To:** Perry, Dudley
**Cc:** Tucker, James; Anderson, Nancy
**Subject:** Client Meetings

Dudley:
 Please see below the email I sent to you on September 4, 2007 stating probable cause for an ADAP investigation and each client's disability. I am requesting a confidential visit with ADAP clients B█████ Y█████, S█████ L█████, and C█████ L█████ on September 26, 2007 at 3:00PM at Chalkville.  In addition, I am requesting all DYS records for ADAP clients S█████ L█████, C█████ L█████, and B█████ Y█████. Please see below for details.

Thank you,
Andrea J. Mixson.

```
Andrea J. Mixson, Staff Attorney
Alabama Disabilities Advocacy Program (ADAP)
University of Alabama
526 Martha Parham West
Box 870395
Tuscaloosa, AL  35487-0395
205-348-4928
205-348-3909 (fax)
1-800-826-1675 (toll-free)
```
This email is intended only for the person to whom it is addressed.  Any review or other use of this information by persons or entities other than the intended recipient or any retransmission without the consent of the sender is prohibited. The views or opinions expressed by the sender of this email are not necessarily those of the institution.

---

**From:** Mixson, Andrea
**Sent:** Tuesday, September 04, 2007 4:31 PM
**To:** Perry, Dudley

**Cc:** Tucker, James; Anderson, Nancy; Johnson, Christy
**Subject:** DYS Matters 9/4/2007

Dudley:

I have discussed the following matters with James recently and he suggested that I email you with probable cause statements. I am also including some dates for visits with some of our clients at Mt. Meigs and Chalkville and a date for our next Vacca monitoring visit.

ADAP has probable cause to believe that Chalkville resident, C▓▓▓▓▓ L▓▓▓▓▓▓, (DOB 8/14/92), was recently subjected to verbal and physical abuse by a Chalkville staff member. C▓▓▓▓▓ is a resident who suffers from depression. ADAP is requesting all DYS records regarding C▓▓▓▓▓ L▓▓▓▓▓ including, but not limited to: 1) all records from C▓▓▓▓▓'s DYS master file, treatment file, cottage file, and medical file and 2) all incident reports and investigatory findings regarding staff assault and abuse against C▓▓▓▓▓. ADAP requests that your office immediately and thoroughly investigate this matter and provide ADAP with your findings as soon as possible.

ADAP has probable cause to believe that Chalkville resident, S▓▓▓▓▓ L▓▓▓▓▓ (DOB: 9/16/1989), suffered physical abuse from DYS staff following a report of self-harm on August 18, 2007. ADAP understands that S▓▓▓▓▓ suffers from depression. ADAP is requesting all DYS records regarding S▓▓▓▓▓ L▓▓▓▓▓, including, but not limited to: 1) all records from S▓▓▓▓▓'s DYS master file, treatment file, cottage file, and medical file and 2) all DYS documents regarding this incident. ADAP requests that your office immediately and thoroughly investigate this matter and provide ADAP with your findings as soon as possible.

**ADAP requests confidential client visits with the following Chalkville residents on Tuesday, September 11, 2007 at 2:30PM:**

B▓▓▓▓ Y▓▓▓▓
S▓▓▓▓▓ L▓▓▓▓▓
C▓▓▓▓▓ L▓▓▓▓▓

**ADAP requests confidential client visits with the following Mt. Meigs residents on Friday, September 7, 2007 at 3:00PM:**

S▓▓▓▓ W▓▓▓▓
K▓▓▓▓ S▓▓▓▓

Per James' 8/27/07 email to you, ADAP has planned a monitoring visit to the **Vacca campus on Thursday, September 6, 2007 at 2:00PM.**

Thank you for your assistance.

