## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| ALABAMA DISABILITIES ADVOCACY PROGRAM | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 2:07-CV-434-MHT |
| J. WALTER WOOD, JR. in his official Capacity as Executive Director of the Alabama Department of Youth Services, | ) ) ) ) | |
| Defendant. | ) ) | |

## JOINT MOTION FOR JUDICIAL APPROVAL OF DISMISSAL TERMS

Pursuant to this Court's Order of April 30, 2008 (Doc. No. 66) allowing the Parties to stipulate dismissal terms in this litigation, the Parties have successfully negotiated an Access Agreement and terms regarding both present and any future attorney fees and expenses.

Wherefore, come now the Parties jointly to file this motion and respectfully move this Court to enter such final orders necessary to effect judicial approval of the Access Agreement and the terms regarding fees and expenses. In making such motion, the Parties agree that all issues raised in this litigation, but not otherwise addressed in this Agreement, are waived without prejudice.

I.    Access Agreement: The attached document, "Alabama Disabilities Advocacy Program (ADAP) Monitoring, Visitation and Record Access Procedures for Department of Youth Services (DYS) Facilities" represents the Parties' mutual obligations regarding ADAP's access to DYS facilities, youth and records.

II.    Attorney Fees and Expenses:  The Defendant has agreed to pay to Plaintiff the

sum of $20,500 in attorney fees and expenses in this litigation.  As to any

potential future attorney fees and expenses incurred by the Plaintiff  to effectuate

the attached Access Agreement, such fees and expenses will be waived by

Plaintiff up and until the Agreement's dispute resolution procedure (Access

Agreement, Section VI) fails and Plaintiff files an enforcement motion with this

Court.

Respectfully submitted this 28th day of July, 2008.

/s/ James A. Tucker
James A. Tucker
Ala. Bar No. ASB 6986-T39J
Email:  jtucker@adap.ua.edu
Nancy Anderson
Ala. Bar No. ASB-3738-R67N
Email:  nanderso@adap.ua.edu
Alabama Disabilities Advocacy Program
University of Alabama
P.O. 870395
Tuscaloosa, Alabama 35487-0395
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
**ATTORNEYS FOR THE PLAINTIFF**

/s/ T. Dudley Perry
T. Dudley Perry
Ala. Bar No. ASB-3985-R67T
General Counsel
Alabama Department of Youth
Services P.O. Box 66
Mt. Meigs, Alabama 36057
Telephone: (334) 215-3803
Facsimile: (334) 215-3872
Email:  Dudley.perry@dys.alabama.gov
**ATTORNEY FOR THE DEFENDANT**

## ALABAMA DISABILITIES ADVOCACY PROGRAM (ADAP)

## MONITORING, VISITATION AND RECORD ACCESS PROCEDURES

## FOR

## DEPARTMENT OF YOUTH SERVICES (DYS) FACILITIES

### Section I

### Introduction

The Department of Youth Services (DYS) is an agency of the state of Alabama that exists for the purposes of developing public service programs for the prevention of juvenile delinquency and the rehabilitation of delinquent youth. Juvenile delinquents are placed in the custody of DYS by juvenile judges throughout the state. Juvenile judges may, subject to jurisdictional limitations and to the due process rights of delinquent youth, commit a juvenile delinquent to the custody of DYS when the delinquent youth is in need of the services provided by DYS.

DYS has developed a program of social and educational services in institutional and community-based settings designed to reduce delinquency and rehabilitate delinquent youth. DYS cooperates with public and voluntary agencies and organizations to provide additional services.

Generally, youth with mental illness or mental retardation may not be properly committed to DYS custody. See §44-1-36, Code of Alabama, 1976 as amended. Nevertheless, there are commitments of youth with disabilities to DYS custody.

The Alabama Disabilities Advocacy Program (ADAP) is authorized to provide legal representation and other advocacy services to individuals with disabilities, including youth with disabilities served by DYS in both residential and non-residential settings. An individual with a disability is an individual who has:

    a.  a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the state of Alabama.[1]

    b.  a developmental disability. A developmental disability is a severe, chronic disability of an individual that (i) is attributable to a mental or physical impairment or

1

combination of mental and physical impairments;  (ii) is manifested before the individual attains age 22; (iii) is likely to continue indefinitely;  (iv) results in substantial functional limitations in 3 or more major life activities (self-care, receptive and expressive language, learning, mobility, self-direction, capacity for independent living, economic self-sufficiency); and (v) reflects the individual's need for a combination and sequence of special, interdisciplinary, or generic services, individualized supports, or other forms of assistance that are of lifelong or extended duration and are individually planned and coordinated.[2]

c.  any disability other than a developmental disability or mental illness or emotional impairment.[3]