1/14/2008

Sincerely,

Andrea J. Mixson

```
Andrea J. Mixson, Staff Attorney
Alabama Disabilities Advocacy Program (ADAP)
University of Alabama
526 Martha Parham West
Box 870395
Tuscaloosa, AL  35487-0395
205-348-4928
205-348-3909 (fax)
1-800-826-1675 (toll-free)
This email is intended only for the person to whom it is addressed.  Any review or
other use of this information by persons or entities other than the intended
recipient or any retransmission without the consent of the sender is prohibited.
The views or opinions expressed by the sender of this email are not necessarily
those of the institution.
```



ALABAMA DISABILITIES

ADVOCACY PROGRAM

**VIA FACSIMILE AND U.S. MAIL**

EXHIBIT E
tabbies

September 24, 2007

Mr. Dudley Perry
Deputy Attorney General
Alabama Department of Youth Services
P.O. Box 66
Mt. Meigs, Alabama 36057

RE: S▬▬▬ L▬▬▬

Dear Dudley:

It has come to my attention that our Chalkville client S▬▬▬ L▬▬▬ had a letter written to her probation officer read out loud in front of other girls by a Chalkville staff member. Such an action by DYS staff violates S▬▬'s liberty interests under the Fourteenth Amendment to meaningful access to the courts and her fundamental right to privacy.

S▬▬ L▬▬▬ reports that Chalkville staff read out loud and in front of other residents, a letter S▬▬ wrote to her probation officer describing very personal information concerning her status as rape victim and the contraction of a disease. S▬▬ states that Chalkville staff prohibited her from writing a complaint about this incident.

The U.S. Supreme Court has ruled that incarcerated adults have a constitutional right to access Courts that is "adequate, effective and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977). The fundamental right to access courts is applicable to incarcerated juveniles in state custody. *See John L. v. Adams*, 969 F.2d 228, 233 (6th Cir. Tenn. 1992); *Morgan v. Sproat*, 432 F. Supp. 1130 at 1158 (D.C. Miss. 1977). The U.S. Supreme Court has also held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *See Turner v. Safley*, 482 U.S. 78, 89 (1987). In S▬▬'s case, her right to privacy as well as her access to the courts was violated when a Chalkville staff member read **out loud** her letter to her probation officer.

According to Chalkville Campus Policy 30.4, students are granted "the right to communicate or correspond with persons or organizations subject only to the limitations necessary to maintain order and security." Chalkville Campus Policy 30.3 states "it is the policy of Chalkville Campus to allow students to send sealed letters to 1) Courts,

---

Protection & Advocacy for
Persons with Developmental
Disabilities

Protection & Advocacy for
Individuals with Mental Illness

Protection & Advocacy of
Individual Rights

Protection & Advocacy for
Assistive Technology

Protection & Advocacy for
Individuals with
Traumatic Brain Injury

Protection & Advocacy for
Beneficiaries of Social Security

Protection & Advocacy for
Voting Accessibility



THE UNIVERSITY OF
ALABAMA
FOUNDED 1831

500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
(205)348-4928
(800)826-1675
FAX (205)348-3909
adap@adap.ua.edu
www.ADAP.net

2) Counsel, 3) Chalkville Staff, 4) Central Office Staff, and 5) Student Advocate Staff and that "incoming letters from the people listed above may be opened and inspected for contraband, but only in the presence of the student." All other "incoming and outgoing mail of students may be screened in unusual circumstances, or where there is probable cause, and that all incoming and outgoing letters and packages will be inspected for contraband or money." *See Chalkville Policy 30.6.* DYS policy also states that there must be "convincing evidence to justify the reading of mail" and that grounds for reading mail include "security, and mail/letters or packages which are pornographic, contain satanic material, are racist, written in code and are drug or gang related." *See Chalkville Policy 30.6*

Chalkville staff's unlawful behavior of reading our client's mail aloud constitutes verbal abuse and is an egregious violation of S█████'s fundamental right to privacy. ADAP is asking for an immediate investigation into this incident and a written report of DYS' findings. ADAP is requesting all copies of "Mail or Letter in" and "Mail Out" logs concerning S█████ during her time at Chalkville. In addition, ADAP is requesting that your office forward to us all letters sent to the attention of ADAP which were not mailed, or that were censored or returned to a resident for editing.

Thank you for your time on Friday. I look forward to hearing from you regarding this matter.

Sincerely,

James A. Tucker
Attorney

Cc: S█████ L█████
     Andrea J. Mixson, Esq.