Any youth served by DYS is eligible to receive ADAP advocacy services (i.e. to be an ADAP client) if he meets the disability criteria outlined above.  ADAP will determine a youth's eligibility for ADAP services.  ADAP will determine a youth's eligibility status based on reasonable inferences drawn from available information in light of an ADAP staff member's experience or training.[4]

In their work on behalf of youth with disabilities being served by DYS, ADAP staff members adhere to the following principles of professional behavior:

a.  ADAP staff members treat all youth and their family members with respect.

b.  ADAP staff members respond appropriately to the emotional responses of youth and family members.

c.  ADAP staff members exercise careful judgment and conduct thorough fact-finding in their monitoring and in their investigations into allegations of abuse and neglect.

d.  ADAP staff members acknowledge that youth occasionally develop contentious feelings toward DYS Case Managers.  ADAP staff members will not undermine the relationship between a youth and his case manager and will bring any ADAP concerns regarding the relationship between a youth and his case manager to the facility's administrative staff.

e.  ADAP staff members will inform DYS staff, at the earliest practicable time, of concerns it has regarding legitimate issues that can or should be resolved.

f.  ADAP staff members recognize that DYS internal advocacy procedures are an important element of the DYS system. ADAP will not take any action that would discourage youth from utilizing established advocacy procedures.

g.  ADAP staff members serve all eligible DYS youth with disabilities regardless of race, color, religion, national origin, sex, sexual orientation, age, or disability, in compliance with the Equal Opportunity policies of the University of Alabama.

## Section II

## Visitation -- Monitoring and Training

1. Introduction

   ADAP monitors DYS facilities to observe and identify policies or procedures; environmental, staffing, or service planning issues; staff-on-youth and youth-on-youth interactions; and, other general conditions or circumstances that could impact the safety and rights of youth served by DYS.[5]  In addition, ADAP conducts informational visits to DYS facilities to provide information on legal rights to youth – both in general and in relation to the particular circumstances of an individual youth.[6]

2. Notice Required

   As per its previous agreement with DYS, ADAP will provide 7 days advance written notice for ADAP's monitoring activities.  Such notice will include the names of the individuals who will have access, the name of the facility and the date and the approximate time ADAP will be on-site.[7]

3. Notice to Whom

   ADAP will contact the identified DYS staff member at each facility to set up monitoring visits.  Upon adoption of this protocol, DYS and ADAP will exchange agency and contact information, including the relevant contact names, telephone numbers, facsimile numbers and mailing addresses for each DYS facility.  The parties will update such information as necessary.

4. Hours

   ADAP is authorized to have access at all reasonable times, which, at a minimum, shall include normal working hours and visiting hours.[8]  While after-hour visits (e.g. third shift visits) will be permitted with notice, as outlined above, it is anticipated that the majority of ADAP's monitoring and training visits will occur during normal working and visiting hours.

5. Scope of Facility Access

   ADAP monitors DYS facilities to observe and identify policies or procedures; environmental, staffing, or service planning issues; staff-on-youth and youth-on-youth interactions; and, other general conditions or circumstances that could impact the safety and

rights of youth served by DYS.[9]   In addition, ADAP conducts informational visits to DYS facilities to provide information on legal rights to youth – both in general and in relation to the particular circumstances of an individual youth.[10]

ADAP staff may meet youth individually or in groups, with or without a request from the youth or their families, during monitoring visits.  ADAP may also request individual DYS staff to speak with ADAP.

ADAP will conduct its monitoring in a manner that:

a.  minimizes interference with the facility's programs;[1]

b.  respects the legitimate privacy interests of youth and facility staff;

c.  honors a youth's request to terminate an interview; and

d.  honors a DYS staff member's refusal to speak with ADAP for other than routine scheduling or procedural matters.[11]

ADAP's monitoring activities reflect ADAP's statutory mandate to:

a.  interact regularly with those individuals who are current or potential recipients of protection and advocacy services;

b.  interact regularly with staff providing care or treatment;

c.  obtain information and review records (See Section V for more detail); and

d.  communicate with family members, social and community service workers and others involved in providing care or treatment.[12]

6.  <u>DYS Oversight of ADAP Staff and Interviewees</u>

ADAP shall have private and unaccompanied access to meet and communicate privately with youth served by DYS regularly, both formally and informally.

To encourage dialogue between youth and ADAP staff, DYS may not pre-screen youth before they talk with ADAP staff during a monitoring visit.  DYS may not discourage youth from talking to ADAP staff and may not take or imply any action against any youth in retaliation for talking with ADAP.  Further, DYS may not conduct post-interview debriefings of youth regarding the nature of their conversations with ADAP though this prohibition is not intended to prevent DYS staff from investigating, per its own policies and procedures, reported incidents of abuse and/or neglect. [13]

---

[1] For example, when monitoring a DYS classroom or other program, ADAP staff will not interrupt the class or program to make any announcements.  If ADAP staff wants to make a brief announcement, ADAP staff will wait until the conclusion of the class or program to do so.