2

**ALABAMA DISABILITIES**

# ADAP

**ADVOCACY PROGRAM**

**VIA FACSIMILE AND U.S. MAIL**

December 11, 2007

Mr. Dudley Perry
Deputy Attorney General
Alabama Department of Youth Services
P.O. Box 66
Mt. Meigs, Alabama 36057

RE: S████ L████ 

Dear Dudley:

It has come to my attention that Chalkville staff forced ADAP client S████ L████, to remove her bra and sleep in a smock in a Chalkville time out room on November 11, 2007. S████ was placed in 24 hour time out without any indication that she had injured or threatened to injure herself. S████ states that she did not injury any staff or peer prior to being placed in 24 hour time out on November 11, 2007. She also reports that on November 11th, Chalkville staff, Mr. Renfroe, grabbed her neck in a choke hold while restraining her on a table prior to S████ being placed in 24 hour time out.

DYS (Chalkville) policy and procedure 19.3(K)(4) states that 24 hour timeout (Time-Out IV) is to be "used only in cases of AWOL/Escape; Assault-Physical and Sexual; Safety Violations and Possession of Weapons, or continued violation of T.O. III offenses." It appears that S████ had not engaged in any of these behaviors prior to her placement in 24 hour time out. Chalkville policy 17.5 states that students shall be "furnished with items necessary for the health and comfort of the student, including clothing, mattress, and blanket." Chalkville policy 19.3 states that "under no circumstances will a student be stripped of all clothing. Students are required to wear jumpsuits/gymsuits while in the "time-out room." Chalkville policy 18.5 states that:

> "it is the policy of Chalkville campus that students in its care will be treated with respect and dignity. They will not be subject to corporal or unusual punishment, disease, property damage, harassment, humiliation, mental or physical abuse or punitive interference with the daily functions of living, such as eating or sleeping."

It appears that S████ had not injured or threatened to injure herself when she was placed in a smock and forced to remove her bra on the evening of November 11, 2007. This action on the part of DYS staff appears to be chiefly, if not wholly, punitive rather than a measure to protect Ms. L████ from self harm.

---

**Protection & Advocacy for Persons with Developmental Disabilities**

**Protection & Advocacy for Individuals with Mental Illness**

**Protection & Advocacy of Individual Rights**

**Protection & Advocacy for Assistive Technology**

**Protection & Advocacy for Individuals with Traumatic Brain Injury**

**Protection & Advocacy for Beneficiaries of Social Security**

**Protection & Advocacy for Voting Accessibility**



THE UNIVERSITY OF
**ALABAMA**
FOUNDED 1831

500 Martha Parham West
Box 870395
Tuscaloosa, Alabama 35487-0395
(205)348-4928
(800)826-1675
FAX (205)348-3909
adap@adap.ua.edu
www.ADAP.net

EXHIBIT
**F**

Mr. Dudley Perry
December 11, 2007
Page 2

ADAP has made prior requests to your office for S⬛⬛'s records following reports that staff at Chalkville physically abused S⬛⬛⬛ and that her legal mail was being intercepted and read out loud by Chalkville staff. On September 4, 2007, Ms. Mixson emailed you asserting probable cause to believe that Chalkville staff had physically abused S⬛⬛⬛and stating the basis ADAP believed that S⬛⬛⬛ qualified for ADAP's services. *See* attached Exhibit A.  In response, Ms. Phyllis Carney wrote me on September 21, 2007 stating:  "The documentation Ms. Mixson requested on September 4, 2007 by way of e-mail can not be processed until DYS is provided with the grounds upon which ADAP believes the students are covered by the Acts, and the facts upon which probable cause is based." *See* attached Exhbit B. On September 24, 2007, ADAP requested all investigative reports and records regarding Ms. L⬛⬛⬛'s legal mail being read out loud and intercepted by Chalkville staff. *See* attached Exhibit C.

As of this date, ADAP has not received the records we requested in our September 4 and September 21 correspondence regarding Ms. L⬛⬛⬛. In addition to Ms. L⬛⬛⬛'s complete file, ADAP also requests an immediate investigation into the November 11, 2007 incident and all records associated with DYS internal investigation into the matter.

Thank you for your attention to this matter. I look forward to your reply.

Sincerely,

James A. Tucker
Attorney

Enc.

c: S⬛⬛ L⬛⬛⬛
   Andrea J. Mixson, Esq.