7.  ADAP Staff Obligations

    To protect the safety and rights of individuals with disabilities in DYS facilities, ADAP will, as soon as feasible, advise DYS staff of safety or rights violations revealed through its monitoring.

8.  DYS Obligation if Access is Denied or Delayed

    If ADAP access to facilities, programs, youth, or records are denied or delayed, ADAP will promptly contact DYS Legal Counsel.  DYS must promptly provide ADAP with a written statement of the reasons for such denial or delay.[14]

## Part III

## Visitation -- Visiting with Youth who are Current or Potential Clients

## of Protection and Advocacy Services

1.  Introduction

    An ADAP lawyer or advocate may meet and confer with his client or potential client regarding confidential matters.   ADAP will certify in writing that a youth is a client or potential client, including the basis (if known at the time) upon which ADAP concludes the youth is an individual with a disability.

2.  Notice Required

    No advance notice is required for visitation with ADAP clients (or potential clients) per DYS policy (e.g. Chalkville Policy Number 30.11 (III)(5)).

    However, ADAP will endeavor to provide reasonable advance notice (24-48 hours) when it seeks to meet with ADAP clients (or potential clients) with the understanding that emergency or exigent situations may arise that prevent such notification.

3.  Notice to Whom

    ADAP will contact the identified DYS staff member at each facility to set up client visits. Upon adoption of this protocol, DYS and ADAP will exchange agency contact information, including the relevant contact names, telephone numbers, facsimile numbers and mailing addresses for each DYS facility.  The parties will update such information as necessary.

4.  Hours

    ADAP is authorized to have access at all reasonable times, which, at a minimum, shall include normal working hours and visiting hours.[15]   While after-hour visits (e.g. third shift visits) will be permitted, it is anticipated that the majority of ADAP's visits with current or potential clients will occur during normal working and visiting hours.

5.  Location of Visits

    ADAP client (or potential client) visits will take place in each facility's administration building.

6.  On-Site Supervision of ADAP Staff

     ADAP shall have private and unaccompanied access to meet and communicate privately with clients (or potential clients), both formally and informally.  Among other reasons, these meetings may be needed to ascertain a youth's eligibility for ADAP's services;[16] to conduct a preliminary assessment regarding an eligible resident's concerns; to provide information about ADAP; or to discuss matters related to ADAP's representation of the individual.[17]

     To encourage dialogue between youth and ADAP staff, DYS may not pre-screen youth before they talk with ADAP staff.  DYS may not discourage youth from talking to ADAP staff and may not take or imply any action against any youth in retaliation for talking with ADAP.  Further, DYS may not conduct post-interview debriefings with youth regarding the nature of their conversations with ADAP though this prohibition is not intended to prevent DYS staff from investigating, per its own policies and procedures, reported incidents of abuse and/or neglect. [18]

7.  Off-Site Communication between ADAP and Facility Youth

     ADAP shall have access to youth, both formally and informally, by telephone and mail.[19]  All such conversations and correspondence shall be afforded the confidentiality given to legal or judicial interactions and will be handled as per the applicable standards from the American Correctional Association.

8.  ADAP Staff Obligations

     ADAP will conduct its visits in a manner that:

a.  minimizes interference with the facility's programs;

b.  respects  the legitimate privacy interests of youth and facility staff;

c.  honors a youth's request to terminate an interview;[20]

d.  honors a DYS staff person's refusal to speak with ADAP for other than routine scheduling or procedural matters; and

e.  abides by security policies of DYS facilities.

     To protect the safety and rights of individuals with disabilities in DYS facilities, ADAP will, as soon as feasible, advise DYS staff of safety or rights violations revealed through its client representation.

9.   <u>DYS Obligation if Access is Denied or Delayed</u>

      If ADAP access to facilities, programs, youth, or records are denied or delayed, ADAP will promptly notify DYS Legal Counsel.  DYS must promptly provide ADAP with a written statement of the reasons for such denial or delay.[21]

## Part IV

### Investigations

1.  Introduction

ADAP conducts investigations[22] of alleged incidents of abuse or neglect at DYS facilities when it receives a complaint of such incidents, when it makes a probable cause determination that such incidents have occurred, or when ADAP determines that there is or may be imminent danger of serious abuse or neglect of an individual with a disability.[23]

2.  Complaint

A complaint includes, but is not limited to, any report or communication, whether formal or informal, written or oral, received by ADAP, including media accounts, newspaper articles, telephone calls (including anonymous calls) from any source alleging abuse or neglect of an individual.[24]

3.  Probable Cause

Probable cause means reasonable grounds for belief that an individual with a disability has been, or may be at significant risk of being subject to abuse or neglect. ADAP makes this determination basing the decision on reasonable inferences drawn from its experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect.[25]

ADAP's determination of probable cause may result from its monitoring or other activities, including observation by ADAP personnel and reviews of monitoring and other reports prepared by others whether pertaining to individuals disabilities or to general conditions affecting their health or safety.[26]

DYS reserves the right to contest ADAP's statement of probable cause and to file with the appropriate court a motion for injunctive, declaratory or other applicable relief.  Despite the foregoing reservation, ADAP affirms its position that statutory, regulatory and case law hold that a determination of probable cause is within ADAP's discretion alone.

4.  Notice

By statute, regulation and case law, ADAP is not required to give advance notice to access a facility, its employees or to youth served by the facility in order to conduct an investigation of suspected abuse or neglect.[27]  However, as per its previous agreement with

10

DYS, ADAP will provide 72 hours advance written notice to conduct investigatory activities, except in emergency or exigent situations. The notice will include the name of the youth; a statement of ADAP's determination of the youth's eligibility for services under ADAP's enabling statutes; and a brief summary of the facts upon which probable cause is based.[28] The notice will be signed by an ADAP staff member with knowledge of the facts. Notice will be provided to the identified DYS facility staff person.

5.   Hours

ADAP shall endeavor to conduct all investigations during normal business hours. However, in emergency situations, ADAP will have reasonable unaccompanied access at all times necessary to conduct a full investigation of an incident of abuse or neglect, including night and weekend hours.[29]

6.   Where in Facility

During an investigation, ADAP personnel shall have reasonable unaccompanied access to all areas of the facility which are used by youth or are accessible to youth.[30] This authority includes the right to inspect, view and photograph all areas of a facility's premises that might be reasonably believed by ADAP to have been connected with the incident under investigation.[31]

7.   Access to Residents

During an investigation, ADAP personnel shall have reasonable unaccompanied access to youth and facility staff.[32] This access shall include the opportunity: to interview any youth, employee, or other person, including the person thought to be the victim of an incident of abuse or neglect or who might be reasonably believed by ADAP to have knowledge of the incident under investigation.[33]

To encourage dialogue between youth and ADAP staff, DYS may not pre-screen youth before they talk with ADAP staff during an investigation. DYS may not discourage youth from talking to ADAP staff and may not take or imply any action against any youth in retaliation for talking with ADAP. Further, DYS may not conduct post-interview debriefings with youth regarding the nature of their conversations with ADAP though this prohibition is not intended to prevent DYS staff from investigating, per its own policies and procedures, reported incidents of abuse and/or neglect.[34]

8. _Access to Records_

ADAP staff will have access to the records of a youth who is the subject of an investigation being conducted pursuant to this Section. For further information on record access, see Section V.

9. _On-Site Supervision of ADAP Staff_

ADAP shall have private and unaccompanied access to meet and communicate privately with youth.[35]

10. _ADAP Staff Obligations_

ADAP will conduct its investigatory visits in a manner that:

a. minimizes interference with the facility's programs;

b. respects the legitimate privacy interests of youth and facility staff;

c. honors a youth's request to terminate an interview; and

d. honors a DYS staff person's refusal to speak with ADAP for other than routine scheduling or procedural matters.[36]

To protect the safety and rights of individuals with disabilities in DYS facilities, ADAP will, as soon as feasible, advise DYS staff of safety or rights violations revealed through its investigations.

11. _DYS Obligation if Access is Denied or Delayed_

If ADAP access to facilities, programs, residents, or records are denied or delayed, ADAP will promptly notify DYS Legal Counsel. DYS must promptly provide ADAP with a written statement of the reasons for such denial or delay.[37]

## Part V

## Record Access

1.  Request Procedure

 ADAP will provide the facility administrator with a written request for a youth's record. If applicable, the request will include a release signed by the youth's parent or legal guardian.

 ADAP will certify in the written request if the purpose of the record review is in furtherance of an investigation conducted pursuant to Section IV.  In such a situation a release signed by the youth's parent or legal guardian is not required.

 ADAP is not required to provide a conclusive, individualized showing of an individual's disability before being allowed access to the records.

2.  On-site Review

 Upon presentation of the written request, ADAP staff will have immediate access to records which are available at the facility.[38]

 Under no circumstances will ADAP staff remove the original record or any part thereof from the control of the facility or add or make changes to the record.  Any problems with an ADAP staff member's handling of the records should be reported to the ADAP Executive Director.

3.  Photocopies of Records

 Upon request, DYS will provide ADAP photocopies of a resident's records with reasonable promptness.  When feasible, DYS should provide photocopies of records on the same day on which access is provided to the records, but in any event, not more than three (3) working days from the date the request was received.[39]  If a death has occurred or if ADAP asserts probable cause of serious and immediate jeopardy to the health or safety of an individual, copies must be provided to the ADAP staff member making the request within 24 hours.[40]

4.  Definition of Records[41]

 a.  Information and individual records, obtained in the course of providing intake, assessment, evaluation, supportive and other services, including medical records, financial records, and reports prepared or received by a member of the staff of a facility or program rendering care or treatment.

13

b. Reports prepared by individuals and entities performing certification or licensure reviews, or by professional accreditation organizations, as well as related assessments prepared for the facility by its staff, contractors or related entities, except that nothing in this section is intended to preempt State law protecting records produced by medical care evaluation or peer review committees.

c. Discharge planning records.

d. Professional, performance, building or other safety standards, demographic and statistical information relating to the facility.

e. Reports prepared by an agency charged with investigating abuse neglect, or injury occurring at a facility rendering care or treatment, or by or for the facility itself, that describe any or all of the following:

    i. Abuse, neglect, or injury occurring at the facility;

    ii. The steps taken to investigate the incidents;

    iii. Reports and records, including personnel records, prepared or maintained by the facility, in connection with such reports of incidents; or

    iv. Supporting information that was relied upon in creating a report, including all information and records used or reviewed in preparing reports of abuse, neglect or injury such as records which describe persons who were interviewed, physical and documentary evidence that was reviewed, and the related investigative findings.

5. <u>Duty to Maintain Confidentiality of Records</u>

    ADAP will maintain the confidentiality of records and information regarding residents and will only use such information as necessary to fulfill its own duties under the law.

    ADAP will maintain the confidentiality of records provided to it to the same extent as is required of DYS under the laws of both the State of Alabama and the United States of America. ADAP will not release or disclose to a third party any individual records without the authorization of the individual or his/her guardian.

## Part VI

## Miscellaneous

1. Nothing in this protocol shall be construed to bar either DYS or ADAP from seeking injunctive, declaratory or other relief from an appropriate court.

2. ADAP and DYS consent to the following-described procedure for resolving any disputes regarding this agreement:

   a. If either party reasonably believes that the other party is not complying with this agreement, the party will notify the other in writing regarding the nature of the alleged non-compliance and will propose recommended corrective action. Not less than 10 days after the receipt of this notice, the parties shall confer in a good-faith effort to resolve the matter. If they fail to reach an agreement which resolves the dispute, either ADAP or DYS may request that the Court appoint a Mediator.

   b. This procedure shall be deemed a condition precedent to either party's filing of any enforcement motion with the District Court, except that it shall not be construed to bar ADAP from seeking immediate judicial relief upon a reasonable belief that a DYS youth is threatened by an imminent or continuing risk of serious harm, and that DYS cannot, or will not, eradicate or minimize such risk effectively, regardless of prior notice.

   c. For the purpose of this provision, "risk of serious harm" shall refer to an imminent threat to life or personal safety as a result of physical or emotional abuse, extreme neglect, physical injury, sexual exploitation or sexual assault.

3. The parties shall review this protocol annually, on or about April 1.

4. Either party may, with thirty days written notice to the other party, withdraw its consent to be bound by the terms of the protocol.

5. It is the intent of the parties that all issues relating to access by ADAP, statutory or otherwise, to DYS facilities are resolved in this agreement.

## Endnotes

[1] 42 C.F.R. Sec. 51.2.

[2] 42 U.S.C. 15002 § 102.

[3] 29 U.S.C. 794e (a)(1).

[4] ADAP, not DYS, is the arbiter of what individuals served by DYS facilities are eligible for ADAP's services. Moreover, DYS may not require, as a condition of granting access to records or facilities, that ADAP make a definitive showing that particular individuals have a disability. *Kentucky Protection and Advocacy Division v. Hall*, No. 3:01CV-538-H (W.D. Ky. September 24, 2001); *Office of Protection and Advocacy for Persons with Disabilities v. Armstrong*, 266 F. Supp. 2d 303 (D. Conn. 2003).

[5] 45 C.F.R. § 1386.22(g)(2); 42 C.F.R. § 51.42(c)(2).

[6] 45 C.F.R. § 1386.22(g)(1); 42 C.F.R. § 51.42(c)(1).

[7] PAIMI regulation interpretive guidance states that in non-emergency (i.e. non-investigative) situations, advance notice to a facility may be reasonable but the guidance does not describe when it would be appropriate to provide advance notice and no description of what constitutes reasonable notice. 62 F.R. 53561. Cases in which courts have required <u>no</u> advance notice to a facility to conduct monitoring or training activities include: *Pennsylvania Protection and Advocacy, Inc. v Royer-Greaves School for the Blind*, 1999 WL 179797, at *6 (E.D. Pa. March 25, 1999) (P&As shall be afforded access to conduct facility monitoring activities without advance notice); *Robbins v. Budke*, 739 F.Supp. 1479, 1487-88 (D.N.M. 1990) (the P&A's ability to observe conditions to which patients are subject is "seriously hindered by the requirement that any tours of the facility take place only with advance notice and only with an administrative chaperon."). In those situations when courts have required advance notice (with exceptions for emergency situations), that notice has been limited to 24 – 48 hours: *Protection and Advocacy, Inc. v. Freudenthal*, 412 F. Supp. 2d 1211 (D. Wy. 2006) (court-approved access agreement stated that the P&A was required to make monitoring requests in writing at least two business days prior to the intended visit, except in emergencies); *Oregon Advocacy Center v. SCAR/Jasper Mountain et al.*, No. 06-6229-TC (D. Oregon, Dec. 13, 2006) (24-hour advance notice to provider or the written approval of the court in advance of an unannounced monitoring visit).

[8] 45 C.F.R. §1386.22(g); 42 C.F.R. § 51.42(c).

[9] 45 C.F.R. § 1386.22(g)(2); 42 C.F.R. § 51.42(c)(2).

[10] 45 C.F.R. § 1386.22(g)(1); 42 C.F.R. § 51.42(c)(1).

[11] 42 C.F.R. § 51.42(c).

[12] 42 C.F.R. § 51.31(d).  *See* S. Rep. 120, 103rd Cong., 1st Sess. 36, reprinted in 1994 U.S. Code Cong. & Admin. News 164, 199 (stating Congress's intent that P&A access "assure that the most vulnerable

individuals [institutionalized persons] who may not be able to contact the P&A system will have access to protection and advocacy services."

[13] 45 C.F.R. §1386.22(h); 42 C.F.R. § 51.42(d). PADD regulation interpretive guidance notes that many commenters "felt that only by frequent personal contact, without the presence of institutional staff, can the P&A system effectively carry out its mission of protecting the rights and safety of residents. The Department [Substance Abuse Mental Health Services Administration, hereinafter "SAMHSA"] agrees that private and unaccompanied access to clients and other residents should be provided and that, if denied, justification should be required under 51.43. The regulations incorporate a provision which specifies that the system generally shall be permitted unaccompanied access to meet and communicate privately with individuals, informally or formally, without the presence of facility staff." 62 FR 53548-01, 53562. Furthermore, a facility may not generally require that tours be conducted only with an "administrative chaperon." In *Robbins v. Budke*, 739 F.Supp. 1479, 1487-88 (D.N.M. 1990), the court held that such a practice "specifically denies the P&A the ability to investigate complaints about environmental, health or safety violations. P&A's ability to even observe the conditions that patients are subject to is seriously hindered by the requirement that any tours of the facility take place only with advance notice and only with an administrative chaperon." *Mississippi Protection and Advocacy System, Inc. v. Cotten*, 1989 WL 224953, *9 (Final Order S.D. Miss. Aug. 7, 1989), aff'd, 929 F.2d 1054 (5th Cir. 1991 (footnote omitted) ("Only by frequent personal contact with residents, out of the presence of [facility] staff, can [the P&A] effectively carry out its mission of pursuing remedies to protect the rights of [facility] residents and of providing the necessary information to them."). Finally, a facility may not pre-screen P&A requests for access to residents or conduct post-interview "counseling," or otherwise question residents regarding their meetings with the P&A. *See Cotten* at 1057. Such practices "could only create a chilling effect of gigantic proportions. [A facility's] ability to coerce and intimidate many if not most [of its residents] is potent and pervasive." *Id*.

[14] 42 C.F.R. § 51.43.

[15] 45 C.F.R. §1386.22(g); 42 C.F.R. § 51.42(c).

[16] To be eligible for ADAP's individual case advocacy services all four of the following statements must be true: 1) the individual with a disability must be eligible under one of ADAP's programs (Protection and Advocacy for Persons with Developmental Disabilities [PADD], Protection and Advocacy for Persons with Mental Illness [PAIMI], Protection and Advocacy Individual Rights [PAIR], Protection and Advocacy for Assistive Technology [PAAT], and Protection and Advocacy for Persons with Traumatic Brain Injury [PATBI]); 2) the individual's situation must involve the abuse or neglect of a person with disability, a violation of a right granted to a person because that person has a disability, or discrimination

based on disability; 3) accepting the individual's case for advocacy services will further one of ADAP's annual priorities and 4) the individual's situation must meet other case selection criteria, which includes such considerations as the availability of other competent resources to advocate on behalf of the individual (including the individual's ability to pay for other legal services, or the individual's ability to advocate on his/her own behalf); whether there is a realistic prospect of success if the case is selected; the extent to which the potential client will benefit from satisfactory resolution of his/her case; and the likelihood of a favorable impact on the legal rights of other individuals with disabilities.

[17] 45 C.F.R. §1386.22(h); 42 C.F.R. § 51.42(d).

[18] 45 C.F.R. §1386.22(h); 42 C.F.R. § 51.42(d). PADD regulation interpretive guidance notes that many commenters "felt that only by frequent personal contact, without the presence of institutional staff, can the P&A system effectively carry out its mission of protecting the rights and safety of residents. The Department [SAMHSA] agrees that private and unaccompanied access to clients and other residents should be provided and that, if denied, justification should be required under 51.43. The regulations incorporate a provision which specifies that the system generally shall be permitted unaccompanied access to meet and communicate privately with individuals, informally or formally, without the presence of facility staff." 62 FR 53548-01, 53562. Furthermore, a facility may not generally require that tours be conducted only with an "administrative chaperon." In *Robbins v. Budke*, 739 F.Supp. 1479, 1487-88 (D.N.M. 1990), the court held that such a practice "specifically denies the P&A the ability to investigate complaints about environmental, health or safety violations. P&A's ability to even observe the conditions that patients are subject to is seriously hindered by the requirement that any tours of the facility take place only with advance notice and only with an administrative chaperon." *Mississippi Protection and Advocacy System, Inc. v. Cotten*, 1989 WL 224953, *9 (Final Order S.D. Miss. Aug. 7, 1989), aff'd, 929 F.2d 1054 (5th Cir. 1991 (footnote omitted) ("Only by frequent personal contact with residents, out of the presence of [facility] staff, can [the P&A] effectively carry out its mission of pursuing remedies to protect the rights of [facility] residents and of providing the necessary information to them."). Finally, a facility may not pre-screen P&A requests for access to residents or conduct post-interview "counseling," or otherwise question residents regarding their meetings with the P&A. *See Cotten* at 1057. Such practices "could only create a chilling effect of gigantic proportions. [A facility's] ability to coerce and intimidate many if not most [of its residents] is potent and pervasive." *Id.*

[19] 42 C.F.R. § 51.42(d).

[20] 42 C.F.R. § 51.42(c).

[21] 42 C.F.R. § 51.43.

[22] 42 C. F. R. § 51.2.

[23] 45 C.F.R. § 1386.22(f); 42 C.F.R. § 51.42(b).

[24] 42 C. F. R. § 51.2. *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center*, 894 F. Supp. 424, 428 (M.D. Ala. 1995) (The term "complaint" should be construed broadly to ensure full protection of the rights of persons with disabilities. Specifically, the court held that an anonymous message alleging abuse at a facility, which was left on a P&A's telephone answering machine, clearly constitutes a valid "complaint.").

[25] 42 C. F. R. § 51.2. Regulatory history clarifies and courts have found that the P&A is "the final arbiter" regarding the determination of "probable cause" – that is, the determination of probable cause is within the discretion of the P&A alone. *Arizona Center for Disability Law v. Allen*, 197 F.R.D. 689, 692 (D. Ariz. 2000). The PAIMI regulations' preamble at 62 FR 53552 provides that:

> [A] large number of commenters supported the proposal that probable cause be defined as a belief based solely on the independent judgment of the system (advocate, attorney, or other person authorized to act on behalf of the system). Commenters argued further that it be made clear that the system is not required to disclose the basis of its probable cause finding to a facility or to any other third party; their determination should not be subject to review by a facility, authority, or Court or some other third party. The Department [SAMHSA] agrees that the determination of whether sufficient probable cause exists shall be based on the independent judgment of the P&A system (that is, the judgment of the advocate, attorney, or other person authorized to act on behalf of the P&A system)[.]

The legislative history of the P&A statutes supports this conclusion. *See, e.g.*, S. Rep. No. 376, 101st Cong., 2d Sess. 23 (1990), which states that "a system may conclude there is 'probable cause' based on monitoring or other activities." (Emphasis added.) *Mississippi Protection & Advocacy System, Inc. v. Cotten*, 929 F.2d 1054 (5th Cir. 1991); *Maryland Disability Law Center v. Mount Washington Pediatric Hospital*, 664 A.2d 16 (Md. App. 1995); *Robbins v. Budke*, 739 F. Supp. 1479 (D. N.M. 1990); *Ohio Legal Rights Service v. Buckeye Ranch, Inc.*, 365 F. Supp.2d 877 (S.D.Ohio, April 12, 2005); *Protection and Advocacy System, Inc. v. David Freudenthal*, 412 F. Supp. 2d 1211 (D.Wy., 2006).

[26] 42 C. F. R. § 51.31(g).

[27] PAIMI regulations interpretive guidance indicates that advance notice is not required for an investigation of suspected abuse or neglect. 68 F.R. 53548, 53561. *Mississippi Protection and Advocacy System, Inc. v. Cotten*, 1989 WL 224953 (S.D. Miss.), aff'd, 929 F.2d 1054 (5th Cir. 1991) (when a P&A has received a report relating to abuse or neglect, or has a belief that such incident may have occurred, a facility serving persons with developmental disabilities must permit the P&A "prompt access" to its premises "and to all potential witnesses of the abuse or neglect").

[28] *See Maryland Disability Law Center, Inc. v. Mount Washington Pediatric Hospital, Inc.*, 106 Md. App. 55, 664 A.2d 16 (Md. Ct of Special Appeals 1995) (ruling that it would be sufficient, in those cases where the P&A has made a determination of probable cause, that the P&A provide to the facility a certification

that an individual eligible for services has been subject to abuse or neglect or that incidents of abuse or neglect are resulting from a general facility policy and that such a certification need not contain any confidential information regarding specific incidents).

[29] Regulations and case law indicate that access to conduct an investigation shall be as prompt as necessary to ensure an effective investigation and that such an investigations may need to be conducted outside of normal working hours.  The relevant interpretive guidance for section 51.42(b) of the PAIMI regulations states (at 68 F.R. 53561) states:

> "[A] access [shall] be granted at "all times necessary..." to conduct a full investigation, and particularly when the system has determined "probable cause" that there is or may be imminent danger of serious abuse or neglect of an individual with mental illness....[I]mmediate access is necessary with respect to service providers to permit P&As to uncover situations that may involve immediate threats to health or safety. It is also necessary to prevent service providers from concealing situations involving abuse or neglect or taking actions that may compromise evidence related to such incidents (such as intimidating staff or service recipients."

In addressing the P&A's ability to conduct an investigation at any time of the day, the *Cotten* court ruled that when a P&A has received a report relating to abuse or neglect, or has a belief that such incident may have occurred, a facility serving persons with developmental disabilities must permit the P&A "prompt access" to its premises "and to all potential witnesses of the abuse or neglect," including "nighttime hours" if necessary in order to conduct a full and complete investigation).

[30] 45 C.F.R. § 1386.22(f), (g); 42 C.F.R. § 51.42(b), (c), (d).

[31] 45 C.F.R. § 1386.22(f).

[32] 45 C.F.R. § 1386.22(f), (g); 42 C.F.R. § 51.42(b), (c), (d).

[33] 45 C.F.R. § 1386.22(f), (g); 42 C.F.R. § 51.42(b), (c), (d).

[34] 45 C.F.R. §1386.22(h); 42 C.F.R. § 51.42(d).  PADD regulation interpretive guidance notes that many commenters "felt that only by frequent personal contact, without the presence of institutional staff, can the P&A system effectively carry out its mission of protecting the rights and safety of residents. The Department [SAMHSA] agrees that private and unaccompanied access to clients and other residents should be provided and that, if denied, justification should be required under 51.43. The regulations incorporate a provision which specifies that the system generally shall be permitted unaccompanied access to meet and communicate privately with individuals, informally or formally, without the presence of facility staff." 62 FR 53548-01, 53562.  Furthermore, a facility may not generally require that tours be conducted only with an "administrative chaperon." In *Robbins v. Budke*, 739 F.Supp. 1479, 1487-88 (D.N.M. 1990), the court held that such a practice "specifically denies the P&A the ability to investigate complaints about environmental, health or safety violations.  P&A's ability to even observe the conditions

that patients are subject to is seriously hindered by the requirement that any tours of the facility take place only with advance notice and only with an administrative chaperon." *Mississippi Protection and Advocacy System, Inc. v. Cotten*, 1989 WL 224953, *9 (Final Order S.D. Miss. Aug. 7, 1989), aff'd, 929 F.2d 1054 (5th Cir. 1991 (footnote omitted) ("Only by frequent personal contact with residents, out of the presence of [facility] staff, can [the P&A] effectively carry out its mission of pursuing remedies to protect the rights of [facility] residents and of providing the necessary information to them."). Finally, a facility may not pre-screen P&A requests for access to residents or conduct post-interview "counseling," or otherwise question residents regarding their meetings with the P&A. *See Cotten* at 1057. Such practices "could only create a chilling effect of gigantic proportions. [A facility's] ability to coerce and intimidate many if not most [of its residents] is potent and pervasive." *Id.*

[35] 45 C.F.R. §1386.22(h); 42 C.F.R. § 51.42(d).

[36] 42 C.F.R. § 51.42(c).

[37] 42 C.F.R. § 51.43.

[38] 42 C.F.R. § 51.41 (a).

[39] 42 U.S.C. § 15043(a)(2)(j)(i).

[40] 42 U.S.C. § 15043(a)(2)(j)(ii).

[41] 42 C.F.R. § 51.41 (c).